UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re AUSTIN CAPITAL MANAGEMENT,      :   No. 1:09-md-02075-TPG
LTD., SECURITIES & EMPLOYEE           :
RETIREMENT INCOME SECURITY ACT        :   CONSOLIDATED AMENDED CLASS
(ERISA) LITIGATION                    :   ACTION COMPLAINT
                                      :
————————————————————                  :
                                      :
PENSION TRUST FUND FOR OPERATING      :
ENGINEERS, OPERATING ENGINEERS        :
PENSION PLAN, OPERATING ENGINEERS     :
HEALTH AND WELFARE TRUST FUND,        :
RUSSELL E. BURNS, JOHN WITT,          :
MICHAEL J. SULLIVAN, RONALD           :
PALMERICK, LABORERS LOCAL 17          :
PENSION PLAN, DANIEL JACKSON and      :
NEW MEXICO EDUCATIONAL                :
RETIREMENT BOARD, on Behalf of        :
Themselves and All Others Similarly Situated, :
                                      :
                 Plaintiffs,          :
                                      :
        vs.                           :
                                      :
AUSTIN CAPITAL MANAGEMENT LTD.,       :
CHARLES W. RILEY, BRENT A. MARTIN,    :
JAMES P. OWEN, ROBERT WAGNER,         :
DAVID C. BROWN, DAVID E. FRIEDMAN,    :
AUSTIN CAPITAL MANAGEMENT GP          :
CORP, KEYCORP, VICTORY CAPITAL        :
MANAGEMENT, INC., RONALD J.           :
DUGAS, KYLE McDONALD,                 :
MONTGOMERY GREEN, and JAY W. VAN      :
ERT,                                  :
                                      :
                 Defendants.          :

———————————————————— x

Plaintiffs (defined below) bring this class action on their own behalf and on behalf of all other similarly situated persons who: (i) purchased shares in any of the Austin Capital Funds[1] controlled or managed by Austin Capital Management Ltd. ("Austin Capital") or any related entity from January 2, 2005 through December 11, 2008 (the "Class Period") and who suffered losses as a result of Defendants' (defined below) misconduct or who are fiduciaries, participants or beneficiaries of employee benefit plans who purchased such shares; and/or (ii) held shares or a related interest in the Austin Capital Funds – including, but not limited to, employee benefit plans and their fiduciaries – as of December 11, 2008 (together collectively, the "Class").  This action charges the Austin Capital Defendants (defined below) with violations of the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the Employee Retirement Income Security Act of 1974 ("ERISA"), breach of contract, breach of fiduciary duty, unjust enrichment, negligence and violations of state blue sky laws.

The allegations contained herein are based on personal knowledge as to the named lead plaintiffs and non-lead plaintiffs and their own acts, and on information and belief as to all other

---

[1]     "Austin Capital Funds" refers to any investment fund controlled or managed by Austin Capital that invested in any Madoff-related entity, including but not limited to: Austin Capital All Seasons Offshore Fund, Ltd. ("All Seasons"); (2) Austin Capital All Seasons Offshore Fund II, Ltd. ("All Seasons II"); (3) Austin Capital Multi-Strategy Offshore Fund, Ltd. ("Multi-Strategy"); (4) Austin Capital Safe Harbor Portable Alpha Offshore Fund One, Ltd. ("Portable Alpha One"); (5) Austin Capital Safe Harbor Portable Alpha Offshore Fund Two, Ltd. ("Portable Alpha Two"); (6) Austin Capital Safe Harbor ERISA Dedicated Fund, Ltd. ("ERISA Fund"); (7) Austin Capital All Seasons Master Account, G.P. ("All Seasons Master Account"); (8) Austin Capital Safe Harbor Master Account, G.P. ("Safe Harbor Master Account"); (9) Austin Capital Next Generation QP Fund ("Next Generation QP Fund"); (10) Next Generation Offshore Fund; (11) Austin Capital Safe Harbor QP Fund ("Domestic Fund"); (12) Austin Capital All Seasons QP Fund; (13) Austin Capital Safe Harbor Offshore Fund; (14) Austin Capital Safe Harbor ID Fund (insurance dedicated); (15) All Seasons ID Fund (insurance dedicated); (16) Austin Capital Multistrategy QP Fund; and (17) Austin Capital Balanced Fund.

matters based on the investigation by and through counsel, which included the review of complaints filed by the United States of America, the Securities and Exchange Commission ("SEC"), papers and pleadings filed in actions pending in various federal courts, offering memoranda and private placement memoranda distributed to investors, and quarterly and periodic reports issued to potential investors, news reports published in the financial press, auditor reports and other publicly available information.

## NATURE OF THE ACTION

1.      This action arises from the massive breaches of fiduciary duty and misrepresentations by the Austin Capital Defendants, in connection with their loss of millions of dollars of investors' money through investments made in funds controlled by Bernard Lawrence Madoff ("Madoff") and/or his firm Bernard L. Madoff Investment Securities LLC ("BMIS"), including in the Rye Select Broad Market Prime Fund, L.P. ("Rye Select Prime Fund") or similar fund.  Plaintiffs and the Class have lost a significant portion of their overall investments in Austin Capital Funds due to Defendants' misconduct.

2.      As detailed below, Austin Capital Funds turned over substantial portions of their capital to Madoff and/or BMIS.  In the largest Ponzi scheme in history, Madoff and BMIS defrauded investors out of as much as $65 billion.  The Madoff fraud was perpetrated by a network of "feeder funds" that enabled Madoff to evolve from an ordinary asset manager for select individual clients to a wholesale manager of billions of dollars for thousands of fund investors.  Seven of Madoff's top feeder funds had $25 billion in assets invested with him and they, together with the feeder funds that fed into them, received hundreds of millions of dollars in management fees over the years for placing their clients' monies with Madoff and/or BMIS.

3.     While Madoff enticed his investors by offering steady double-digit "returns" in both up and down markets, there were numerous "red flags" that Defendants knowingly, recklessly and/or negligently ignored that indicated that Madoff was not actually employing his stated investment strategy, but instead was engaged in fraudulent behavior such as front-running or an illegal Ponzi scheme and that Austin Capital's investments in Madoff feeder funds were unduly risky and inappropriate.

4.     Importantly, based on these red flags, numerous diligent investment advisors in the industry decided not to invest with Madoff.  Specifically, many investment advisors, investment banks and pension funds – *i.e*., JPMorgan Chase & Co., Fort Worth Employee Retirement Fund and Acorn Partners, a firm which assists its clients in selecting money managers – took the time and effort to conduct proper due diligence reviews, and, as a result of these warning signs, chose ***not*** to invest with Madoff or any of his affiliated funds.  In stark contrast, however, despite representing in their offering memoranda that they would evaluate and monitor all investments, the Austin Capital Defendants failed to conduct a due diligence review necessary to determine whether the Madoff-related funds were appropriate investments and ignored all the red flags that would have revealed that Madoff was a fraud and an unsafe investment for ERISA plan investors.

5.     Upon information and belief, Defendants' due diligence and risk management failures concerning Madoff's role as the sub-manager of the Austin Capital Funds were concealed in all of the promotional and informational materials provided to Class members regarding the Austin Capital Funds.  Plaintiffs and the Class were unaware that their funds were being invested with Madoff and/or his affiliates without proper due diligence.  The failure to disclose this information, and the failure to conduct the promised due diligence and risk management and resulting misrepresentations,

rendered statements in the Austin Capital Funds' offering documents and other materials false and misleading.

6.      Moreover, while some of the materials provided by the Austin Capital Funds included a section on risk factors that described a wide variety of investment strategies employed by the Austin Capital Funds, there was no warning about the risk that the Austin Capital Defendants took in the management of the Austin Capital Funds – entrusting a single sub-manager with sole discretion over the custody and trading of a substantial portion of the funds' net assets without conducting meaningful due diligence into his operations, investments and/or investment strategy.

7.      Plaintiffs and the Class hereby seek to recover damages, as well as all fees and other amounts wrongfully paid to the Austin Capital Defendants.  The management fees paid in error, and based on false information, should also be returned to Plaintiffs and the Class.

## JURISDICTION AND VENUE

8.      These claims arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, under §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), and §§409 and 502(a)(2) and (3) of ERISA, 29 U.S.C. §§1109, 1132(a), as well as under common law.  Jurisdiction is conferred by, and venue is proper pursuant to, §27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. §1331 and §502(e) of ERISA, 29 U.S.C. §1132(e), and pursuant to supplemental jurisdiction.  Defendants used the instrumentalities of interstate commerce and the U.S. mails.

## PARTIES

**Plaintiffs**

9.      Lead Plaintiff Pension Trust Fund for Operating Engineers ("Operating Engineers") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §§1002(37).  As

set forth in its certification previously filed with the Court, and incorporated herein by reference, Operating Engineers purchased and held $164.3 million worth of shares of the ERISA Fund during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby. Operating Engineers is composed of three individual funds, the Operating Engineers Pension Plan, the Operating Engineers Health and Welfare Trust Fund and the Operating Engineers Pensioned Health and Welfare Trust Fund, each of which is a separate legal entity and plaintiff, but is referred to collectively as Operating Engineers. Operating Engineers maintains its principal place of business at 1640 South Loop Road, Alameda, California.

10. Plaintiff Russell E. Burns ("Burns") is a trustee and fiduciary of Operating Engineers within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), asserts claims for violations of 29 U.S.C. §1109 on behalf of Operating Engineers and the Class. Plaintiff Burns is a trustee and fiduciary of each of the three Operating Engineers funds.

11. Lead Plaintiff International Brotherhood of Teamsters Local 705 Pension Fund ("Local 705") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §1002(37). As set forth in its certification previously filed with the Court and incorporated herein by reference, Local 705 purchased and held $25 million of Portable Alpha One shares during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby. Local 705 maintains its principal place of business at 1645 W. Jackson Blvd., 7th Floor, Chicago, IL.

12. Plaintiff John Witt ("Witt") is the Plan Administrating Manager and fiduciary for Local 705 within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), asserts claims for violations of 29 U.S.C. §1109 on behalf of Local 705 and the Class.

13.     Lead Plaintiff Sheet Metal Workers' National Pension Fund ("Sheet Metal Workers") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §§1002(37). As set forth in its certification previously filed with the Court and incorporated herein by reference, Sheet Metal Workers purchased and held $50 million of All Seasons shares during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby.  Sheet Metal Workers maintains its principal place of business at 601 North Fairfax Street, Suite 500, Alexandria, Virginia.

14.     Plaintiffs Michael J. Sullivan ("Sullivan") and Ronald Palmerick ("Palmerick") are trustees and fiduciaries for Sheet Metal Workers within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), assert claims for violations of 29 U.S.C. §1109 on behalf of Sheet Metal Workers and the Class.

15.     Plaintiff Laborers Local 17 Pension Plan ("Local 17 Pension Plan") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §1002(37).  As set forth in its certification, attached hereto as Exhibit A, Local 17 Pension Plan  purchased and held $4 million of ERISA Fund shares during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby.  Local 17 Pension Plan maintains its principal place of business at 451 B Little Britain Road, Newburg, New York 12550.

16.     Plaintiff Daniel Jackson ("Jackson") is the Employee Benefits Administrator and a named fiduciary of and participant in the Local 17 Pension Plan within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), asserts claims for violations of 29 U.S.C. §1109 on behalf of Local 17 Pension Plan and the Class.

17.     Plaintiff New Mexico Educational Retirement Board ("New Mexico ERB") is a public pension plan that manages the benefits of New Mexico's public educational employees.  As

set forth in its certification, attached hereto as Exhibit B, New Mexico ERB  purchased and held $130 million of Domestic Fund shares during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby.  New Mexico ERB maintains its principal place of business at 6201 Uptown Blvd., NE, Suite 204, Albuquerque, New Mexico.

18.     Lead Plaintiffs Operating Engineers, Local 705 and Sheet Metal Workers, and plaintiffs Local 17 Pension Plan, Burns, Witt, Sullivan, Palmerick, Jackson and New Mexico ERB, are collectively referred to herein as "Plaintiffs," and Plaintiffs, with the exception of New Mexico ERB, are referred to herein as "ERISA Plaintiffs."

**Austin Capital Corporate Defendants**

19.     Defendant Austin Capital is a limited partnership, based in Austin, Texas, that oversees hedge fund investment portfolios for individuals and institutional clients.  At some or all times during the Class Period, Austin Capital placed and controlled investments with various entities holding ERISA covered employee benefit plans assets, including: (1) All Seasons; (2) All Seasons II; (3) Multi-Strategy; (4) Portable Alpha One; (5) Portable Alpha Two; (6) ERISA Fund; (7) All Seasons Master Account; (8) Safe Harbor Master Account; (9) Next Generation QP Fund; and (10) Next Generation Offshore Fund.  Austin Capital also placed and controlled investments with the following entities: (11) Domestic Fund; (12) Austin Capital All Seasons QP Fund; (13) Austin Capital Safe Harbor Offshore Fund; (14) Austin Capital Safe Harbor ID Fund (insurance dedicated); (15) All Seasons ID Fund (insurance dedicated); (16) Austin Capital Multistrategy QP Fund; (17) Austin Capital Balanced Fund; and others.[2]  The sole general partner of Austin Capital is Austin

---

[2]     The first ten Austin Capital Funds listed held ERISA plan assets at some or all times during the Class Period.  The last seven Austin Capital Funds may or may not have held ERISA plan assets

Capital Management GP Corp. ("ACM-GP").  The sole limited partner of Austin Capital is KeyCorp.  Both Austin Capital and ACM-GP are wholly-owned subsidiaries of KeyCorp.  As of 2008, Austin Capital had approximately $2.3 billion under management for all of its clients.  Austin Capital is a fiduciary of the Austin Capital Funds within the meaning of §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), in that: (a) it exercised authority or control over the management and disposition of the ERISA covered employee benefit plan assets, including those assets which were, in turn, entrusted to the discretion and control of Madoff; (b) it is an investment manager within the meaning of §3(38) of ERISA, 29 U.S.C. §1002(38), which by definition is a fiduciary; (c) it rendered investment advice for a fee on other compensation, direct or indirect, with respect to those assets; (d) it executed an agreement expressly recognizing its status as a fiduciary within the meaning of ERISA with several of the above named ERISA covered employee benefit plans; and (e) it expressly recognized its status as a fiduciary within the meaning of ERISA in correspondence with several of the above named ERISA covered employee benefit plans.

20.     Defendant AMC-GP is a Texas corporation and the sole general partner of Austin Capital.  ACM-GP is wholly owned by KeyCorp.  By virtue of the control it exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, defendant ACM-GP has, at all relevant times, been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds, and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

---

at some or all times during the Class Period.  Full names of the funds are previously defined in n.1 of footnote one.

21.     Defendant KeyCorp is an Ohio corporation with its principal offices in Cleveland, Ohio, and is the owner of Austin Capital.  KeyCorp is one of the nation's largest bank-based financial services companies, with consolidated assets of approximately $98 billion.  KeyCorp provides investment management services as well as banking and other services to its clients and customers.  During the Class Period, Victory Capital Management, Inc. ("Victory"), a wholly-owned subsidiary of KeyCorp, managed the assets of the Austin Capital Funds.  KeyCorp is the sole limited partner of Austin Capital and sole shareholder of ACM-GP.

22.     As described *infra*, KeyCorp's Executive Vice President and Chief Compliance Officer, Ronald J. Dugas ("Dugas"), is a member of the Austin Capital Board of Directors. Defendant KeyCorp had the authority to exercise, and did exercise, control over Austin Capital's investment management policies and decisions, through its ownership and through the service of KeyCorp executives on Austin Capital's Board of Directors.  Through KeyCorp's exercise of authority or control over the conduct of Austin Capital, it exercised authority or control over Austin Capital's management of the assets invested in the Austin Capital Funds.  By virtue of the authority or control it exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, defendant KeyCorp has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

23.     Defendant Victory is a New York corporation with principal offices in Cleveland, Ohio.  It engages in the business of investment portfolio management.  Victory is wholly owned by KeyCorp, and has served as the asset management subsidiary of KeyCorp since at least 2005. Victory acquired Austin Capital in January 2006.  Victory manages approximately $62 billion in

assets.  Through its ownership of Austin Capital, Victory exercised authority and/or control over Austin Capital's investment policies and decisions on behalf of its owner, KeyCorp.  Through Victory's exercise of authority or control over the conduct of Austin Capital, it exercised authority and/or control over Austin Capital's management of the assets invested in the Austin Capital Funds, also on behalf of its owner, KeyCorp.  By virtue of the authority or control it exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Victory has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and was responsible for managing such assets in accordance with the provisions of ERISA.

24.     The acquisition of Austin Capital allowed KeyCorp and Victory to attract institutional investors while providing crucial scale in assets and operations for Austin Capital.  In fact, Austin Capital's total assets under management skyrocketed after the acquisition in early 2006.

25.     Austin Capital's founder and senior managing director, Charles W. Riley ("Riley"), in a news article published by *American Banker* entitled "Austin Capital Acquisition Pays Off for Victory" dated November 26, 2007, said: "What has really changed is now we're getting a lot more exposure to the institutional world through Victory's institutional marketing people."  He explained that institutional investors avoid smaller funds with higher operational risks, "[b]ut once we were integrated into Victory, those concerns went away.  Because now a very large institution could allocate to us and not be concerned about our business, because they knew we had Victory and KeyCorp backstopping us."

26.     Austin Capital also relied on KeyCorp's $100 million of fiduciary and liability insurance to successfully run its business.  A questionnaire from Marco Consulting Group, an

investment consultant to a number of employee pension plans, asked Austin Capital "what does your firm believe is the most unique aspect of your investment philosophy or process? How does this contribute to your firm's value-added?" Austin Capital responded, stating in part, "[O]ur recent acquisition by KeyCorp and affiliation with its asset management subsidiary, Victory, provides our firm and clients with the benefits of their financial and administrative backing, which allow[s] us to maintain full operational control of the firm and our investment process."

27.    Austin Capital, KeyCorp and Victory also represented and marketed the Austin Capital Funds on the basis of KeyCorp's and Victory's roles as ERISA fiduciaries. These representations made it clear that the Austin Capital Funds and their investors did not just rely on the resources and efforts of Austin Capital, but they also relied on the involvement and oversight of KeyCorp and Victory. The various Austin Capital Funds were sold on the basis of those representations. For example, Austin Capital Safe Harbor Fund presentation materials dated August 24, 2006 promoted the fund on the basis of Austin Capital's status as a subsidiary of KeyKorp and affiliate of Victory. The materials assured investors that the "combination with KeyCorp" benefited the funds by allowing: (1) the opportunity to broaden equity participation within the Austin Capital Investment Team; (2) the ability to leverage the technology spend of a much larger organization; (3) the support of a 29-member Institutional Sales and Client Service Team at Victory; and (4) additional resources in the compliance and finance areas. The same presentation materials specifically identified Victory as part of the Austin Capital Management Team Organization and further identified a five-member accounting team as part of Austin Capital's Administration, Compliance & Control group. An organizational chart included in the materials represented that five professionals from "KeyCorp/Victory Compliance" had compliance responsibilities at Austin Capital and that five professionals from "KeyCorp/Victory Finance Team" were also part of the

Austin Capital Management Team Organization.  Substantially identical representations were made in March 1, 2007 presentation materials.

28.     On December 10, 2007, presentation materials for the Austin Capital Safe Harbor Portable Alpha Offshore Funds, Austin Capital and KeyCorp similarly marketed those funds by touting KeyCorp's oversight of "$6 billion in Taft-Hartley assets" and over "170 Taft-Hartley clients nationwide," together with "A long, proud history of supporting Union Labor."  The presentation materials repeated many of the representations and admissions quoted above and further admitted that Austin Capital's In-house Chief Compliance Officer reported "directly to the Chief Compliance Officer of KeyCorp/Victory Capital Management" and was "Supported by seven compliance officers in Cleveland," (*i.e.*, at KeyCorp headquarters).

29.     On April 22, 2008 presentation materials for the Austin Capital Safe Harbor Fund again repeated the representations concerning KeyCorp's prominence in overseeing ERISA funds and touted its oversight of "$6 billion in Taft-Hartley assets," "170 Taft-Hartley clients," and Victory's role as part of the Austin Capital Management Team.  The sales materials put it succinctly: "Why the Safe Harbor Fund?"  The answer was: "Austin Capital Management's stable, experienced investment team is backed by the significant resources of Victory Capital and KeyCorp."  Indeed, according to the materials, Austin Capital's Chief Compliance Officer had been transferred to Austin Capital from Victory.  Upon information and belief, including the repeated similar representations made over several years, Plaintiffs allege that similar admissions and assurances were made in presentation materials to each of Austin Capital's clients.  By virtue of their involvement in Austin Capital's day-to-day operations, KeyCorp and Victory exercised authority or control over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds.

30.     Defendants Austin Capital, ACM-GP, KeyCorp and Victory are collectively referred to herein as the "Austin Capital Corporate Defendants."

31.     It was common for each of the Austin Capital Corporate Defendants to ignore corporate formalities and structure in their communications with Plaintiffs and the Class. The Austin Capital Corporate Defendants worked in concert with the objective of deceiving Plaintiffs and the Class into purchasing shares of the Austin Capital Funds and maintaining those investments for the purposes of garnering fees and other pecuniary benefits.

**Individual Defendants**

32.     Defendant Riley served during the Class Period as Senior Managing Director and Chief Investment Officer of Austin Capital.  Riley was President of ACM-GP.  He was responsible for coordinating and supervising Austin Capital's research and portfolio construction activities.  As of April 30, 2009, he was reportedly no longer a member of the Board of Directors for various investment vehicles managed by Austin Capital, but remained part of Austin Capital and is still an investment manager to the Austin Capital Funds.  According to Austin Capital's Part II, Form ADV filings with the SEC, Riley managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV).  By virtue of the authority or control Riley exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, defendant Riley has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

- 13 -

33.     Defendant Brent A. Martin ("Martin") served during the Class Period as Senior Managing Director and Chief Investment Officer of Austin Capital.  As of April 30, 2009, defendant Martin was reportedly no longer a member of the Board of Directors for the various investment vehicles managed by Austin Capital, but remained part of Austin Capital and was still an investment manager to the Austin Capital Funds.  According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Martin managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control Martin exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Martin has, at all relevant times, been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

34.     Defendant James P. Owen ("Owen") served during the Class Period as Senior Managing Director of Austin Capital.  According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Owen managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control Owen exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Owen has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

35.     Defendant Robert Wagner ("Wagner") has served as Chief Executive Officer and Chairman of Victory and is a member of KeyCorp Executive Council.  Wagner additionally serves

on the ACM-GP Board of Directors.  According to Austin Capital's Part II, Form ADV filings with the SEC, Wagner managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority and control Wagner exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, defendant Wagner has, since the acquisition of Austin Capital by Victory, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

36.     Defendant David C. Brown ("Brown") has served as Chief Operating Officer ("COO") and Senior Managing Director of Victory since 2004.  Brown additionally serves as a director of ACM-GP.  According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Brown managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control Brown exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Brown has at all relevant times been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

37.     Defendant David E. Friedman ("Friedman") was Managing Director of ERISA Fund and Managing Director and COO of Austin Capital.  According to Austin Capital's Part II, Form ADV filings with the SEC, Friedman managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007

Form ADV.)  By virtue of the authority or control Friedman exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Friedman has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

38.     Defendant Kyle McDaniel ("McDaniel") was Austin Capital's Director of Risk Management from October 2001 to April 2006 and Senior Manager of Risk Review from April 2006 to the present.  Based on Austin Capital's Part II, Form ADV filings with the SEC, McDaniel managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control McDaniel exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, McDaniel has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

39.     Defendant Montgomery Green ("Green") served as Austin Capital's Portfolio Manager from August 1999 to the present.  According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Green managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV).  By virtue of the authority or control Green exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Green has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by

the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

40.     Defendant Jay W. Van Ert ("Van Ert") served as Austin Capital's Portfolio Manager from August 1999 to the present.  According to Austin Capital's Part II, Form ADV filings with the SEC, Van Ert managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control Van Ert exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Van Ert, has at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

41.     Defendant Ronald J. Dugas ("Dugas") is a KeyCorp executive who served on the Board of Directors of Austin Capital.  He is the Executive Vice President and Chief Compliance Officer for KeyCorp.  Starting in 2000, he assumed the risk management responsibilities for the Capital Markets, Asset Management and Treasury Functions under the Risk Management Group of KeyCorp.  According to Austin Capital's Part II, Form ADV filings with the SEC, Dugas managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's July 17, 2009 Form ADV).  By virtue of the authority or control Dugas exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Dugas has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i)

of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

42.     Defendants Riley, Martin, Owen, Wagner, Brown, Friedman, McDaniel, Green, Van Ert and Dugas are collectively referred to herein as the "Individual Defendants."

43.     The Individual Defendants received substantial fees and compensation for their participation in the management of Austin Capital.  Austin Capital received a management fee of 1%-1.5% of the net asset value annually (paid monthly).

44.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Austin Capital Corporate Defendants, controlled the contents of various public statements and investor reports pertaining to Austin Capital during the Class Period. Upon information and belief, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public statements and investor reports detailed herein and is therefore primarily liable for the representations contained therein.

45.     The Individual Defendants, by virtue of their high-level positions with the Austin Capital Corporate Defendants, directly participated in the management of those entities, were directly involved in the day-to-day operations of those entities at the highest levels and were privy to confidential proprietary information concerning those entities and their business, operations, growth, financial statements, and financial condition, as alleged herein.

46.     By virtue of the control that each of the Individual Defendants exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, each of the Individual Defendants was at all relevant times an ERISA fiduciary with

- 18 -

respect to these employee benefit plan assets held by the Austin Capital Funds, and, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

47.     The Austin Capital Corporate Defendants and the Individual Defendants are collectively referred to herein as the "Austin Capital Defendants."

48.     The Austin Capital Defendants received substantial fees for their participation in the management of the Austin Capital Funds.  The Austin Capital Defendants are jointly and severally responsible for the breaches of fiduciary duty alleged herein, in that they constitute an integrated enterprise with shared officers, directors, partners, personnel and other resources for the joint purpose of providing investment management to Class members and/or participated in the breaches of fiduciary duty herein.

49.     Each of the Austin Capital Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit upon Plaintiffs and the Class by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme caused Plaintiffs and the Class to suffer substantial losses in connection with their multi-million dollar investments in the Austin Capital Funds.

50.     It is appropriate to treat the Austin Capital Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed to Plaintiffs and the Class as alleged herein is the collective action of the narrowly defined group of Defendants identified above.  The Austin Capital Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued and approved or ratified these statements, in violation of federal securities laws, ERISA and state common law.

51.     The Austin Capital Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Austin Capital Funds' financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously issued statements that had become materially misleading or untrue so that the value of shares of the Austin Capital Funds would be based upon truthful and accurate information.  The Austin Capital Defendants' misrepresentations and omissions during the relevant period violated these specific requirements and obligations.

**Doe Defendants**

52.     Upon information and belief, Does 1-100 ("Doe Defendants") are individuals or entities whose names and addresses are presently unknown.  Plaintiffs do not know the specific identities of the Doe Defendants at this time; however, Plaintiffs intend to amend this complaint once their identities become known to them.

53.     The Austin Capital Defendants and the Doe Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Madoff and BMIS Perpetrated a $65 Billion Ponzi Scheme**

54.     On December 10, 2008, Madoff allegedly told his two sons that the asset management arm of his firm, BMIS, was a giant Ponzi scheme that had bilked investors out of billions of dollars.  Madoff's sons alerted the Federal Bureau of Investigation and, the following day, Madoff was arrested and charged with violations of the antifraud provisions of the federal securities laws.  The SEC immediately filed an emergency action in this District seeking to cease all ongoing offerings of securities and investment advisory fraud by Madoff and BMIS.  The SEC alleged in its moving papers that:

Madoff is a resident of New York City and is the sole owner of BMIS. BMIS' website indicates that Madoff founded BMIS in the early 1960s and that he is an attorney. Madoff is a former Chairman of the board of directors of the NASDAQ stock market. BMIS is both a broker-dealer and investment adviser registered with the Commission. Madoff [oversees] and controls the investment adviser services at BMIS as [well as] the overall finances of BMIS. The most recent Form [ADV] for BMIS filed in January 2008 with the Commission listed BMIS [as] having over $17 billion in assets under management.

BMIS is a broker-dealer and investment advisor registered in both capacities with the Commission. BMIS engages in three different operations, which include investment adviser services, market making services and proprietary trading. BMIS website states that [it] has been providing quality executions for broker-dealers, banks and financial institutions since its inception in 1960[]; and that BMIS, "[w]ith more than $700 million in firm capital, Madoff currently ranks among the top 1% of US Securities firms."

Since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS. Madoff conducts certain investment advisory business for clients that [are] separate from the BMIS' proprietary trading and market making activities.

Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS. Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS.

In or about the first week of December, Madoff told Senior Employee No. 2 that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so. According to the Senior Employees, they had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.

According to a Form ADV filed by Madoff, on behalf of BMIS, with the Commission on or about January 7, 2008, Madoff's investment advisory business served between 11 and 25 clients and had a total of approximately $17.1 billion in assets under management.

\*       \*       \*

At Madoff's Manhattan apartment, Madoff informed the Senior Employees, in substance, that his investment advisory business was a fraud. Madoff stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." In substance, Madoff communicated to [his] Senior Employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors. Madoff

stated that the business was insolvent, and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be at least approximately $50 billion. One of the Senior Employees has a personal account at BMIS in which several million had been invested under the management of Madoff.

At Madoff's Manhattan apartment, Madoff further informed the Senior Employees that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

55.     On March 12, 2009, Madoff was sent to jail after pleading guilty to 11 felony counts.

An article published in *The Wall Street Journal* on March 13, 2009 entitled "Madoff Jailed After

Admitting Epic Scam" stated, in relevant part, that:

Mr. Madoff pleaded guilty to 11 felony counts and for the first time publicly described how he managed the global, multibillion-dollar Ponzi scheme and concealed it from federal authorities and investors for more than a decade. He pleaded guilty after waiving a grand-jury indictment and criminal trial in hopes of receiving a more lenient sentence from the judge. He faces a maximum sentence of 150 years, but is more likely to get about 20 years in prison, if sentences run concurrently.

U.S. District Judge Denny Chin revoked Mr. Madoff's bail, no longer allowing him to remain in his $7 million Manhattan penthouse where he has been living under 24-hour security guard since mid-December. He was sent directly to jail, pending his sentencing June 16. The decision drew a burst of applause from a crowd of Madoff investors and other spectators in the courtroom.

*       *       *

Mr. Madoff did shed some light on why he started the fraud and whether he knew he would get caught. He said when the fraud started in the early 1990s, he felt "compelled" to give institutional investors strong returns despite the weak stock market and national recession. "When I began the Ponzi scheme I believed it would end shortly and I would be able to extricate myself and my clients from the scheme," he told the court. "However, this proved difficult and ultimately impossible."

56.     Madoff explained how he perpetrated the fraud in his criminal allocution, which

Madoff read in open court on March 12, 2009:

To the best of my recollection, my fraud began in the early 1990s. At that time, the country was in a recession and this posed a problem for investments in the securities markets. Nevertheless, I had received investment commitments from certain institutional clients and understood that those clients, like all professional

- 22 -

investors, expected to see their investments out-perform the market. While I never promised a specific rate of return to any client, I felt compelled to satisfy my clients' expectations, at any cost. I therefore claimed that I employed an investment strategy I had developed, called a "split strike conversion strategy," to falsely give the appearance to clients that I had achieved the results I believed they expected.

Through the split-strike conversion strategy, I promised to clients and prospective clients that client funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index, a collection of the 100 largest publicly traded companies in terms of their market capitalization. I promised that I would select a basket of stocks that would closely mimic the price movements of the Standard & Poor's 100 Index. I promised that I would opportunistically time these purchases and would be out of the market intermittently, investing client funds during these periods in United States Government-issued securities such as United States Treasury bills. In addition, I promised that as part of the split strike conversion strategy, I would hedge the investments I made in the basket of common stocks by using client funds to buy and sell option contracts related to those stocks, thereby limiting potential client losses caused by unpredictable changes in stock prices. In fact, I never made the investments I promised clients, who believed they were invested with me in the split strike conversion strategy.

To conceal my fraud, I misrepresented to clients, employees and others, that I purchased securities for clients in overseas markets. Indeed, when the United States Securities and Exchange Commission asked me to testify as part of an investigation they were conducting about my investment advisory business, I knowingly gave false testimony under oath to the staff of the SEC on May 19, 2006 that I executed trades of common stock on behalf of my investment advisory clients and that I purchased and sold the equities that were part of my investment strategy in European markets. In that session with the SEC, which took place here in Manhattan, New York, I also knowingly gave false testimony under oath that I had executed options contracts on behalf of my investment advisory clients and that my firm had custody of the assets managed on behalf of my investment advisory clients.

To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations. I knew those false confirmations and account statements would be and were sent to clients through the U.S. mails from my office here in Manhattan.

Another way that I concealed my fraud was through the filing of false and misleading certified audit reports and financial statements with the SEC. I knew that these audit reports and financial statements were false and that they would also be

sent to clients. These reports, which were prepared here in the Southern District of New York, among things, falsely reflected my firm's liabilities as a result of my intentional failure to purchase securities on behalf of my advisory clients.

Similarly, when I recently caused my firm in 2006 to register as an investment advisor with the SEC, I subsequently filed with the SEC a document called [] Form ADV Uniform Application for Investment Adviser Registration. On this form, I intentionally and falsely certified under penalty of perjury that Bernard L. Madoff Investment and Securities had custody of my advisory clients' securities. That was not true and I knew it when I completed and filed the form with the SEC, which I did from my office on the 17th floor of 855 Third Avenue, here in Manhattan.

In more recent years, I used yet another method to conceal my fraud. I wired money between the United States and the United Kingdom to make it appear as though there were actual securities transactions executed on behalf of my investment advisory clients. Specifically, I had money transferred from the U.S. bank account of my investment advisory business to the London bank account of Madoff Securities International Ltd., a United Kingdom corporation that was an affiliate of my business in New York. Madoff Securities International Ltd. was principally engaged in proprietary trading and was a legitimate, honestly run and operated business. Nevertheless, to support my false claim that I purchased and sold securities for my investment advisory clients in European markets, I caused money from the bank account of my fraudulent advisory business, located here in Manhattan, to be wire transferred to the London bank account of Madoff Securities International Limited.

There were also times in recent years when I had money, which had originated in the New York Chase Manhattan bank account of my investment advisory business, transferred from the London bank account of Madoff Securities International Ltd. to the Bank of New York operating bank account of my firm's legitimate proprietary and market making business. That Bank of New York account was located in New York. I did this as a way of ensuring that the expenses associated with the operation of the fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making businesses.

In connection with the purported trades, I caused the fraudulent investment advisory side of my business to charge the investment advisory clients $0.04 per share as a commission. At times in the last few years, these commissions were transferred from Chase Manhattan bank account of the fraudulent investment advisory side of my firm to the account at the Bank of New York, which was the operating account for the legitimate side of Bernard L. Madoff Investment Securities – the proprietary trading and market making side of my firm. I did this to ensure that the expenses associated with the operation of my fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making businesses. It is my belief that the salaries and bonuses of the personnel involved in the operation of the legitimate side of Bernard L. Madoff

Investment Securities were funded by the operations of the firm's successful proprietary trading and market making businesses.

57.     On June 29, 2009, Madoff was sentenced to 150 years in prison. An article published in *The Wall Street Journal* on June 30, 2009 entitled "'Evil' Madoff Gets 150 Years in Epic Fraud" stated, in relevant part, that:

> Bernard Madoff, the self-confessed author of the biggest financial swindle in history, was sentenced to the maximum 150 years behind bars for what his judge called an "extraordinarily evil" fraud that shook the nation's faith in its financial and legal systems and took "a staggering toll" on rich and poor alike.
>
> The landmark sentence, one of the stiffest ever given for a white-collar crime, came just six months after Mr. Madoff, a pioneer on Wall Street, allegedly told his sons that his entire business was a massive Ponzi scheme. The penalty sparked a burst of applause in a courtroom packed with victims of the fraud.

58.     Madoff perpetrated his fraudulent scheme through his New York and London offices, where directors and shareholders included family members and associates of Madoff. Madoff used his London office to launder over $250 million of client monies generated by his New York investment advisory business. The money was first transferred to London and then transferred back to the New York office to benefit Madoff personally and BMIS. These transfers gave the appearance that Madoff was trading his clients' monies in Europe – a false claim that Madoff proffered when probed by investors about his trading strategy.

59.     Shortly after Madoff's guilty plea, Madoff's auditor, David Friehling ("Friehling"), was charged by federal prosecutors with falsely certifying that he audited financial statements for BMIS. According to an article in *The Wall Street Journal* published on March 19, 2009 entitled "Accountant Arrested for Sham Audits," Friehling knowingly and improperly rubberstamped Madoff's financial statements without conducting a comprehensive audit:

> In the criminal complaint against Mr. Friehling, a Federal Bureau of Investigation agent said the auditor didn't verify the existence of assets that Mr. Madoff said he held or securities trades Mr. Madoff said he made. The agent also

- 25 -

said Mr. Friehling didn't examine a bank account through which billions of dollars of client funds flowed, among other things.

Mr. Friehling, 49 years old, was the sole auditor at Friehling & Horowitz, a storefront accounting firm in New City, N.Y., a New York City suburb. The government said he audited Mr. Madoff's financial statements since 1991. Since Mr. Madoff's arrest, auditing experts not involved in the case have said they were skeptical that one individual could have audited such a big company. Mr. Madoff's firm, which had several businesses, including a division that facilitated securities trades between investors, had $1.1 billion in assets, according to 2007 financial statements prepared by Mr. Friehling that were reviewed by The Wall Street Journal.

In a separate civil complaint that mirrored the criminal charges, the SEC also alleged that Mr. Friehling and his family had investment accounts at the Madoff firm worth more than $14 million, a "blatant" conflict of interest that violated auditing rules, according to the complaint. He and his family withdrew at least $5.5 million since 2000, the SEC said.

60.     On November 3, 2009, Friehling pleaded guilty to securities fraud, aiding and abetting investment advisor fraud, three counts of obstructing or impeding the administration of Internal Revenue laws and four counts of making false filings with the SEC. He admitted that he failed to conduct independent audits of BMIS's financial statements, saying he took the information given to him by Madoff or Madoff's employees at "face value."

61.     A reasonable due diligence inquiry into Madoff auditor's accounting practices would have alerted a reasonable investor to the Madoff Ponzi scheme. According to an opinion piece by the *Business Mirror*, published on March 25, 2009 entitled "Missing An Easy Clue," it is "Due Diligence 101" to inquire into the auditor's accounting practices:

Investors may have avoided about $74 billion in losses if they had examined – or just tried to shake hands with – accountants supposedly verifying the books.

"Due Diligence 101 should demand that you check out the auditing firm and find out if it exists," said Richard Dietrich, an accounting professor at Ohio State University in Columbus. "Then, you have to find out if they are qualified."

                    *        *        *

"Too many Larry, Moe & Curly accounting firms" are now auditing money managers, said James Cox, a law professor at Duke University in Durham, North

Carolina. "While we made progress with accounting for reporting companies, we have not with investment advisers."

*     *     *

Money managers should be required to disclose to regulators who audits their books, handles their trades and has custody of their assets, Cox said. Fund managers typically disclose those details privately to investors, who may try to independently verify them. Many don't.

Friehling, Madoff's accountant, operated from an office in the Georgetown Office Plaza, sandwiched between a medical practice and a pediatrician's office. Prosecutors and the SEC said Friehling, 49, vouched for Madoff's books without taking meaningful steps to verify them.

62.     Madoff feeder funds and sub-feeder funds have already been punished by numerous authorities for bilking investors of their entire investments and for the wholly unearned and unjust management fees that they levied on investors for merely handing over their clients' investment assets to Madoff. The Austin Capital Defendants' actions have mirrored the behavior of these other feeder funds, wherein they failed to perform adequate due diligence and concealed the fact that investments made on behalf of the Austin Capital Funds (and investors in those funds) were sub-managed by Madoff. Many members of the Class lost significant sums of money due to this misconduct and Defendants have been unjustly enriched in the form of undeserving management and administrative fees.

**The Investments of the Austin Capital Funds**

63.     Austin Capital invested in the Rye Select Prime Fund, managed by Tremont Group Holdings, Inc., Tremont Partners, Inc. and Tremont (Bermuda) Limited (collectively "Tremont"). The Austin Capital Defendants' initial investment with Madoff occurred in 1997.

64.     Tremont served as a nominal investment manager to the Rye Select Prime Fund, but all investment decisions and all trades were "executed" by Madoff. Madoff was also the custodian of all the securities owned by the funds he managed.

65.     Despite knowingly investing with Madoff, and despite representing that they would perform active due diligence and investment monitoring, the Austin Capital Defendants recklessly failed to conduct meaningful due diligence investigation into Madoff or BMIS and failed to oversee capital investment.  Instead, the Austin Capital Defendants lost more than $180 million of Plaintiffs' and the Class' money invested in the Austin Capital Funds, which invested in Madoff through the Rye Select Prime Fund.

66.     The loss of Class assets was foreseeable in light of the numerous red flags concerning Madoff's operations and the significant risk that Madoff was misappropriating investor funds.  The materialization of this significant risk caused the loss of Class assets.  In addition, Defendants' misstatements and omissions described herein concealed the risk that Madoff was a fraud.  Absent the concealment, Plaintiffs and the other Class members would have been spared all or a substantial portion of the loss.

### False and Misleading Statements Concerning Austin Capital's Purported Due Diligence, Risk Management Practices and Financial Performance

67.     The Austin Capital Defendants uniformly promoted Austin Capital's due diligence procedures to potential investors in meetings and presentations.  The presentations, including the representations set out in this and the following paragraph, were made to the New Mexico ERB on or about August 24, 2006, to the Laborer's District Council of Western Pennsylvania Welfare and Pension Fund on or about December 10, 2007, to the Operating Engineers on or about April 22, 2008 and to the Local 705 on or about August 3, 2007.  On information and belief, Plaintiffs allege that a substantially identical presentation was made as a matter of course to all Austin Capital Fund investors.  In a section of the presentations entitled "Due Diligence," Austin Capital described its extensive initial due diligence procedure at length as requiring the following:

- "Substantially complete Due Diligence Questionnaire."

- An "On-site visit with investment team to review manager's investment process, portfolio construction, risk management and liquidity."

- A "Detailed review of how manager prices investments."

- "Meet and evaluate back-office personnel and processing."

- "Evaluate the health of the manager business with core focus on compensation."

- "Thoroughly review offering docs & audits."

68.     In the same presentations, the Austin Capital Defendants similarly assured investors that Austin Capital followed extensive and ongoing risk management practices which included understanding the following:

- Understanding of portfolio management guidelines of underlying hedge fund managers (max position size, risk budge, volatility bands, drawdown sensitivity).

- Analysis of operational capabilities of underlying hedge fund managers.

- Portfolio-level analysis (manager correlations, gross/net exposures, sector/region exposures, factors, leverage).

- Aggregate exposure to individual underlying securities.

- Scenario analysis (performance in historically stressful markets, e.g. Summer 1998, April/May 2005).

- Complete understanding of valuation methodology of underlying hedge fund, including role of administrator and prime broker in valuation process.

- Is the underlying hedge fund manager running a profitable, successful business?

- Policies and procedures of the underlying hedge fund managers.

- Agreements with service providers.

- Liquidity risk at strategy level.

69.     The Austin Capital Defendants similarly made uniform misrepresentations to Plaintiffs and other investors in the offering memoranda for the various funds that they marketed.

For example, in the November 1, 2007 Offering Memorandum for the Austin Capital Safe Harbor

ERISA Dedicated Fund, Ltd., Defendants stated that:

**Advantages of Investing in the Fund**

*        *        *

- [p]rofessional selection and monitoring of hedge fund managers by the Investment
  Manager . . . .

*        *        *

**Investment Manager Evaluation and Selection Criteria**

The Investment Manager will utilize its experience in evaluating and
selecting hedge fund managers and private investment partnerships. . . .

*        *        *

- The hedge fund manager should invest a majority of his own investment capital in
  the same pool of funds that he invests for his investors. This is intended to minimize
  possible conflicts of interest and to keep the hedge fund manager focused on
  managing the investment partnership.

- The hedge fund manager's primary compensation should be based on profits (usually
  20% of profits) generated for investors. This is intended to focus the hedge fund
  manager on generating positive returns regardless of the direction of the stock
  market.

- The compensation of the hedge fund manager should be subject to a "high water
  mark" which requires that investors recoup any net losses before the hedge fund
  manager shares in the profits of the hedge fund.

*        *        *

- The hedge fund manager should be knowledgeable, focused and dedicated with a
  clearly defined investment strategy. This is intended to aid the Investment Manager
  in selecting a diversified group of hedge fund managers.

*        *        *

- The hedge fund manager should run a "good shop." He should be well organized
  and employ highly competent individuals in all key positions.

- The private investment partnership managed by the hedge fund manager must be
  audited by a well-known, reputable certified public accountant firm. Recent audited
  financial statements should be available for review.

*        *        *

- 30 -

[N]o exception will be made to the requirement of annual audited financial statements.

*       *       *

This requires the Investment Manager to monitor investments and determine whether to modify the investment strategies and retain or terminate hedge fund managers.

Substantially identical misrepresentations were made in the December 1, 2003 Offering Memorandum for the Austin Capital All Seasons Offshore Fund, Ltd. and in the May 1, 2006 Offering Memoranda for the Austin Capital All Seasons Offshore Fund, Ltd. Upon information and belief, Plaintiffs allege that these same standard misrepresentations were made as a matter of course in each of the offering memoranda that the Austin Capital Defendants published throughout the Class Period.

70.      The representations made in the presentation materials and offering memoranda were false and misleading. Contrary to those representations, Madoff had not invested a majority of his own capital in the Rye Select Prime Fund. In addition, Madoff's primary compensation was not based on profits generated for investors, but instead was based on market rate commissions, inexplicably causing Madoff to forgo hundreds of millions of dollars in potential fees and without being subject to any "high water mark" to allow investors to recoup losses. Nor did Madoff apply a clearly defined investment strategy, but instead insisted on secrecy. In fact, all competent investment professionals who attempted to replicate or even understand Madoff's purported investment strategies concluded that the strategy was unworkable, that Madoff was likely doing something else or that Madoff was in fact perpetrating a fraud. Nor was there any reason to believe that Madoff was running a good shop. Instead, key positions were held by family members, Madoff's SEC filing admitted that he only relied on approximately five people to run the consulting business and the business lacked technology as rudimentary as email communication with clients. Finally, Madoff was not audited by a well-known, reputable accounting firm, but instead was audited

by a no-name firm with a single active auditor. Indeed, after Madoff was arrested, the government auditor who examined the purported audit papers quickly determined, within a few hours, that no audits had in fact been conducted of Madoff's business.

71.     In addition, the Austin Capital Defendants falsely assured investors that their initial due diligence involved onsite visits to and background checks of the investment manager and that they visited each of the Austin Capital Funds' asset managers at least once, but generally twice a year as part of their on-going risk management, including a visit by the Austin Capital Fund's portfolio manager to review investment issues and a visit by the fund's risk manager to evaluate the asset manager's back office, operations and technology.

72.     For example, in an April 11, 2007 response to a Request for Information on behalf of Operating Engineers, Austin Capital represented that:

> **Prior to selecting a hedge fund manager, what organizational/structural due diligence occurs as it relates to the manager's operations/accounting/reporting, back office functions, and background checks.  Please discuss whether you use any third parties to assist in this process.**
>
> There are three ways that we perform due diligence on managers, prior to investing, that is unrelated to the manager's investment process.  First, Kyle McDaniel, our Risk Manager, will travel to the prospective manager's office, often with the Portfolio Manager, to conduct his own due diligence of operations, accounting, technology and various back office functions.  In doing so, he is attempting to identify all business risk associated with the firm.  Second, we will call on industry contacts that have had or still do have relationships with the prospective manager to assess their opinions and form a more unbiased perspective on the manager's business operations.  Finally, we employ Fidelifacts to conduct formal background checks on all the principals of a prospective manager.
>
> *          *          *
>
> **Describe the process for communicating with managers once they are hired. How often do you normally meet with the hedge fund managers and what does the agenda include?**
>
> Once a new manager is hired, our communication process becomes regimented in that we schedule formal quarterly updates calls as well as office visits at least once a year by both the portfolio manager and the risk managers (separate visits, if

possible).  In addition, the portfolio manager typically speaks with each manager at least once or twice a month via email or telephone to discuss anything from performance to new business developments.  This combination of formal and informal communications helps us to build a more complete picture of the manager and gives us more insight into their portfolio.

73.    The Austin Capital Defendants made similar representations in a Request for Proposal response to Massachusetts Pension Reserves Investment Management Board ("Mass PRIM"), and in their initial due diligence meetings with New Mexico ERB, Plaintiffs alleged upon such information and belief, that the Austin Capital Defendants made similar uniform representations in their initial meetings with each of their investors.

74.    Contrary to the Austin Capital Defendants' representations, however, Friedman, McDaniel and Van Ert admitted during conference calls on December 12 and 16, 2008 with the Mass PRIM, as reflected by that investor's official minutes, that their last on-site due diligence review of Madoff had been in late 2005.

75.    Similarly, in December 11 and 17, 2008 telephone calls with representatives of Investment Performance Services, a professional investment advisor, McDaniel and Van Ert admitted that Austin Capital had relied on Tremont to conduct the initial due diligence and ongoing risk management and had failed to conduct its annual risk management reviews.  McDaniel and Van Ert further admitted that they were aware that Madoff's operation acted as its own asset custodian, supplying its own asset records and relied on its own brokerage operations, which generated its own trade documentation.  McDaniel further admitted that although Austin Capital has visited or called Tremont various times over the life of the investment, he was only able to identify a single instance, in 2005, when he had visited Madoff.

76.    Notwithstanding the purported due diligence and risk management procedures that the Austin Capital Defendants represented to Plaintiffs and the Class that they undertook, the Austin

Capital Funds invested in the largest Ponzi scheme in history.  This is due to the fact that the Austin Capital Defendants turned a blind eye to the numerous red flags that indicated that Madoff's operations were fraudulent.  Defendants further induced Plaintiffs and members of the Class into investing with them while concealing their failure to carry out the due diligence and investment monitoring they represented to undertake.  Defendants pursued and persisted in this wrongful course of conduct in order to reap the inflated management fees that were available only through investing with Madoff.

77.     Tremont and Madoff touted consistent returns and a strong investment strategy – i.e., the split-strike conversion strategy – to the Austin Capital Defendants.  Instead of conducting a meaningful due diligence, including a risk management review of Madoff-controlled funds, the Austin Capital Defendants touted the investment strategy and consistent returns offered by the Austin Capital Funds.  Because the Austin Capital Defendants both defrauded investors and breached their fiduciary duties to the Class, all of the assets that Austin Capital allowed to be invested with Madoff were lost.

78.     Had the Austin Capital Defendants performed the adequate and comprehensive due diligence review of Madoff and BMIS that they promised investors they would undertake, they would have confirmed the significant risks of investing with Madoff.

79.     In stark contrast to the promises made, the Austin Capital Defendants utterly failed to conduct a meaningful due diligence review into whether Madoff was actually making trades, or whether he was instead holding assets in order to pay redemption requests by more senior investors.  The Austin Capital Defendants were aware, having received for example Rye Broad Markets' Relationships Overview, but did not question the fact that Madoff was both the custodian of the assets and the executing broker.  In other words, even if Austin Capital did check the custodian's

records against the broker's records, it would have been in essence checking one piece of information received from Madoff against other information received from Madoff. This lack of third-party corroboration should have dissuaded the Austin Capital Defendants from investing with Madoff through the Rye Select Prime Fund.

80.     Throughout the Class Period, the Austin Capital Defendants also made repeated false representations concerning the performance and asset value of the Austin Capital Funds that were invested in the Rye Select Prime Fund. False or misleading performance and numbers were reported in the presentation materials for the Austin Capital Funds, including the Performance Analysis sections, and in Austin Capital's monthly Performance Update reports. Those representations were false and misleading because the asset values listed for the Austin Capital Funds did not account for the fraudulent values attributed to those assets by Madoff and/or BMIS. Similarly, the misrepresentations for each of the Austin Capital Funds would necessarily have been closely uniform since the undisclosed loss for any particular fund would be the same for each investor in that fund.

81.     Despite the numerous "red flags," the Austin Capital Defendants determined to keep investor money in the Austin Capital Funds invested in Madoff through Rye Select Prime Fund.

82.     The Austin Capital Defendants recklessly relied on the due diligence efforts of Tremont and others. The Austin Capital Defendants, however, were fiduciaries who had their own fiduciary obligations, which included the duty to conduct their own adequate due diligence on Madoff. The Austin Capital Defendants shirked these fiduciary duties and are directly responsible for the losses suffered by the Class.

**Despite Numerous "Red Flags," Defendants Failed
to Perform an Adequate Due Diligence Review**

83.     Austin Capital's marketing materials repeatedly touted the firm's extensive due diligence, risk management and investment monitoring practices.

84.     In fact, however, Defendants failed to conduct the due diligence necessary to protect the capital invested in the Austin Capital Funds by Plaintiffs and the Class and instead exposed these investments to the largest Ponzi scheme in history, imprudently and indeed recklessly causing significant losses.

85.     Defendants did not attempt to perform appropriate due diligence on their ultimate investment in Madoff; had they done so they would have learned that Madoff did not respond fully and candidly to routine requests for information, and provided inconsistent and demonstrably false explanations for the huge options volume he purportedly traded in order to implement his ostensibly hedged investment strategy.   Hedge funds are complex investment funds that often lack transparency, and the mere disclosure of a fund's investment holdings would not adequately reveal the types and magnitudes of risks that a hedge fund manager undertakes.   Accordingly, the unique and complex nature of hedge funds requires a level of robust, proactive due diligence above and beyond what is required for more transparent investments that are strictly regulated.

86.     Particular care must be exercised in due diligence of hedge managers and their funds, because of: (i) their more complex investment strategies; (ii) the possibilities of concentrated exposure to market and counterparty risks; (iii) their use of leverage and the associated risks; and (iv) the minimal regulation of these firms.  Funds of funds, such as Austin Capital, have a fiduciary duty to understand how a hedge fund or hedge fund manager may perform in a variety of future scenarios, and to review its organizational culture, internal economic incentives and conflicts of interest.

87.     On the flipside of the "due diligence coin," monitoring a hedge fund or a hedge fund manager is a continuation of the initial, fiduciary-grounded due diligence process.  While the initial due diligence serves to qualify a hedge fund as a desirable investment, the ongoing risk management monitoring process continually and periodically reconfirms that the conclusions and assumptions used in the initial evaluation and selection remain valid.  Fiduciaries, as well as institutional investment staff and consultants, must take reasonable steps to identify any events or circumstances that may result in the hedge fund/hedge fund manager failing to meet the standards and expectations that were originally required in the selection process.

88.     Funds of hedge funds are a common entry point for institutional investors to invest in alternative investments such as hedge funds because they provide diversity within that investment class, and because their managers perform the necessary due diligence in connection with each underlying hedge fund investment.  These are important factors to conservative institutional investors such as Plaintiffs and other members of the Class.  In fact, superior qualitative judgment and quantitative analysis often distinguish hedge fund investment managers from one another.  Managers of funds of funds, such as Austin Capital, are expected to perform in-depth due diligence on their underlying hedge fund investments.

89.     In fact, Harry Markopolos ("Markopolos"), a former money manager based in Boston, started complaining to the SEC in 2000 that Madoff was committing fraud of some sort – either front-running his clients' money or operating a Ponzi scheme.  In a 19-page document sent to the SEC in November 7, 2005, entitled "The World's Largest Hedge Fund is a Fraud," he argued that it was impossible for Madoff's firm to collect as much money as it did from feeder funds and still execute his purported split-strike strategy, and identified 29 "red flags" that should have caused

investment managers to further investigate Madoff's operations to dispel these warning signs or decide not to invest with Madoff and/or BMIS. These "red flags" included:

(a)     **Madoff's Fund Structure:** Unlike most private pooled investments where the investor is charged a fee by a fund manager, most investors with Madoff were invested in secondary fund of funds, such as Tremont, and were charged management fees by the respective fund of funds, but not by Madoff. Notwithstanding the fact that Madoff could easily have collected management or performance fees, Madoff chose to forgo hundreds of millions of dollars in fees, and only collected "market rate" commissions charged on each trade;

(b)     **Madoff's Secrecy:** Madoff insisted on a policy of secrecy, rather than transparency, regarding his purported management of investments. Madoff's purported returns went unverified. Madoff's trade tickets also went unverified. In fact, Defendants could have confirmed that Madoff's trade tickets were fraudulent had Defendants just asked to see them to compare them to information available from the Option Price Reporting Authority ("OPRA"), as discussed *infra*;

(c)     **Impossible Options Volume:** The total amount of call options outstanding was not nearly enough to generate $50 billion of assets under management. Moreover, the price percentages at which Madoff claimed to purchase the put options were unreasonably underpriced, and "there [were] not enough index option put contracts in existence to hedge the way [Madoff said] he [was] hedging." In particular, the S&P 100 Index options that Madoff purported to trade could not handle the reported trading volume. A report from Bloomberg estimated that Madoff's strategy would have required at least ten times the S&P 100 Index option contracts that traded on U.S. exchanges. Testifying before the House Committee on Financial Services on February 4, 2009, Markopolos explained that any hedge fund manager should have been able to determine that Madoff was a fraud based solely on the basis of analyzing options volumes. Taking into account only the

size of the investment in Madoff and his purported strategy through the Rye Select Prime Fund managed by Tremont, it should have been apparent that the options volume on the S&P 100 Index to implement the strategy simply did not exist;

(d)    **Compelling Media Releases that Questioned Madoff's Strategy:** On May 7, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," which listed numerous "red flags" including the specious double-digit returns using the "split-strike conversion" strategy.  Also, a May 2001 article in *MAR/Hedge* entitled "Madoff tops charts; skeptics ask how" identified many financial professionals who questioned the source and consistency of Madoff's returns;

(e)    **Impossibly Low Correlation to the Market:** The performance of a fund that actually employs a "split-strike conversion" strategy would track the market's performance.  In contrast, Madoff consistently created double-digit returns for his investors. For example, as of 2001, Fairfield Sentry, a fund of funds invested primarily in Madoff, had only four months of losses since its inception in 1989.  As Markopolos explained in his 2005 memo to the SEC, "It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market [as measured by the fund's beta ] where its returns are supposedly being generated from.  This makes no sense!"  In plain English, if a manager pursues a strategy of investing in a diversified basket of stocks hedged by index puts to limit his downside risk, he should expect to decline less than the market in a sharply declining market, but he will not actually produce significant gains in such a market.  Nevertheless, while purporting to follow just such a strategy, in months and quarters where the S&P 100 declined, Madoff claimed that his portfolio actually produced substantial gains, requiring the conclusion that he was lying about the true nature of his strategy;

(f)     **Madoff's Illegal Manipulations:** Madoff boasted to several feeder funds that he subsidized returns in down quarters to maximize reported performance and minimize risk, which in and of itself is an illegal manipulation of his accounting books and records;

(g)     **Madoff's Auditor was Obscure and Ill-equipped:** Madoff was audited by a small auditor in Rockland County, New York, Friehling & Horowitz ("F&H"), a three-employee accounting firm, as opposed to the 90% of single strategy hedge funds that are audited by one of the top ten auditoring firms.  F&H's staff consisted of Jerome Horowitz (a partner who lived in Miami), a secretary and one active accountant, Friehling.  Additionally, while F&H purportedly audited BMIS, F&H had filed annual forms with The American Institute of Certified Public Accountants ("AICPA") attesting that it had not performed audits for the past 15 years.  The AICPA conducted an ethics investigation into F&H and announced that, as a result, it had expelled Friehling.  Federal investigators have issued a subpoena to F&H and have requested documents going back to 2000; Friehling was arrested by authorities for his improper audits and faces up to 100 years in prison if convicted of the felony charges levied against him;

(h)     **Lack of a Third Party Custodian and Administrator:** Madoff did not use an independent custodian.  By both directing trades as money manager and keeping track of the funds as custodian, Madoff was in a unique position to be able to falsify his accounting records.  Additionally, the comptroller of BMIS was based in Bermuda, while most mainstream hedge fund investment advisers have their comptroller in-house;

(i)     **Madoff's Family-Run Operation:** The Madoff family held high positions with the NASD, NASDAQ, SIA, DTC and other prominent industry bodies, and accordingly, these organizations would not be inclined to doubt or investigate Madoff or BMIS.  Only Madoff family members were privy to his investment strategy, and key positions of control at BMIS were held by

members of the Madoff family.  Madoff's brother, Peter Madoff, was a senior managing director, head of trading and chief compliance officer for BMIS on the broker-dealer business.  Madoff's nephew, Charles Wiener, served as the director of administration.  Madoff's oldest son, Mark, was the director of listed trading.  His youngest son, Andrew, was director of NASDAQ trading.  Madoff's niece served as the in-house legal counsel and rules compliance attorney on the broker-dealer side of the business.  As noted by a due diligence team from Société Générale's investment bank, a European bank that internally blacklisted Madoff and prohibited the bank from doing business with him, the fact that Madoff's brother, Peter, was the chief compliance officer at BMIS was a significant red flag that informed its decision to avoid Madoff entirely;

      (j)     **Madoff's Incoherent 13F Filings:** Investment managers who manage over $100 million or more of assets are required to disclose in 13F filings with the SEC the class of securities, the CUSIP number, the number of shares owned and the total market value of each security.  Madoff's 13F disclosures usually contained only smatterings of small positions in small equities, and his explanation for this was that his strategy was mostly in cash at the end of each quarter to avoid disclosing the securities he was trading.  However, had Madoff been doing as he claimed, there would have been massive movements in money markets at the end of each quarter, but no such movements existed; and

      (k)     **BMIS's Questionable Office Space:** Madoff's secret operation took up about three-quarters of the 17th floor of the oval-shaped Lipstick Building in Manhattan.  Most Madoff employees on other floors did not have access to the space.  Anyone performing a proper due diligence would have questioned why all of the hedge fund's files were being quarantined in an inaccessible floor of the building.  Additionally, in its regulatory filings, BMIS indicated that it had only between one and five employees managing a disclosed $17 billion of assets under management.

90.     Had Plaintiffs and the Class known that Defendants would knowingly or recklessly disregard these numerous "red flags," they would have never invested in the Austin Capital Funds.

91.     Basic risk management techniques readily available to the Austin Capital Defendants at a low cost could have shown that Madoff and Rye Select Prime Fund were claiming investment returns that were all but impossible.

92.     One such risk management technique – the bias ratio – is a mathematical analysis that identifies abnormalities in investment returns.  Another technique involves a comparison of Madoff's risk profile to that of a peer group.  Such analyses would have shown Madoff's risk profile to be inconsistent with his claimed investment style.

93.     Moreover, had the Austin Capital Defendants performed due diligence as they represented to Plaintiffs and the Class in writing on multiple occasions, the Austin Capital Defendants would have confirmed that Madoff was a fraud.

94.     Given the warning sign that there was insufficient options volume to support Madoff's purported split-strategy for the size of the asset pool he was managing, the Austin Capital Defendants could have and should have asked to review Madoff's trade confirmations.  Had they done so, they would have confirmed that Madoff's trade confirmations were indeed fraudulent and that he was, in reality, not trading OEX options at all.  It is public information that the OPRA reports each trade that is executed and price quotations for options generated by each options exchange, including the Chicago Board Options Exchange ("CBOE").[3]  With Madoff's falsified trade confirmation, Defendants could have obtained the trade execution data for the particular dates that

---

[3]     Options trading information is gathered by OPRA from the various exchanges where the options are traded and then disseminated to the public through market data vendors, such as Bloomberg and the CBOE.

Madoff purportedly executed trades from a market data vendor.  Defendants would have seen that no

OEX index options traded at the prices Madoff reported on a given day and thus confirmed that

Madoff was falsifying his trade confirmations and was not actually trading the OEX options at all.

95.     Indeed, Markopolos similarly explained in his Congressional testimony that anyone

with access to Madoff's falsified trade confirmations, could have easily confirmed that Madoff was

not actually trading OEX options:

> Mr. Ackerman:  But there was nothing they could do to check it out, that he didn't
> actually buy it.

> Mr. Markopolos:  You could.  *As an individual investor you could not.  But as a
> feeder fund*, you should have been able to go to the New York Stock Exchange and
> see that those volumes of stock did not trade on that day at that price.  *They could
> have gone to the [O]ption [P]rice [R]eporting [A]uthority that the Chicago Board
> Options Exchange offers, and you would have seen that no OEX index options
> traded at those prices that day.*

Markopolos' testimony before the House Committee on Financial Services on February 4, 2009.

**Other Prudent Advisors Stopped Investing with
Madoff Following Their Due Diligence Review of BMIS**

96.     Prudent investment advisors, investment banks and pension funds, such as

J.P. Morgan Chase & Co., the Fort Worth Employees' Retirement Fund and Acorn Partners, took the

time and effort to conduct proper due diligence reviews of Madoff, and as a result of these warning

signs, chose not to invest or maintain their earlier investments with Madoff or any of his affiliated

funds.  In stark contrast, Defendants failed to even conduct a rudimentary due diligence review that

would have alerted them to or even confirmed Madoff's fraudulent scheme.

97.     An article published in *The New York Times* on January 29, 2009, entitled "JPMorgan

Exited Madoff-Linked Funds Last Fall," stated, in relevant part, that:

> As early as 2006, the bank had started offering investors a way to leverage
> their bets on the future performance of two hedge funds that invested with Mr.

Madoff.  To protect itself from the resulting risk, the bank put $250 million of its own money into those funds.

But the bank suddenly began pulling its millions out of those funds in early autumn, months before Mr. Madoff was arrested, according to accounts from Europe and New York that were subsequently confirmed by the bank.  The bank did not notify investors of its move, and several of them are furious that it protected itself but left them holding notes that the bank itself now says are probably worthless.

A spokeswoman, Kristin Lemkau, said the bank withdrew from the Madoff-linked funds last fall after "a wide-ranging review of our hedge fund exposure."  Ms. Lemkau acknowledged, however, that the bank also "*became concerned about the lack of transparency to some questions we posed as part of our review*."

98.    An article published in Bloomberg *Businessweek* on December 31, 2008, entitled "The Madoff Case Could Reel in Former Investors," stated, in relevant part, that:

The managers of the Fort Worth Employees' Retirement Fund thought they had dodged a bullet when Bernard L. Madoff was arrested on Dec. 11 for alleged fraud.  Just a few months earlier the $1.7 billion public pension plan had pulled $10 million out of a hedge fund that invested exclusively with Madoff.  But now the managers face the possibility of having to give back the money – a sum that includes all of the pension's purported gains over the years plus its initial investment.

\*        \*        \*

Some investors may not have known what they were buying.  The Fort Worth pension fund, for example, owned the Rye Select Broad Market, a hedge fund managed by the Tremont Group.  The Rye marketing literature rarely, if ever, mentioned Madoff by name, even though his fund was the only investment.  Says Steven Caruso, a lawyer for a number of Tremont investors: "Some investors may be facing the prospect of a financial death sentence if they're forced to return funds."  In a letter to investors, Tremont's managers say they "exercised appropriate due diligence."

Managers of the Fort Worth pension fund, who first invested with Rye five years ago, started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio.  The Rye fund raised red flags almost immediately.  Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye.

99.    An article published in *The New York Times* on December 13, 2008, entitled "Look at Wall St. Wizard Finds Magic Had Skeptics," quoted Robert Rosenkranz, a principal at Acorn Partners, an investment advisory firm, who stated:

> "Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

100.    An article published in *The New York Times* on December 17, 2008, entitled "European Banks Tally Losses Linked to Fraud" stated, in relevant part, that:

> Société Générale, itself the victim of an apparent scam early this year when unauthorized bets by a trader, Jérôme Kerviel, caused a $7 billion loss, was not the only financial firm to think Mr. Madoff's unfailing record was too good to be true, said Drago Indjic, a project manager at the Hedge Fund Center of the London Business School, told the Times.

> "Madoff did not pass due diligence for many European hedge fund companies," Mr. Indjic said.  "Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."

> Smaller American investment advisory firms like Acorn Partners and Aksia also spotted problems with Mr. Madoff's strategy early on, but Société Générale is the first major investment player known to have steered clients away [from] him.

> Mr. Indjic said the scheme revealed not only faulty due diligence, but also a basic failure to diversify.  "If you had half a percentage point of total assets under management with one firm, that is more typical," he told the Times.  "But some had much, much more than that with Madoff, so their due diligence failure was compounded by poor portfolio management."

101.    The financial press also reported that, prior to the disclosure of the massive fraud committed by Madoff, Simon Fludgate, head of operational due diligence at Aksia LLC, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing.  The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff was operating a secret, unregistered investment vehicle from his office.

102.     A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which invests in hedge funds for clients, as follows:

> "There was no independent custodian involved who could prove the existence of assets . . . There's clear and blatant conflict of interest with a manager using a related-party broker-dealer.   Madoff is enormously unusual in that this is not a structure I've seen."

103.     Other private investors similarly concluded that Madoff's operation did not provide a safe investment due to the lack of transparency regarding Madoff's investment strategy and the lack of an independent asset custodian or executing broker.   Instead, they discovered widespread industry rumors skeptical of Madoff's claims.   According to James Hedges, a professional investment advisor who considered investing with Madoff for a number of clients, "there was a preponderance of suspicion among hedge fund industry insiders that something was awry at Madoff Securities."   In addition, Hedges noted that Madoff's consistent returns over an extended period of time were not correlated with the market.   Officials at Renaissance Technologies Corporation similarly uncovered industry rumors that Madoff was suspected of inflating his profits by cherry-picking trades since his stated investment strategy was unworkable and inconsistent with options data or counterparty availability.

104.     Employees at Renaissance and other companies also noted, in reviewing Madoff customer statements, that Madoff was able to purchase stocks, *i.e.*, fill his orders, at extremely low prices and sell at extremely high prices on a regular basis, raising the suspicion that he was cherry-picking his execution prices at the best prices of the day.   Similarly, Madoff was able to consistently anticipate and predict broader market movements over time by moving out of the market (*i.e.*, going to cash) or moving back in.   Madoff's timing, both with respect to order fill and moving in or out of the market, was simply far too good to be true.   Finally, Renaissance also determined that Madoff's claimed option trading strategy was unworkable in the magnitude ($10 billion-plus) necessary to

produce Madoff's results. Renaissance was quickly able to determine that the necessary volume did not exist on the relevant exchange, and that no counter-party would rationally incur the consistent and ongoing losses necessary to support Madoff's consistent and ongoing profits. Indeed, the author of a 2001 article in MarHedge questioning Madoff's investment strategy subsequently explained that he was told by a former senior executive of a futures exchange, "everyone knows [Madoff] isn't real . . . everybody knows he can't possibly be producing these kinds of returns."

105.    Ironically, a recent complaint filed by the New York Attorney General ("NYAG") against Ivy Asset Management LLC ("Ivy") confirmed how simple it was for a competent hedge fund manager to identify Madoff as a likely fraud. The principals of Ivy concluded that Madoff was a likely fraud as early as 1998, simply by asking Madoff to explain where he was trading the large volume of options that supposedly hedged his positions; Madoff's answers were patently false and inconsistent. Unlike the other managers cited above, however, Ivy did not cause its clients to abandon Madoff. Instead, it reduced its exposure and allowed its clients most dependent on Madoff's fictional returns to remain invested, motivated by nothing other than greed and the fear of losing assets under management. *See* NYAG's action against Ivy, *The People of the State of New York v. Ivy Asset Mgmt. LLC*, No. 450489/2010 (N.Y. Sup. Ct. May 11, 2010). As illustrated by the NYAG's complaint against Ivy, only by willfully and recklessly turning a blind eye to the incredible aspects of Madoff's story, could an investment professional have failed to see that Madoff was a fraud. From the facts adduced here, there is a strong inference that the Austin Capital Defendants knew that Madoff was a fraud, just as defendants in the NYAG's complaint against Ivy and its principals knew it. But the conclusion is inescapable that the Austin Capital Defendants were at least reckless in failing to conclude that Madoff was likely a fraud and thus investing with him was

inappropriately risky.  Only by willfully turning a blind eye could the Austin Capital Defendants have kept themselves from knowing the truth.

## Defendants Immediately Disclaim
## Responsibility for Any Losses

106.    On December 18, 2008, Austin Capital sent out a letter to investors, which stated in relevant part, that Austin Capital had invested assets in Rye Select Prime Fund, a fund controlled by Tremont that relied on Madoff as its sub-advisor, that Madoff had purported to employ a "split-strike conversion" strategy and that Austin Capital expected to lose 100% of its investment with Madoff.

107.    As a direct result of the Austin Capital Defendants' conduct, Plaintiffs and the Class have witnessed the value of their investments disappear.  Had Plaintiffs and the Class known that the Austin Capital Defendants would knowingly or recklessly ignore Madoff's numerous red flags and invest their funds imprudently, they would have never invested in the Austin Capital Funds.

## Defendants Unjustly Reaped
## Millions of Dollars in Management Fees

108.    At all relevant times, Defendants charged annual management fees of 1%-1.5% of net asset value to Plaintiffs and the Class for investing in the Austin Capital Funds.  As with other investment funds, the management fee was calculated as a percentage of the Austin Capital Funds' net asset value.

109.    Performance fees are intended to be an incentive for the investment manager to produce the largest returns possible.  Annual performance fees, usually 20%-25% of profits, are a means to provide a share of positive returns to the investment manager.  Performance fees are extremely lucrative for managers who perform well, and give managers an incentive to take excessive risk rather than targeting high long-term returns or more secure returns.  In a fund of funds, management and performance fees are generally charged at the fund of funds as well as the

sub-fund level.  Therefore, the aggregate fees charged to investors will be higher if they invest in a fund of funds, rather than directly in hedge funds.

110.    In the aggregate, those fees represented substantial income to the Austin Capital Defendants.  Upon information and belief, the Austin Capital Defendants unjustly collected millions of dollars in management and administrative fees throughout the Class Period for merely entrusting and/or re-depositing their clients' funds with a sub-manager – *i.e.*, Madoff and/or BMIS.

111.    The Austin Capital Defendants improperly collected these fees, as they mismanaged the investments made by Plaintiffs and the Class.  Moreover, once the assets were entrusted to Madoff, he misappropriated those assets, making the financial statements and reports of the Austin Capital Funds reflecting assets under management and profits on which fees were charged entirely fictional.  By failing to perform adequate due diligence into Madoff's practices, and by charging, appropriating and accepting fees on wholly fictional assets and returns, the Austin Capital Defendants breached their fiduciary duties, collected these fees improperly and were unjustly enriched.

## AUSTIN CAPITAL DEFENDANTS' NON-ERISA FIDUCIARY DUTIES TO NEW MEXICO ERB AND OTHER NON-ERISA COVERED FUNDS

112.    As managers, officers or partners of investment partnerships and investment companies, the Individual Defendants had an affirmative fiduciary obligation to refrain from self-dealing and act in the best interests of the investment entities' investors to preserve the assets of the Austin Capital Funds.  To diligently comply with these duties, the managers or officers may not take any action that:

(a)    adversely affects the value of the assets of the Austin Capital Funds and the return provided to Austin Capital investors;

(b)    contractually prohibits them from complying with their fiduciary duties;

(c)      otherwise adversely affects their duty to monitor, supervise and direct the investments for the Austin Capital Funds' investors; and/or

(d)      provides the managers or partners with preferential treatment at the expense of, or separate from, Austin Capital investors.

113.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as managers or partners of Austin Capital, are obligated to refrain from:

(a)      participating in any transaction where the managers' or officers' loyalties are divided;

(b)      participating in any transaction where the managers or officers are entitled to receive a personal financial benefit not equally shared by the investors in Austin Capital; and/or

(c)      unjustly enriching themselves at the expense or to the detriment of investors.

114.    Plaintiffs allege herein that the Individual Defendants, separately and together, and aided and abetted by the other Defendants, violated their fiduciary duties owed to Plaintiffs and the other investors in the Austin Capital Funds in connection with their operation of those funds and the selection of fund managers, including their duties of loyalty, good faith, candor, due care and independence, insofar as they were at least grossly negligent in their management of the Austin Capital Funds' assets, engaged in self-dealing and/or obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiffs or the Class, and/or aided and abetted therein.  As a result of Defendants' gross negligence, self-dealing and divided loyalties, neither Plaintiffs nor the Class will receive adequate or fair value for their investment in the Austin Capital Funds.

## CLASS ACTION ALLEGATIONS

115.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and similarly situated persons who: (i) purchased shares in any of the Austin Capital Funds controlled or managed by Austin Capital or any related entity during the Class Period and who suffered losses as a result of Defendants' misconduct or who are fiduciaries, participants or beneficiaries of employee benefit plans who purchased such shares; and/or (ii) held shares or related financial interests in any of the Austin Capital Funds – or who are fiduciaries, participants or beneficiaries of employee benefit plans who purchased such shares – as of December 11, 2008.  Excluded from the Class are Defendants, the officers and directors of Defendants during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have, or had, a controlling interest.

116.    With respect to the ERISA claims (Counts IV through VII), the ERISA Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and (b)(3) on behalf of all fiduciaries, participants and beneficiaries of any employee benefit plan covered by ERISA who were invested in any of the Austin Capital Funds that were subject to the provisions of ERISA at any time during the Class Period.  Excluded from the Class are defendants, their officers, employees, directors, partners and members of the immediate families of any of the foregoing, or any of their heirs, successors or assigns.

117.    Prior to the effective date of the Pension Protection Act ("PPA"), some of the Austin Capital Funds were comprised of a sufficient percentage of employee benefit plan assets to make the assets of those Funds "plan assets" within the meaning of §3(42) of ERISA, 29 U.S.C. §1002(42). Because the assets of the Austin Capital Funds were plan assets, they were subject to the provision

- 51 -

of ERISA.  After the effective date of the PPA, which changed the definition of "plan assets," the assets of those Funds constituted "plan assets" to the extent of the percentage of the equity interest in those funds held by "benefit plan investors," as defined in §3(42) of ERISA, 29 U.S.C. §1002(42). At all relevant times, the ERISA Plaintiffs' plans were "benefit plan investors."  That percentage of the assets of the ERISA-covered Austin Capital Funds were subject to the provisions of ERISA. These ERISA-covered Austin Capital Funds include: (1) All Seasons; (2) All Seasons II; (3) Multi-Strategy; (4) Portable Alpha One; (5) Portable Alpha Two; (6) ERISA Fund; (7) All Seasons Master Account; and (8) Safe Harbor Master Account; (9) Next Generation QP Fund; and (10) Next Generation Offshore Fund.

118.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are over 100 members in the Class.  Moreover, the participants in the employee benefit plans named in this complaint comprise thousands of individuals.  Record owners and other members of the Class may be identified from records maintained by the Austin Capital Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Austin Capital Defendants issued shares purporting to be worth hundreds of millions of dollars.

119.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected, although to different degrees, by Defendants' wrongful conduct, as complained of herein, in violation of federal and state laws as complained of herein.

120.    Plaintiffs' participant and fiduciary claims are also typical of the claims of holders in the Austin Capital Funds because: (i) to the extent that Plaintiffs seek relief on behalf of the employee benefit plans covered by ERISA that invested in feeder funds covered by ERISA pursuant

to §502(a)(2) of ERISA, their claims are similar to claims brought by any other Class member; and (ii) to the extent that Plaintiffs seek relief under §502(a)(3) of ERISA for equitable relief, that relief would affect all Class members equally; all holders in the Austin Capital Funds were injured and continue to be injured in the same manner by Defendants' breaches of fiduciary duty, and their injuries can be remedied by restoring to each ERISA covered employee benefit plan investor the losses suffered as a result of the Austin Capital Defendants' indirect investments in Madoff. To the extent required by ERISA, disgorgement of amounts earned through breaches of fiduciary duties can be similarly allocated.

121.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex securities and employee benefit/ERISA litigation.

122.    Class action status in this action is warranted and appropriate under Fed. R. Civ. P. 23(b)(3) because common questions of law and fact exist as to all purchasers in the Austin Capital Funds and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to all purchasers in the Austin Capital Funds are:

(a)    whether the Austin Capital Defendants violated the Exchange Act and/or the Securities Act;

(b)    whether the documents issued by the Austin Capital Defendants to investors omitted and/or misrepresented material facts about the structure of the investments placed with third-party fund managers;

(c)    to what extent purchasers in the Austin Capital Funds have sustained damages and the proper measure of damages;

(d)     whether the Austin Capital Defendants breached their fiduciary duties under state law;

(e)     whether the Austin Capital Defendants were unjustly enriched under state law as a result of the alleged misconduct; and

(f)     whether the Austin Capital Defendants failed to exercise reasonable care under state law in overseeing the investments in the Austin Capital Funds.

123.    Common questions of law and fact exist as to all holders of shares in the Austin Capital Funds, including those employee benefit plans that held shares in the Austin Capital Funds, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to holders of shares in the Austin Capital Funds, including those employee benefit plans which held shares in the Austin Capital Funds, are:

(a)     whether all or a portion of the assets of the Austin Capital Funds, at all times or any relevant time, were plan assets within the meaning of §3(42) of ERISA;

(b)     whether the Austin Capital Defendants were fiduciaries within the meaning of ERISA as a result of their roles with respect to the investments made by the Austin Capital Funds;

(c)     whether the Austin Capital Defendants breached their fiduciary duties under ERISA by causing or allowing the Austin Capital Funds to invest and maintain a portion of their assets in accounts under the control of Madoff;

(d)     whether the Austin Capital Defendants, or any of them, breached their fiduciary duties under ERISA by, *inter alia*:

(i)     causing or allowing the assets to be invested with Madoff;

(ii)    failing to diversify assets under Madoff's control;

- 54 -

(iii)       failing to adequately investigate the soundness and suitability of investing with Madoff; or

(iv)       failing to adequately monitor the holders' assets invested through Madoff;

(v)       failing to perform investment management activities as represented to investors;

(e)       whether holders of shares in the Austin Capital Funds were harmed by Defendants' breaches of fiduciary duties; and

(f)       the extent to which fiduciaries, participants or beneficiaries of employee benefit plans are entitled to recover losses resulting from breaches of fiduciary duties or obtain other appropriate equitable relief, including, without limitation, appointment of an independent fiduciary to take control of the Austin Capital Defendants' assets for the benefit of holders of shares in the Austin Capital Funds.

124.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of each Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

125.     Class action status in this action is warranted and appropriate under Fed. R. Civ. P. 23(b)(1)(B) for the holders of shares in the Austin Capital Funds because prosecution of separate actions would create a risk of adjudications with respect to individual members that would, as a practical matter, be dispositive of the interests of the other members not parties to these actions, or substantially impede their ability to protect their interests.

126.    Class action status for the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds is also warranted under the other subsections of Fed. R.  Civ. P. 23(b) because: (i) prosecution of separate actions by the members  would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to holders of shares in the Austin Capital Funds thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against the Austin Capital Defendants**
**(Brought by Plaintiffs on Behalf of the Class)**

127.    Plaintiffs incorporate ¶¶1-126 by reference.

128.    During the Class Period, the Austin Capital Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129.    The Austin Capital Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and the Class similarly situated in connection with their purchases of shares in the Austin Capital Funds during the Class Period.

130.      Plaintiffs and the Class have suffered damages in that, in reliance on the Austin Capital Defendants' assurances, they paid artificially inflated prices for shares in the Austin Capital Funds.  Plaintiffs and the Class would not have purchased shares in the Austin Capital Funds at the prices they paid, or at all, if they had been aware of Austin Capital's actual practices.

131.      As a direct and proximate result of the Austin Capital Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchases of shares in the Austin Capital Funds during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants, AMC-GP, KeyCorp and Victory
### (Brought by Plaintiffs on Behalf of the Class)

132.      Plaintiffs incorporate ¶¶1-131 by reference.

133.      The Individual Defendants, AMC-GP, KeyCorp and Victory acted as controlling persons of Austin Capital within the meaning of §20(a) of the Exchange Act.  By reason of their positions with or relationship to Austin Capital, the Individual Defendants, AMC-GP, KeyCorp and Victory had the power and authority to cause Austin Capital to engage in the wrongful conduct complained of herein.  Austin Capital was controlled by the Individual Defendants, AMC-GP, KeyCorp and Victory.  By reason of such conduct, the Individual Defendants, AMC-GP, KeyCorp and Victory are liable pursuant to §20(a) of the Exchange Act.

## COUNT III

### For Violation of §12(a)(2) of the Securities Act
### Against the Austin Capital Defendants
### (Brought by Plaintiffs on Behalf of the Class)

134.    Plaintiffs incorporate ¶¶1-126 by reference.  For purposes of this count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

135.    By means of defective offering documents which operated in the same fashion as a prospectus, the Austin Capital Defendants assisted in the sale of shares of the Austin Capital Funds to Plaintiffs and the Class.  The offering documents operated in the same manner as a prospectus in that they were the vehicles for Austin Capital to sell shares in the Austin Capital Funds to various investors.

136.    In order to induce Plaintiffs and the Class to purchase shares in the Austin Capital Funds, the Austin Capital Defendants made numerous oral statements which were untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading offering documents and in actively soliciting Plaintiffs and the Class to purchase shares in the Austin Capital Funds as set forth in detail herein.

137.    The offering documents contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading and concealed and failed to disclose material facts, as detailed above.  The Austin Capital Defendants owed Plaintiffs and the Class, who purchased shares in the Austin Capital Funds pursuant to the offering documents, the

- 58 -

duty to make a reasonable and diligent investigation of the statements contained in the offering documents to ensure that such statements were true and that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

138.    Plaintiffs and the Class that purchased shares in the Austin Capital Funds did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the offering documents at the time they acquired shares in the Austin Capital Funds.

139.    By reason of the conduct alleged herein, the Austin Capital Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the Class who purchased shares in the Austin Capital Funds pursuant to the offering documents sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiffs and the Class who purchased such shares have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the Austin Capital Defendants sued herein.

## COUNT IV

**For Breach of Fiduciary Duty Under ERISA**
**Against the Austin Capital Defendants**
**(Brought by ERISA Plaintiffs and the Fiduciaries, Participants and Beneficiaries of**
**Employee Benefit Plans that Held Shares in the ERISA-Covered Austin Capital Funds)**

140.    ERISA Plaintiffs incorporate ¶¶1-126 by reference.

141.    This count is brought on behalf of fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds against the Austin Capital Defendants pursuant to §§502(a)(2) and (3) of ERISA, 29 U.S.C. §§1109, 1132(a)(2) and (3), for breaches of the fiduciary obligations imposed by §404 of ERISA, 29 U.S.C. §1104, upon fiduciaries and persons who exercise control over the investment or management of assets of employee benefit plans.

142.    ERISA §404(a)(B) requires that a fiduciary with respect to an employee benefit plan act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. §1104(a)(1)(B).

143.    At all relevant times, 25% or more of investments in the Austin Capital Funds were by benefit plan investors as described in the provisions of ERISA and applicable regulations governing whether an entity holds ERISA-covered employee benefit plan assets.  Because 25% or more of investments in the Austin Capital Funds were made by such investors, the Austin Capital Funds are deemed to have held plan assets within the meaning of ERISA §3(42), 29 U.S.C. §1002(42), and the Department of Labor regulations thereunder.

144.    The Austin Capital Funds purchased shares in, or otherwise invested with the Rye Select Prime Fund.  The Rye Select Prime Fund was a so-called "feeder fund" for one or more of the Madoff managed investment vehicles or entities.  The Rye Select Prime Fund invested assets entrusted to it exclusively with Madoff entities.

145.    As set forth *supra*, the Austin Capital Defendants were fiduciaries within the meaning of ERISA §3(21), with respect to the management and disposition of the assets invested in the ERISA-covered Austin Capital Funds because a portion or all of the assets of the ERISA-covered Austin Capital Funds were plan assets under ERISA §3(42), 29 U.S.C. §1002(42), and the Department of Labor regulations thereunder.

146.    As fiduciaries with respect to the ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds, the Austin Capital Defendants owed a duty of loyalty to them under §404(a)(1)(A) of ERISA, 29 U.S.C. §1104(a)(1)(A), to act solely and exclusively in their and their participants and

beneficiaries' best interests and under §404(a)(1)(B) of ERISA, 29 U.S.C. §1104(a)(1)(B), to invest or manage plan assets "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  The Austin Capital Defendants breached these duties by, *inter alia*:

     (a)    failing to sufficiently investigate the Rye Select Prime Fund to ensure that it was a safe, prudent, legitimate, honest and suitable investment for employee benefit plans and their participants and beneficiaries, and through such failure, failing to identify the risks associated with the decision of the Rye Select Prime Fund to invest the Austin Capital Funds' assets with Madoff and his company;

     (b)    entrusting ERISA covered plan assets to Madoff through the Rye Select Prime Fund when they knew or should have known through the exercise of ordinary care, skill and prudence that the investment presented an unacceptable risk, if not likelihood or certainty that Madoff was not managing investments as represented;

     (c)    failing to prudently monitor the investments of the Austin Capital Funds or to locate or give sufficient attention to warning signs about the unreliability and unsuitability of the Rye Select Prime Fund because it was a Madoff-related investment vehicle;

     (d)    failing to prudently monitor the Rye Select Prime Fund investments during the period during which the Austin Capital Defendants invested plan assets held in those entities;

     (e)    failing to disclose to ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds the true risks associated with investments by the Austin Capital Funds; and

(f)     failing to monitor and divest their investments in the Rye Select Prime Fund when they knew or, through the exercise of appropriate ERISA standard of care, should have known that the Rye Select Prime Fund was not a prudent investment.

147.    The Austin Capital Defendants breached the fiduciary duties owed to ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds under §404 of ERISA with respect to each act and omission associated with their investment in, and decision to invest in, the Rye Select Prime Fund and/or Madoff related entities.

148.    As a result of the above-described conduct, the Austin Capital Defendants have breached their fiduciary duties to the ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds under §404 of ERISA, causing them to incur substantial monetary losses.

149.    Pursuant to §409 of ERISA, 29 U.S.C. §1109, the Austin Capital Defendants are personally liable to the ERISA Plaintiffs and fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds for losses resulting from their fiduciary breaches and to restore to the employee benefit plans any losses resulting from those breaches.

## COUNT V

**For Paying Fees in Violation of ERISA
Against the Austin Capital Defendants
(Brought by ERISA Plaintiffs and the Fiduciaries, Participants and Beneficiaries of
Employee Benefit Plans that Held Shares in the ERISA-Covered Austin Capital Funds)**

150.    ERISA Plaintiffs incorporate ¶¶1-126 and ¶¶140-149 by reference.

151.    ERISA requires that a fiduciary of an employee benefit plan act "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying the reasonable expenses of administering the plan."  29 U.S.C. §1104(a)(1)(A).

152.    ERISA §406(a) prohibits a fiduciary with respect to an employee benefit plan from directly or indirectly causing the "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan. . . ." 29 U.S.C. §1106(a)(1)(D).  The Austin Capital Defendants are each "parties in interest" as that term is used in ERISA with respect to the ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds within the meaning of §3(14) of ERISA, 29 U.S.C. §1002(14), because they are fiduciaries and provided services to Plaintiffs and the Class who were employee benefit plans which held shares in the Austin Capital Funds.

153.    ERISA §406(b)(3) prohibits a fiduciary with respect to an employee benefit plan from receiving any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. 29 U.S.C. §1106(b)(3).

154.    The Austin Capital Defendants caused or allowed the ERISA-covered Austin Capital Funds to transfer millions of dollars in management fees based on assets under management that had been entrusted to Madoff or BMIS, when these assets had in fact been misappropriated by Madoff and lost as part of the Ponzi scheme he operated.  Defendants received fees amounting to 1%-1.5% of net asset value annually (paid monthly).  No portion of those fees however, has been refunded, even though the amount of the fees were calculated based on, in large part, misappropriated or entirely fictional assets and profits falsely claimed by Madoff or entities controlled by him to be held for investment on behalf of the ERISA-covered Austin Capital Funds.

155.    By causing or allowing the fees to be paid and subsequently retained without adjustment, based on purely fictional assets or assets which had been misappropriated, the Austin Capital Defendants have violated ERISA, insofar as the documents and instruments governing entitlement to fees calls for fees to be paid on assets actually managed through the ERISA-covered Austin Capital Funds.  Further, ERISA §406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D) prohibits direct or indirect transfers of plan assets to parties in interest, and transfers can only be exempt if paid pursuant to a contract or reasonable arrangement for no more than a reasonable consideration. Because the transfer at issue here was either in violation of the contract that provided for its payment, not paid pursuant to a reasonable contract or arrangement if the contract or arrangement permitted a fee based on fictional assets, or if in compliance with a contract, amounted to more than reasonable compensation having been paid on misappropriated or fictional assets and profits, the transfer violated 29 U.S.C. §1106(a)(1)(D).

156.    As such, the Austin Capital Defendants are liable for restoring any losses or unearned fees to the employee benefit plans covered by ERISA that invested in the Austin Capital Funds and, as a result, suffered losses through the payment and retention of investment management fees, referral fees and profit allocations based on assets that had been misappropriated by Madoff or entities associated with him, or based on assets that were entirely fictional, in violation of §§406(a) and (b) of ERISA, 29 U.S.C. §1106.

## COUNT VI

### For Breach of Co-Fiduciary Duty Under ERISA
### Against the Austin Capital Defendants on Behalf of Plaintiffs and the Class Who Were Employee Benefit Plans Which Held Shares in the Austin Capital Funds
### (Brought by ERISA Plaintiffs and the Fiduciaries, Participants and Beneficiaries of Employee Benefit Plans that Held Shares in the ERISA-Covered Austin Capital Funds)

157.    ERISA Plaintiffs incorporate ¶¶1-126 and ¶¶140-156 by reference.

158.     ERISA imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if he participates in a breach of fiduciary duty of another fiduciary, with either actual or constructive knowledge of such a breach.  29 U.S.C. §1105(a)(1).

159.     In addition to liability that the Austin Capital Defendants have pursuant to §404 of ERISA, the Austin Capital Defendants are also liable to ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds under §405 of ERISA, 29 U.S.C. §1105(a)(3), for a breach of a fiduciary obligation by the other because:

(a)     The Austin Capital Defendants participated knowingly in, or knowingly undertook to conceal, the acts or omission of each other, knowing such acts or omissions to be a breach;

(b)     by failing to comply with ERISA §404, the Austin Capital Defendants enabled others to commit the breach or breaches alleged herein; and

(c)     The Austin Capital Defendants had knowledge of, or, in the exercise of reasonable care, should have had knowledge that each of the other Austin Capital Defendants breached the fiduciary duties owed to ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds but failed to make reasonable efforts under the circumstances to remedy the breach or breaches.

## COUNT VII

### For Disgorgement of Profits
### Against the Austin Capital Defendants
### (Brought by ERISA Plaintiffs and the Fiduciaries, Participants and Beneficiaries of Employee Benefit Plans that Held Shares in the ERISA-Covered Austin Capital Funds)

160.     ERISA Plaintiffs incorporate ¶¶1-126 and ¶¶140-159 by reference.

161.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), permits a plan participant, beneficiary, or fiduciary to bring an action for appropriate equitable relief to redress violations and/or enforce provisions of Title I of ERISA.

162.    In the event that any of the Austin Capital Defendants are not fiduciaries under ERISA §3(21) with regard to any of the claims set forth above, each Defendant is liable under ERISA §502(a)(3) for the ERISA violations set forth above because each Defendant knowingly participated in those violations and, as a consequence and part of their participation in those violations, received fees from the ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds. Accordingly, they must restore to ERISA Plaintiffs and the fiduciaries, participants and beneficiaries of employee benefit plans that held shares in the ERISA-covered Austin Capital Funds all fees and profits thereon received by any of the Austin Capital Defendants on account of the plans' investments of assets in Madoff and Madoff-related investments.

163.    The Austin Capital Defendants have violated the fiduciary duties of care, loyalty, candor, good faith and independence owed to holders of shares in the ERISA-covered Austin Capital Funds and have acted to put their personal interests ahead of the interests of ERISA Plaintiffs and the Class.

164.    By the acts, transactions and course of conduct alleged herein, the Austin Capital Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to holders of shares in the ERISA-covered Austin Capital Funds by:

(a)    failing to properly preserve the assets of the ERISA-covered Austin Capital Funds; and

(b)     ignoring or not protecting against the failure to properly evaluate fund managers, which resulted in the ERISA-covered Austin Capital Funds' assets being managed by Madoff entities.

165.     By reason of the foregoing acts, practices and course of conduct, the Austin Capital Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward holders of shares in the ERISA-covered Austin Capital Funds.

166.     As a result of the actions of the Austin Capital Defendants, holders of shares in the ERISA-covered Austin Capital Funds have been and will be irreparably harmed in that portions of their investments have evaporated in a Ponzi scheme.

## COUNT VIII

**For Breach of Fiduciary Duty**
**Against the Austin Capital Defendants**
**(Brought by New Mexico ERB on Behalf of All Plan Investors Not Subject to ERISA Who Invested with Austin Capital)**

167.     New Mexico ERB incorporates ¶¶1-166 by reference.

168.     The Austin Capital Defendants have violated the fiduciary duties of care, loyalty, candor, good faith and independence owed to holders of shares in the Austin Capital Funds and have acted to put their personal interests ahead of the interests of Plaintiffs and the Class.

169.     By the acts, transactions and course of conduct alleged herein, the Austin Capital Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to holders of shares in the Austin Capital Funds by:

(a)     failing to properly preserve the assets of the Austin Capital Funds; and

(b)     ignoring or not protecting against the failure to properly evaluate fund managers, which resulted in the Austin Capital Funds' assets being managed by Madoff entities.

170.     By reason of the foregoing acts, practices and course of conduct, the Austin Capital Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward holders of shares in the Austin Capital Funds.

171.     As a result of the actions of the Austin Capital Defendants, holders of shares in the Austin Capital Funds have been and will be irreparably harmed in that portions of their investments have evaporated in a Ponzi scheme.

### COUNT IX

**For Common Law Fraud**
**(Against the Austin Capital Defendants)**
**(Brought by New Mexico ERB on Behalf of All Plan Investors Not Subject to ERISA Who Invested with Austin Capital)**

172.     New Mexico ERB incorporates ¶¶1-171 by reference.

173.     The Austin Capital Defendants fraudulently induced New Mexico ERB and all plan investors, who invested with Austin Capital but are not subject to the provisions of ERISA, to hold their positions in the Austin Capital Funds by misrepresenting that the Austin Capital Funds would invest their monies in a legitimate fund, relying on the investment strategy marketed by the Austin Capital Defendants.

174.     The Austin Capital Defendants falsely represented that they would conduct due diligence into Rye Select Prime Fund and Madoff to confirm that Rye Select Prime Fund and Madoff were legitimate, viable entities, using the represented investments strategy and in accordance with the required legal and regulatory requirements.

175.     The Austin Capital Defendants failed to disclose the following material information, and, thereby, made false and misleading representations: (i) that the Austin Capital Defendants had not conducted proper due diligence into Madoff to verify that the Austin Capital Funds' assets were being invested properly; and (ii) there were numerous red flags regarding the dangers of investing

with Madoff, including the lack of transparency into Madoff, the lack of segregation of duties, the inadequate auditing of Madoff and the consistent returns Madoff provided even in down markets, among others.

176.  At the time the statements and misrepresentations were made by the Austin Capital Defendants in the offering documents, private placement memoranda, account statements, marketing and other materials, the Austin Capital Defendants knew them to be false and intended to deceive New Mexico ERB and the plan investors, who invested with Austin Capital but are not subject to the provisions of ERISA, by making such statements and representations.

177.  They justifiably relied on the false representations made by the Austin Capital Defendants to their detriment by purchasing and holding assets in the Austin Capital Funds.

178.  Had New Mexico ERB and all plan investors, who invested with Austin Capital but are not subject to the provisions of ERISA, known of the material facts that the Austin Capital Defendants wrongfully concealed and misrepresented and the falsity of those misrepresentations, they would not have continued to maintain their assets in the Austin Capital Funds.

179.  As a direct and proximate result of their reliance upon the false representations and omissions of the Austin Capital Defendants, New Mexico ERB and all plan investors, who invested with Austin Capital but are not subject to the provisions of ERISA, have suffered damages, namely, the loss of their investments in the Austin Capital Funds.  Moreover, the Austin Capital Defendants have wrongfully charged, and Plaintiffs and the Class paid, management fees that were unearned.

180.  By reason of the foregoing, the Austin Capital Defendants are jointly and severally liable to Plaintiffs and the Class.

181.  The Austin Capital Defendants' acts were willful and wanton and Plaintiffs and the Class are entitled to punitive damages.

## COUNT X

### For Unjust Enrichment
### Against the Austin Capital Defendants
**(Brought by New Mexico ERB on Behalf of All Plan Investors Not Subject to ERISA Who Invested with Austin Capital)**

182.     New Mexico ERB incorporates ¶¶1-181 by reference.

183.     As a result of the conduct described above, the Austin Capital Defendants will be and have been unjustly enriched, in the form of unjustified management fees.

184.     All the payments and benefits provided to the Austin Capital Defendants named herein were at the expense of New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA.  They did not receive the benefit from these payments promised by the Austin Capital Defendants, with respect to care and diligence in selecting fund managers.  Instead, they have been damaged by such payments.

185.     The Austin Capital Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA.  A constructive trust for the benefit of Plaintiffs and the Class should be imposed thereon.

## COUNT XI

### For Breaches of Contract
### Against Austin Capital
**(Brought by New Mexico ERB on Behalf of All Plan Investors Not Subject to ERISA Who Invested with Austin Capital)**

186.     New Mexico ERB incorporates ¶¶1-185 by reference.

187.     This is a claim for contract breaches against Austin Capital.

188.     New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA agreed to invest in the Austin Capital Funds based on Austin Capital's assurances about its care in selecting fund managers.  Austin Capital was to be paid a

percentage (on a sliding scale) annually of the net asset value (paid monthly) for its services in selecting fund managers.

189.   The terms of the contract are included in substantially identical written materials distributed to each Class member.  These documents include substantially identical sales materials to prospective investors and substantially identical offering documents.

190.   Austin Capital did not provide the agreed-upon services.  Material terms of the contract required Austin Capital to carefully select fund managers.  In the face of significant "red flags," Austin Capital placed the Austin Capital Funds' assets with Madoff-managed funds.

191.   New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA have fully performed under the terms of the offering documents with Austin Capital.

192.   New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA have been damaged as a result of Austin Capital's breaches.

## COUNT XII

### For Negligent Misrepresentation
### Against the Austin Capital Defendants
### (Brought by New Mexico ERB on Behalf of All Plan Investors Not Subject to ERISA Who Invested with Austin Capital)

193.   New Mexico ERB incorporates ¶¶1-192 by reference.

194.   This is a claim for negligent misrepresentation against The Austin Capital Defendants.

195.   The Austin Capital Defendants made materially inaccurate written representations and omissions in substantially identical written materials distributed to New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA.

196.    The written materials distributed by the Austin Capital Defendants told investors to rely upon them.  The Austin Capital Defendants expected New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA to rely upon them.

197.    The written materials contained materially false and misleading statements and omissions as alleged above.

198.    New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA did rely upon these documents.  It was their reasonable expectation – as is common industry practice and sound business practice – that the Austin Capital Defendants would update the written materials to reflect material changes in the process of selecting fund managers.

199.    The Austin Capital Corporate Defendants had a special duty of care to accurately and completely represent all material facts to New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA who held shares in the Austin Capital Funds because they owed such investors a fiduciary duty as alleged above.

200.    The Austin Capital Corporate Defendants were responsible for distributing the offering documents to New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA who held shares in the Austin Capital Funds.  The Austin Capital Corporate Defendants therefore knew or should have known that investors would act or refrain from taking action on the basis of information provided in the offering documents.

201.    New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA who held shares in the Austin Capital Funds took action or refrained from taking action on the basis of The Austin Capital Corporate Defendants' negligent statements and omissions as follows:

(a)      if The Austin Capital Corporate Defendants had imparted complete and accurate information in the offering documents, New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA who held shares in the Austin Capital Funds, would have demanded a higher interest rate to compensate investors for the true risk of the investment;

(b)      if The Austin Capital Corporate Defendants had properly updated the offering documents consistent with their duties and undertakings, New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA would have protected their investment capital by: (i) insuring against the increased risk; or (ii) redeeming their shares in the Austin Capital Funds; and

(c)      but for The Austin Capital Corporate Defendants' misrepresentations and omissions, shares in the Austin Capital Funds could not have been sold to New Mexico ERB and all plan investors who invested with  Austin Capital Funds but are not subject to the provisions of ERISA.

202.    New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA have suffered damages as a result of The Austin Capital Corporate Defendants' negligent misrepresentations.

## COUNT XIII

**For Gross Negligence**
**Against the Austin Capital Defendants**
**(Brought by New Mexico ERB on Behalf of All Plan Investors Not Subject to ERISA Who Invested with Austin Capital)**

203.    New Mexico ERB incorporates ¶¶1-202 by reference.

204.    As investment managers with discretionary control over the assets entrusted to them by New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to

the provisions of ERISA, the Austin Capital Defendants owed a duty to manage and monitor their investments with reasonable care.  The Austin Capital Defendants breached this duty.

205.    The Austin Capital Defendants further breached their duty of care by failing to:

(a)    take all reasonable steps to ensure that the investment of the assets of New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA were made and maintained in a prudent and professional manner;

(b)    take all reasonable steps to preserve the value of their investments;

(c)    perform all necessary and adequate due diligence; and

(d)    exercise generally the degree of prudence, caution and good business practices that would be expected of any reasonable investment professional.

206.    As a direct and proximate result of the Austin Capital Defendants' gross negligence, New Mexico ERB and all plan investors who invested with Austin Capital but are not subject to the provisions of ERISA who held shares in the Austin Capital Funds have suffered damages and are entitled to such damages from the Austin Capital Defendants.

## COUNT XIV

**For Violation of N. M. Stat. Ann. §58-13C-509 (2010) on Behalf of Plaintiff New Mexico ERB and Other New Mexico State Entities and State Pension Plans Class Members Against the Austin Capital Defendants, KeyCorp, Victory and Their Officers**

207.    Plaintiff New Mexico ERB incorporates ¶¶1-126 by reference.

208.    During the Class Period, Austin Capital and its officers and employees sold securities to New Mexico ERB and other New Mexico state entities and state pension plans by means of untrue statements of material facts or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances pursuant to which they were made, not misleading, in violation of N. M. Stat. Ann. §58-13C-509(B) (2010).  Plaintiff New Mexico ERB and other New

Mexico state entities and state pension plans were unaware of the untruth or omissions resulting from Defendants' untrue or misleading statements.

209.    Plaintiff New Mexico ERB demands recovery of the consideration paid or alternatively, damages suffered due to Defendants' untrue or misleading statements pursuant to N. M. Stat. Ann. §58-13C-509(B)(1)-(3) (2010).

210.    KeyCorp and Victory, and their officers and employees, together with Austin Capital's officers and employees are jointly liable pursuant to N. M. Stat. Ann. §58-13C-509 (G) (2010), for Austin Capital's violations of N. M. Stat. Ann. §58-13C-509(B) (2010).

## COUNT XV

**For Violation of Tex. Rev. Civ. Stat. Art. 581-33 on Behalf of New Mexico ERB and Other State Entities and State Pension Plans Class Members Against the Austin Capital Defendants, KeyCorp and Victory and Their Officers**

211.    Plaintiff New Mexico ERB incorporates ¶¶1-126 by reference.

212.    During the Class Period, Austin Capital and its officers and employees sold securities to New Mexico ERB and other state entities and state pension plans by means of untrue statements of material facts or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances pursuant to which they were made, not misleading, in violation of Tex. Rev. Civ. Stat. Art. 581-33(A)(2).  New Mexico ERB and other state entities and state pension plans were unaware of the untruth or omissions resulting from Defendants' untrue or misleading statements.

213.    Plaintiff New Mexico ERB demands recovery of the consideration paid or alternatively, damages suffered due to Defendants' untrue or misleading statements pursuant to Tex. Rev. Civ. Stat. Art. 581-33(D).

214.   KeyCorp and Victory defendants and their officers and employees, together with Austin Capital's officers and employees are jointly liable pursuant to Tex. Rev. Civ. Stat. Art. 581-33(F) for Austin Capital's violations of Tex. Rev. Civ. Stat. Art. 581-33(A)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying Plaintiffs as Class representatives;

B.   Awarding compensatory damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Restoring all losses to employee benefit plans caused by the violations of ERISA set forth herein, and disgorging all profits made through the misuse or misappropriation of ERISA plan assets to the plans whose assets were so used or misappropriated;

D.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.   Awarding rescission or a rescissory measure of damages; and

F.   Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

DATED:  October 6, 2010

ROBBINS GELLER RUDMAN
&  DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
EDWARD Y. KROUB


_____
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
ekroub@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JOHN K. GRANT
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
johnkg@rgrdlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  510/725-3000
510/725-3001 (fax)

HAGENS BERMAN SOBOL SHAPIRO LLP
LEE M. GORDON
700 S. Flower Street, Suite 2940
Los Angeles, CA  90017-4101
Telephone:  213/330-7150
213/330-7152 (fax)

*Co-Lead Counsel for Plaintiffs*

SLEVIN & HART, P.C.
THOMAS J. HART
1625 Massachusetts Avenue, NW, Suite 450
Washington, DC  20036
Telephone:  202/797-8700
202/234-8231 (fax)

COHEN MILSTEIN SELLERS
  & TOLL PLLC
MICHELLE C. YAU
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005-3964
Telephone:  202/408-4600
202/408-4699 (fax)

COHEN MILSTEIN SELLERS
  & TOLL PLLC
MARC I. MACHIZ
255 South 17th Street, Suite 1307
Philadelphia, PA  19103
Telephone:  267/773-4682
267/773-4690 (fax)

*Additional Counsel for Plaintiffs*

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the County of Melville, State of New York, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 58 South Service Road, Suite 200, Melville, New York 11747.

2.      That on October 6, 2010, declarant caused the **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** to be served by depositing a true copy thereof in a United States mailbox in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 6, 2010, at Melville, New York.

_____
Christine Stella

AUSTIN CAPITAL_MADOFF

Service List - 10/6/2010   (09-0068)

Page 1 of 2

**Counsel For Defendant(s)**

Douglas M. Selwyn
Conner & Winters, LLP
1001 McKinney Street, Suite 550
Houston, TX 77002
  713/650-3850
  713/650-3851 (Fax)

Roy Richard Love, III
Conner & Winters, LLP
1700 One Leadership Square
211 North Robinson
Oklahoma City, OK 73102
  405/272-5711

Harold K. Gordon
Jones Day
222 East 41st Street
New York, NY 10017
  212/326-3939
  212/755-7306 (Fax)

Deidre Ann Grossman
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
  212/969-3000
  212/969-2900 (Fax)

**Counsel For Plaintiff(s)**

Marc I. Machiz
Cohen Milstein Sellers & Toll PLLC
One South Broad Street, Suite 1850
Philadelphia, PA 19107
  215/825-4010

Michelle C. Yau
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., N.W., Suite 500
Washington, DC 20005-3964
  202/408-4600
  202/408-4699 (Fax)

Reed R. Kathrein
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
  510/725-3000
  510/725-3001 (Fax)

Lee M. Gordon
Hagens Berman Sobol Shapiro LLP
700 S. Flower Street, Suite 2940
Los Angeles, CA 90017-4101
  213/330-7150
  213/330-7152 (Fax)

AUSTIN CAPITAL_MADOFF
Service List - 10/6/2010   (09-0068)
Page 2 of 2

Samuel H. Rudman
David A. Rosenfeld
Edward Y. Kroub
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173(Fax)

John K. Grant
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
  415/288-4545
  415/288-4534(Fax)

# EXHIBIT A

## CERTIFICATION OF SECURITIES CLASS ACTION
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Daniel Jackson, Jr., Fund Administrator of Laborers International Union of North America Local No. 17 Pension Plan ("Laborers Local 17") declare, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed the Consolidated Amended Class Action Complaint (the "Complaint"), and authorize the filing of this Certification on behalf of Laborers Local 17.

2.     Laborers Local 17 did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in this private action.

3.     Laborers Local 17 is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Laborers Local 17 transactions in the securities that are the subject of this action were as indicated on Schedule A, attached hereto.

5.     In the three-year period preceding the date of this Certification, Laborers Local 17 did not serve as a representative party on behalf of any class in a securities action.

6.     Laborers Local 17 will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 th day of September, 2010.

Daniel Jackson, Jr.
Fund Administrator
Laborers International Union of North
America Local No. 17 Pension Plan

## SCHEDULE A

### AUSTIN CAPITAL SAFE HARBOR ERISA DEDICATED FUND LTD. SHARES

| Transaction Date | Transaction Description | Price Per Share | Units | Total Cost |
|---|---|---|---|---|
| 6/20/2008 | PURCHASE | $1,148.4807 | 3,482.8622 | $ 4,000,000.00 |

# EXHIBIT  B

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

NEW MEXICO EDUCATIONAL RETIREMENT BOARD ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:
*In re Sterling Financial Corp. Sec. Litig.*, No. 07-cv-02171 (E.D. Pa.)
*Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc., et al.*, No. 07-81038 (S.D. Fla.)

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:
*In re Hansen Natural Corp. Sec. Litig.*, N. 06-cv-07599 (C.D. Cal.)

AUSTIN CAPITAL

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of March, 2010.

NEW MEXICO EDUCATIONAL RETIREMENT BOARD

By: _____

Its: Executive Director

- 2 -

AUSTIN CAPITAL

**ERB's HEDGE FUND Transactions**

**January 2, 2005 through December 11, 2008**

**SCHEDULE A**

| | |
|---|---|
| 11/28/2006 | $50,000,000.00 |
| 03/30/2007 | $50,000,000.00 |
| 07/31/2008 | $30,000,000.00 |
| **Total** | $130,000,000.00 |