UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

In re AUSTIN CAPITAL MANAGEMENT,   :   No. 1:09-md-02075-TPG
LTD., SECURITIES & EMPLOYEE   :
RETIREMENT INCOME SECURITY ACT   :   CONSOLIDATED SECOND AMENDED
(ERISA) LITIGATION   :   CLASS ACTION COMPLAINT
  :
—————————————————————— :

PENSION TRUST FUND FOR OPERATING   :
ENGINEERS, OPERATING ENGINEERS   :
PENSION PLAN, OPERATING ENGINEERS :
HEALTH AND WELFARE TRUST FUND,   :
RUSSELL E. BURNS, JOHN WITT,   :
MICHAEL J. SULLIVAN, RONALD   :
PALMERICK, LABORERS LOCAL 17   :
PENSION PLAN, DANIEL JACKSON, NEW :
MEXICO EDUCATIONAL RETIREMENT   :
BOARD, and TEXAS TREASURY   :
SAFEKEEPING TRUST COMPANY on   :
Behalf of Themselves and All Others Similarly :
Situated,   :
  :
         Plaintiffs,   :
  :
    vs.   :
  :
AUSTIN CAPITAL MANAGEMENT LTD.,   :
CHARLES W. RILEY, BRENT A. MARTIN,   :
JAMES P. OWEN, ROBERT WAGNER,   :
DAVID C. BROWN, DAVID E. FRIEDMAN, :
AUSTIN CAPITAL MANAGEMENT GP   :
CORP, KEYCORP, VICTORY CAPITAL   :
MANAGEMENT, INC., RONALD J.   :
DUGAS, KYLE McDANIEL,   :
MONTGOMERY GREEN, and JAY W. VAN :
ERT,   :
  :
         Defendants.   x

—————————————————————

588910_1

Plaintiffs (defined below) bring this class action on their own behalf and on behalf of all other similarly situated persons who: (i) purchased shares in any of the Austin Capital Funds[1] controlled or managed by Austin Capital Management Ltd. ("Austin Capital") or any related entity from January 2, 2005 through December 11, 2008 (the "Class Period") and who suffered losses as a result of Defendants' (defined below) misconduct or who are fiduciaries, participants or beneficiaries of employee benefit plans who purchased such shares; and/or (ii) held shares or a related interest in the Austin Capital Funds – including, but not limited to, employee benefit plans and their fiduciaries – as of December 11, 2008 (together collectively, the "Class"). This action charges the Austin Capital Defendants (defined below) with violations of the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the Employee Retirement Income Security Act of 1974 ("ERISA"), breach of contract, breach of fiduciary duty, unjust enrichment, negligence and violations of state blue sky laws.

The allegations contained herein are based on personal knowledge as to the named lead plaintiffs and non-lead plaintiffs and their own acts, and on information and belief as to all other

---

[1]     "Austin Capital Funds" refers to any investment fund controlled or managed by Austin Capital that invested in any Madoff-related entity, including but not limited to: Austin Capital All Seasons Offshore Fund, Ltd. ("All Seasons"); (2) Austin Capital All Seasons Offshore Fund II, Ltd. ("All Seasons II"); (3) Austin Capital Multi-Strategy Offshore Fund, Ltd. ("Multi-Strategy"); (4) Austin Capital Safe Harbor Portable Alpha Offshore Fund One, Ltd. ("Portable Alpha One"); (5) Austin Capital Safe Harbor Portable Alpha Offshore Fund Two, Ltd. ("Portable Alpha Two"); (6) Austin Capital Safe Harbor ERISA Dedicated Fund, Ltd. ("ERISA Fund"); (7) Austin Capital All Seasons Master Account, G.P. ("All Seasons Master Account"); (8) Austin Capital Safe Harbor Master Account, G.P. ("Safe Harbor Master Account"); (9) Austin Capital Next Generation QP Fund ("Next Generation QP Fund"); (10) Next Generation Offshore Fund; (11) Austin Capital Safe Harbor QP Fund ("Domestic Fund"); (12) Austin Capital All Seasons QP Fund; (13) Austin Capital Safe Harbor Offshore Fund ("Safe Harbor Offshore Fund"); (14) Austin Capital Safe Harbor ID Fund (insurance dedicated); (15) All Seasons ID Fund (insurance dedicated); (16) Austin Capital Multistrategy QP Fund; and (17) Austin Capital Balanced Fund.

matters based on the investigation by and through counsel, which included the review of complaints filed by the United States of America, the Securities and Exchange Commission ("SEC"), papers and pleadings filed in actions pending in various federal courts, offering memoranda and private placement memoranda distributed to investors, and quarterly and periodic reports issued to potential investors, news reports published in the financial press, auditor reports and other publicly available information.

## NATURE OF THE ACTION

1.      This action arises from the massive breaches of fiduciary duty and misrepresentations by the Austin Capital Defendants, in connection with their loss of millions of dollars of investors' money through investments made in funds controlled by Bernard Lawrence Madoff ("Madoff") and/or his firm Bernard L. Madoff Investment Securities LLC ("BMIS"), including in the Rye Select Broad Market Prime Fund, L.P. ("Rye Select Prime Fund") or similar fund.  Plaintiffs and the Class have lost a significant portion of their overall investments in Austin Capital Funds due to Defendants' misconduct.

2.      As detailed below, Austin Capital Funds turned over substantial portions of their capital to Madoff and/or BMIS.  In the largest Ponzi scheme in history, Madoff and BMIS defrauded investors out of as much as $65 billion.  The Madoff fraud was perpetrated by a network of "feeder funds" that enabled Madoff to evolve from an ordinary asset manager for select individual clients to a wholesale manager of billions of dollars for thousands of fund investors.  Seven of Madoff's top feeder funds had $25 billion in assets invested with him and they, together with the feeder funds that fed into them, received hundreds of millions of dollars in management fees over the years for placing their clients' monies with Madoff and/or BMIS.

3.      While Madoff enticed his investors by offering steady double-digit "returns" in both up and down markets, there were numerous "red flags" that Defendants knowingly, recklessly and/or negligently ignored that indicated that Madoff was not actually employing his stated investment strategy, but instead was engaged in fraudulent behavior such as front-running or an illegal Ponzi scheme and that Austin Capital's investments in Madoff feeder funds were unduly risky and inappropriate.

4.      Importantly, based on these red flags, numerous diligent investment advisors in the industry decided not to invest with Madoff.  Specifically, many investment advisors, investment banks and pension funds – *i.e.*, JPMorgan Chase & Co., Fort Worth Employee Retirement Fund and Acorn Partners, a firm which assists its clients in selecting money managers – took the time and effort to conduct proper due diligence reviews, and, as a result of these warning signs, chose ***not*** to invest with Madoff or any of his affiliated funds.  In stark contrast, however, despite representing in their offering memoranda that they would evaluate and monitor all investments, the Austin Capital Defendants failed to conduct a due diligence review necessary to determine whether the Madoff-related funds were appropriate investments and ignored all the red flags that would have revealed that Madoff was a fraud and an unsafe investment for ERISA plan investors.

5.      Upon information and belief, Defendants' due diligence and risk management failures concerning Madoff's role as the sub-manager of the Austin Capital Funds were concealed in all of the promotional and informational materials provided to Class members regarding the Austin Capital Funds.  Plaintiffs and the Class were unaware that their funds were being invested with Madoff and/or his affiliates without proper due diligence.  The failure to disclose this information, and the failure to conduct the promised due diligence and risk management and resulting misrepresentations,

- 3 -

rendered statements in the Austin Capital Funds' offering documents and other materials false and misleading.

6.      Moreover, while some of the materials provided by the Austin Capital Funds included a section on risk factors that described a wide variety of investment strategies employed by the Austin Capital Funds, there was no warning about the risk that the Austin Capital Defendants took in the management of the Austin Capital Funds – entrusting a single sub-manager with sole discretion over the custody and trading of a substantial portion of the funds' net assets without conducting meaningful due diligence into his operations, investments and/or investment strategy.

7.      Plaintiffs and the Class hereby seek to recover damages, as well as all fees and other amounts wrongfully paid to the Austin Capital Defendants.  The management fees paid in error, and based on false information, should also be returned to Plaintiffs and the Class.

## JURISDICTION AND VENUE

8.      These claims arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, under §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), and §§409 and 502(a)(2) and (3) of ERISA, 29 U.S.C. §§1109, 1132(a), as well as under common law.  Jurisdiction is conferred by, and venue is proper pursuant to, §27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. §1331 and §502(e) of ERISA, 29 U.S.C. §1132(e), and pursuant to supplemental jurisdiction.  Defendants used the instrumentalities of interstate commerce and the U.S. mails.

## PARTIES

### Plaintiffs

9.      Lead Plaintiff Pension Trust Fund for Operating Engineers ("Operating Engineers") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §§1002(37).  As

set forth in its certification previously filed with the Court, and incorporated herein by reference, Operating Engineers purchased and held $164.3 million worth of shares of the ERISA Fund during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby. Operating Engineers is composed of three individual funds, the Operating Engineers Pension Plan, the Operating Engineers Health and Welfare Trust Fund and the Operating Engineers Pensioned Health and Welfare Trust Fund, each of which is a separate legal entity and plaintiff, but is referred to collectively as Operating Engineers. Operating Engineers maintains its principal place of business at 1640 South Loop Road, Alameda, California.

10.     Plaintiff Russell E. Burns ("Burns") is a trustee and fiduciary of Operating Engineers within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), asserts claims for violations of 29 U.S.C. §1109 on behalf of Operating Engineers and the Class. Plaintiff Burns is a trustee and fiduciary of each of the three Operating Engineers funds.

11.     Lead Plaintiff International Brotherhood of Teamsters Local 705 Pension Fund ("Local 705") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §1002(37). As set forth in its certification previously filed with the Court and incorporated herein by reference, Local 705 purchased and held $25 million of Portable Alpha One shares during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby. Local 705 maintains its principal place of business at 1645 W. Jackson Blvd., 7th Floor, Chicago, IL.

12.     Plaintiff John Witt ("Witt") is the Plan Administrating Manager and fiduciary for Local 705 within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), asserts claims for violations of 29 U.S.C. §1109 on behalf of Local 705 and the Class.

588910_1

13.     Lead Plaintiff Sheet Metal Workers' National Pension Fund ("Sheet Metal Workers") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §§1002(37). As set forth in its certification previously filed with the Court and incorporated herein by reference, Sheet Metal Workers purchased and held $50 million of All Seasons shares during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby.  Sheet Metal Workers maintains its principal place of business at 601 North Fairfax Street, Suite 500, Alexandria, Virginia.

14.     Plaintiffs Michael J. Sullivan ("Sullivan") and Ronald Palmerick ("Palmerick") are trustees and fiduciaries for Sheet Metal Workers within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), assert claims for violations of 29 U.S.C. §1109 on behalf of Sheet Metal Workers and the Class.

15.     Plaintiff Laborers Local 17 Pension Plan ("Local 17 Pension Plan") is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §1002(37).  As set forth in its certification, attached hereto as Exhibit A, Local 17 Pension Plan  purchased and held $4 million of ERISA Fund shares during the Class Period, a portion of which was managed by Madoff and/or BMIS, and has been damaged thereby.  Local 17 Pension Plan maintains its principal place of business at 451 B Little Britain Road, Newburg, New York 12550.

16.     Plaintiff Daniel Jackson ("Jackson") is the Employee Benefits Administrator and a named fiduciary of and participant in the Local 17 Pension Plan within the meaning of §3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A) and, pursuant to 29 U.S.C. §1132(a)(2), asserts claims for violations of 29 U.S.C. §1109 on behalf of Local 17 Pension Plan and the Class.

17.     Plaintiff New Mexico Educational Retirement Board ("New Mexico ERB") is a public pension plan that manages the benefits of New Mexico's public educational employees.  As

set forth in its certification, attached hereto as Exhibit B, New Mexico ERB  purchased and held

$130 million of Domestic Fund shares during the Class Period, a portion of which was managed by

Madoff and/or BMIS, and has been damaged thereby.  New Mexico ERB maintains its principal

place of business at 6201 Uptown Blvd., NE, Suite 204, Albuquerque, New Mexico.

17a.    Plaintiff Texas Treasury Safekeeping Trust Company ("Texas Safekeeping") is a

special purpose trust company established to protect and manage Texas state financial assets.  As set

forth in its certification, attached hereto as Exhibit C, Texas Safekeeping purchased $287.5 million

of the Safe Harbor Offshore Fund during the Class Period, a portion of which was managed by

Madoff and/or BMIS, and has been damaged thereby.  Texas Safekeeping maintains its principal

place of business at 208 East 10th Street, Austin, Texas.

18.    Lead Plaintiffs Operating Engineers, Local 705 and Sheet Metal Workers, and

plaintiffs Local 17 Pension Plan, Burns, Witt, Sullivan, Palmerick, Jackson, New Mexico ERB, and

Texas Safekeeping are collectively referred to herein as "Plaintiffs," and Plaintiffs, with the

exception of New Mexico ERB, are referred to herein as "ERISA Plaintiffs."

**Austin Capital Corporate Defendants**

19.    Defendant Austin Capital is a limited partnership, based in Austin, Texas, that

oversees hedge fund investment portfolios for individuals and institutional clients.  At some or all

times during the Class Period, Austin Capital placed and controlled investments with various entities

holding ERISA covered employee benefit plans assets, including: (1) All Seasons; (2) All Seasons

II; (3) Multi-Strategy; (4) Portable Alpha One; (5) Portable Alpha Two; (6) ERISA Fund; (7) All

Seasons Master Account; (8) Safe Harbor Master Account; (9) Next Generation QP Fund; and (10)

Next Generation Offshore Fund.  Austin Capital also placed and controlled investments with the

following entities: (11) Domestic Fund; (12) Austin Capital All Seasons QP Fund; (13) Austin

- 7 -

Capital Safe Harbor Offshore Fund; (14) Austin Capital Safe Harbor ID Fund (insurance dedicated); (15) All Seasons ID Fund (insurance dedicated); (16) Austin Capital Multistrategy QP Fund; (17) Austin Capital Balanced Fund; and others.[2]   The sole general partner of Austin Capital is Austin Capital Management GP Corp. ("ACM-GP").   The sole limited partner of Austin Capital is KeyCorp.  Both Austin Capital and ACM-GP are wholly-owned subsidiaries of KeyCorp.  As of 2008, Austin Capital had approximately $2.3 billion under management for all of its clients.  Austin Capital is a fiduciary of the Austin Capital Funds within the meaning of §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), in that: (a) it exercised authority or control over the management and disposition of the ERISA covered employee benefit plan assets, including those assets which were, in turn, entrusted to the discretion and control of Madoff; (b) it is an investment manager within the meaning of §3(38) of ERISA, 29 U.S.C. §1002(38), which by definition is a fiduciary; (c) it rendered investment advice for a fee on other compensation, direct or indirect, with respect to those assets; (d) it executed an agreement expressly recognizing its status as a fiduciary within the meaning of ERISA with several of the above named ERISA covered employee benefit plans; and (e) it expressly recognized its status as a fiduciary within the meaning of ERISA in correspondence with several of the above named ERISA covered employee benefit plans.

20.     Defendant AMC-GP is a Texas corporation and the sole general partner of Austin Capital.  ACM-GP is wholly owned by KeyCorp.  By virtue of the control it exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin

---

[2]     The first ten Austin Capital Funds listed held ERISA plan assets at some or all times during the Class Period.  The last seven Austin Capital Funds may or may not have held ERISA plan assets at some or all times during the Class Period.  Full names of the funds are previously defined in n.1 of footnote one.

- 8 -

Capital Funds, defendant ACM-GP has, at all relevant times, been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds, and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

21.     Defendant KeyCorp is an Ohio corporation with its principal offices in Cleveland, Ohio, and is the owner of Austin Capital.  KeyCorp is one of the nation's largest bank-based financial services companies, with consolidated assets of approximately $98 billion.  KeyCorp provides investment management services as well as banking and other services to its clients and customers.  During the Class Period, Victory Capital Management, Inc. ("Victory"), a wholly-owned subsidiary of KeyCorp, managed the assets of the Austin Capital Funds.  KeyCorp is the sole limited partner of Austin Capital and sole shareholder of ACM-GP.

22.     As described *infra*, KeyCorp's Executive Vice President and Chief Compliance Officer, Ronald J. Dugas ("Dugas"), is a member of the Austin Capital Board of Directors. Defendant KeyCorp had the authority to exercise, and did exercise, control over Austin Capital's investment management policies and decisions, through its ownership and through the service of KeyCorp executives on Austin Capital's Board of Directors.  Through KeyCorp's exercise of authority or control over the conduct of Austin Capital, it exercised authority or control over Austin Capital's management of the assets invested in the Austin Capital Funds.  By virtue of the authority or control it exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, defendant KeyCorp has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

588910_1

23.     Defendant Victory is a New York corporation with principal offices in Cleveland,

Ohio.  It engages in the business of investment portfolio management.  Victory is wholly owned by

KeyCorp, and has served as the asset management subsidiary of KeyCorp since at least 2005.

Victory acquired Austin Capital in January 2006.  Victory manages approximately $62 billion in

assets.  Through its ownership of Austin Capital, Victory exercised authority and/or control over

Austin Capital's investment policies and decisions on behalf of its owner, KeyCorp.  Through

Victory's exercise of authority or control over the conduct of Austin Capital, it exercised authority

and/or control over Austin Capital's management of the assets invested in the Austin Capital Funds,

also on behalf of its owner, KeyCorp.  By virtue of the authority or control it exercised over the

management and disposition of ERISA covered employee benefit plan assets invested in the Austin

Capital Funds, Victory has at all relevant times been an ERISA fiduciary with respect to these

employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA,

29 U.S.C. §1002(21)(A)(i), and was responsible for managing such assets in accordance with the

provisions of ERISA.

24.     The acquisition of Austin Capital allowed KeyCorp and Victory to attract institutional

investors while providing crucial scale in assets and operations for Austin Capital.  In fact, Austin

Capital's total assets under management skyrocketed after the acquisition in early 2006.

25.     Austin Capital's founder and senior managing director, Charles W. Riley ("Riley"), in

a news article published by *American Banker* entitled "Austin Capital Acquisition Pays Off for

Victory" dated November 26, 2007, said: "What has really changed is now we're getting a lot more

exposure to the institutional world through Victory's institutional marketing people."  He explained

that institutional investors avoid smaller funds with higher operational risks, "[b]ut once we were

integrated into Victory, those concerns went away.  Because now a very large institution could

allocate to us and not be concerned about our business, because they knew we had Victory and KeyCorp backstopping us."

26.      Austin Capital also relied on KeyCorp's $100 million of fiduciary and liability insurance to successfully run its business. A questionnaire from Marco Consulting Group, an investment consultant to a number of employee pension plans, asked Austin Capital "what does your firm believe is the most unique aspect of your investment philosophy or process? How does this contribute to your firm's value-added?" Austin Capital responded, stating in part, "[O]ur recent acquisition by KeyCorp and affiliation with its asset management subsidiary, Victory, provides our firm and clients with the benefits of their financial and administrative backing, which allow[s] us to maintain full operational control of the firm and our investment process."

27.      Austin Capital, KeyCorp and Victory also represented and marketed the Austin Capital Funds on the basis of KeyCorp's and Victory's roles as ERISA fiduciaries. These representations made it clear that the Austin Capital Funds and their investors did not just rely on the resources and efforts of Austin Capital, but they also relied on the involvement and oversight of KeyCorp and Victory. The various Austin Capital Funds were sold on the basis of those representations. For example, Austin Capital Safe Harbor Fund presentation materials dated August 24, 2006 promoted the fund on the basis of Austin Capital's status as a subsidiary of KeyCorp and affiliate of Victory. The materials assured investors that the "combination with KeyCorp" benefited the funds by allowing: (1) the opportunity to broaden equity participation within the Austin Capital Investment Team; (2) the ability to leverage the technology spend of a much larger organization; (3) the support of a 29-member Institutional Sales and Client Service Team at Victory; and (4) additional resources in the compliance and finance areas. The same presentation materials specifically identified Victory as part of the Austin Capital Management Team Organization and

- 11 -

further identified a five-member accounting team as part of Austin Capital's Administration, Compliance & Control group. An organizational chart included in the materials represented that five professionals from "KeyCorp/Victory Compliance" had compliance responsibilities at Austin Capital and that five professionals from "KeyCorp/Victory Finance Team" were also part of the Austin Capital Management Team Organization. Substantially identical representations were made in March 1, 2007 presentation materials.

28.     On December 10, 2007, presentation materials for the Austin Capital Safe Harbor Portable Alpha Offshore Funds, Austin Capital and KeyCorp similarly marketed those funds by touting KeyCorp's oversight of "$6 billion in Taft-Hartley assets" and over "170 Taft-Hartley clients nationwide," together with "A long, proud history of supporting Union Labor." The presentation materials repeated many of the representations and admissions quoted above and further admitted that Austin Capital's In-house Chief Compliance Officer reported "directly to the Chief Compliance Officer of KeyCorp/Victory Capital Management" and was "Supported by seven compliance officers in Cleveland," (*i.e.*, at KeyCorp headquarters).

29.     On April 22, 2008 presentation materials for the Austin Capital Safe Harbor Fund again repeated the representations concerning KeyCorp's prominence in overseeing ERISA funds and touted its oversight of "$6 billion in Taft-Hartley assets," "170 Taft-Hartley clients," and Victory's role as part of the Austin Capital Management Team. The sales materials put it succinctly: "Why the Safe Harbor Fund?" The answer was: "Austin Capital Management's stable, experienced investment team is backed by the significant resources of Victory Capital and KeyCorp." Indeed, according to the materials, Austin Capital's Chief Compliance Officer had been transferred to Austin Capital from Victory. Upon information and belief, including the repeated similar representations made over several years, Plaintiffs allege that similar admissions and assurances were made in

588910_1

presentation materials to each of Austin Capital's clients. By virtue of their involvement in Austin Capital's day-to-day operations, KeyCorp and Victory exercised authority or control over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds.

30.     Defendants Austin Capital, ACM-GP, KeyCorp and Victory are collectively referred to herein as the "Austin Capital Corporate Defendants."

31.     It was common for each of the Austin Capital Corporate Defendants to ignore corporate formalities and structure in their communications with Plaintiffs and the Class. The Austin Capital Corporate Defendants worked in concert with the objective of deceiving Plaintiffs and the Class into purchasing shares of the Austin Capital Funds and maintaining those investments for the purposes of garnering fees and other pecuniary benefits.

**Individual Defendants**

32.     Defendant Riley served during the Class Period as Senior Managing Director and Chief Investment Officer of Austin Capital. Riley was President of ACM-GP. He was responsible for coordinating and supervising Austin Capital's research and portfolio construction activities. As of April 30, 2009, he was reportedly no longer a member of the Board of Directors for various investment vehicles managed by Austin Capital, but remained part of Austin Capital and is still an investment manager to the Austin Capital Funds. According to Austin Capital's Part II, Form ADV filings with the SEC, Riley managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV). By virtue of the authority or control Riley exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, defendant Riley has at all relevant times been an ERISA fiduciary with respect to these employee benefit plan assets held by

- 13 -

the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

33.     Defendant Brent A. Martin ("Martin") served during the Class Period as Senior Managing Director and Chief Investment Officer of Austin Capital. As of April 30, 2009, defendant Martin was reportedly no longer a member of the Board of Directors for the various investment vehicles managed by Austin Capital, but remained part of Austin Capital and was still an investment manager to the Austin Capital Funds. According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Martin managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.) By virtue of the authority or control Martin exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Martin has, at all relevant times, been an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has at all relevant times had a responsibility to manage such assets in accordance with the provisions of ERISA.

34.     Defendant James P. Owen ("Owen") served during the Class Period as Senior Managing Director of Austin Capital. According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Owen managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.) By virtue of the authority or control Owen exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Owen has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin

588910_1

Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

35.     Defendant Robert Wagner ("Wagner") has served as Chief Executive Officer and Chairman of Victory and is a member of KeyCorp Executive Council.  Wagner additionally serves on the ACM-GP Board of Directors.  According to Austin Capital's Part II, Form ADV filings with the SEC, Wagner managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority and control Wagner exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, defendant Wagner has, since the acquisition of Austin Capital by Victory, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

36.     Defendant David C. Brown ("Brown") has served as Chief Operating Officer ("COO") and Senior Managing Director of Victory since 2004.  Brown additionally serves as a director of ACM-GP.  According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Brown managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control Brown exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Brown has at all relevant times been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

- 15 -

37.     Defendant David E. Friedman ("Friedman") was Managing Director of ERISA Fund and Managing Director and COO of Austin Capital.  According to Austin Capital's Part II, Form ADV filings with the SEC, Friedman managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds.  (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control Friedman exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Friedman has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

38.     Defendant Kyle McDaniel ("McDaniel") was Austin Capital's Director of Risk Management from October 2001 to April 2006 and Senior Manager of Risk Review from April 2006 to the present.  Based on Austin Capital's Part II, Form ADV filings with the SEC, McDaniel managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.)  By virtue of the authority or control McDaniel exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, McDaniel has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

39.     Defendant Montgomery Green ("Green") served as Austin Capital's Portfolio Manager from August 1999 to the present.  According to Austin Capital's Part II, Form ADV filings with the SEC, defendant Green managed the Austin Capital Funds and controlled the investment

- 16 -

assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV). By virtue of the authority or control Green exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Green has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

40.    Defendant Jay W. Van Ert ("Van Ert") served as Austin Capital's Portfolio Manager from August 1999 to the present. According to Austin Capital's Part II, Form ADV filings with the SEC, Van Ert managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's January 12, 2007 Form ADV.) By virtue of the authority or control Van Ert exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Van Ert, has at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

41.    Defendant Ronald J. Dugas ("Dugas") is a KeyCorp executive who served on the Board of Directors of Austin Capital. He is the Executive Vice President and Chief Compliance Officer for KeyCorp. Starting in 2000, he assumed the risk management responsibilities for the Capital Markets, Asset Management and Treasury Functions under the Risk Management Group of KeyCorp. According to Austin Capital's Part II, Form ADV filings with the SEC, Dugas managed the Austin Capital Funds and controlled the investment assets of the Austin Capital Funds. (*See, e.g.*, Part II, Austin Capital's July 17, 2009 Form ADV). By virtue of the authority or control Dugas

588910_1

exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, Dugas has, at all relevant times, been an ERISA fiduciary with respect to the employee benefit plan assets held by the Austin Capital Funds pursuant to §3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)((i), and has, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

42.     Defendants Riley, Martin, Owen, Wagner, Brown, Friedman, McDaniel, Green, Van Ert and Dugas are collectively referred to herein as the "Individual Defendants."

43.     The Individual Defendants received substantial fees and compensation for their participation in the management of Austin Capital.  Austin Capital received a management fee of 1%-1.5% of the net asset value annually (paid monthly).

44.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Austin Capital Corporate Defendants, controlled the contents of various public statements and investor reports pertaining to Austin Capital during the Class Period. Upon information and belief, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public statements and investor reports detailed herein and is therefore primarily liable for the representations contained therein.

45.     The Individual Defendants, by virtue of their high-level positions with the Austin Capital Corporate Defendants, directly participated in the management of those entities, were directly involved in the day-to-day operations of those entities at the highest levels and were privy to confidential proprietary information concerning those entities and their business, operations, growth, financial statements, and financial condition, as alleged herein.

588910_1

46.     By virtue of the control that each of the Individual Defendants exercised over the management and disposition of ERISA covered employee benefit plan assets invested in the Austin Capital Funds, each of the Individual Defendants was at all relevant times an ERISA fiduciary with respect to these employee benefit plan assets held by the Austin Capital Funds, and, at all relevant times, had a responsibility to manage such assets in accordance with the provisions of ERISA.

47.     The Austin Capital Corporate Defendants and the Individual Defendants are collectively referred to herein as the "Austin Capital Defendants."

48.     The Austin Capital Defendants received substantial fees for their participation in the management of the Austin Capital Funds.  The Austin Capital Defendants are jointly and severally responsible for the breaches of fiduciary duty alleged herein, in that they constitute an integrated enterprise with shared officers, directors, partners, personnel and other resources for the joint purpose of providing investment management to Class members and/or participated in the breaches of fiduciary duty herein.

49.     Each of the Austin Capital Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit upon Plaintiffs and the Class by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme caused Plaintiffs and the Class to suffer substantial losses in connection with their multi-million dollar investments in the Austin Capital Funds.

50.     It is appropriate to treat the Austin Capital Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed to Plaintiffs and the Class as alleged herein is the collective action of the narrowly defined group of Defendants identified above.  The Austin Capital Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein,

were aware, or recklessly disregarded, that the false and misleading statements were being issued and approved or ratified these statements, in violation of federal securities laws, ERISA and state common law.

51.     The Austin Capital Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Austin Capital Funds' financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously issued statements that had become materially misleading or untrue so that the value of shares of the Austin Capital Funds would be based upon truthful and accurate information. The Austin Capital Defendants' misrepresentations and omissions during the relevant period violated these specific requirements and obligations.

**Doe Defendants**

52.     Upon information and belief, Does 1-100 ("Doe Defendants") are individuals or entities whose names and addresses are presently unknown. Plaintiffs do not know the specific identities of the Doe Defendants at this time; however, Plaintiffs intend to amend this complaint once their identities become known to them.

53.     The Austin Capital Defendants and the Doe Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Madoff and BMIS Perpetrated a $65 Billion Ponzi Scheme**

54.     On December 10, 2008, Madoff allegedly told his two sons that the asset management arm of his firm, BMIS, was a giant Ponzi scheme that had bilked investors out of billions of dollars. Madoff's sons alerted the Federal Bureau of Investigation and, the following day, Madoff was arrested and charged with violations of the antifraud provisions of the federal securities laws. The

- 20 -

SEC immediately filed an emergency action in this District seeking to cease all ongoing offerings of securities and investment advisory fraud by Madoff and BMIS.  The SEC alleged in its moving papers that:

> Madoff is a resident of New York City and is the sole owner of BMIS. BMIS' website indicates that Madoff founded BMIS in the early 1960s and that he is an attorney.  Madoff is a former Chairman of the board of directors of the NASDAQ stock market.  BMIS is both a broker-dealer and investment adviser registered with the Commission.  Madoff [oversees] and controls the investment adviser services at BMIS as [well as] the overall finances of BMIS.  The most recent Form [ADV] for BMIS filed in January 2008 with the Commission listed BMIS [as] having over $17 billion in assets under management.

> BMIS is a broker-dealer and investment advisor registered in both capacities with the Commission. BMIS engages in three different operations, which include investment adviser services, market making services and proprietary trading.  BMIS website states that [it] has been providing quality executions for broker-dealers, banks and financial institutions since its inception in 1960[]; and that BMIS, "[w]ith more than $700 million in firm capital, Madoff currently ranks among the top 1% of US Securities firms."

> Since at least 2005, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.  Madoff conducts certain investment advisory business for clients that [are] separate from the BMIS' proprietary trading and market making activities.

> Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS.  Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS.

> In or about the first week of December, Madoff told Senior Employee No. 2 that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so.  According to the Senior Employees, they had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.

> According to a Form ADV filed by Madoff, on behalf of BMIS, with the Commission on or about January 7, 2008, Madoff's investment advisory business served between 11 and 25 clients and had a total of approximately $17.1 billion in assets under management.

*        *        *

At Madoff's Manhattan apartment, Madoff informed the Senior Employees, in substance, that his investment advisory business was a fraud. Madoff stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." In substance, Madoff communicated to [his] Senior Employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors. Madoff stated that the business was insolvent, and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be at least approximately $50 billion. One of the Senior Employees has a personal account at BMIS in which several million had been invested under the management of Madoff.

At Madoff's Manhattan apartment, Madoff further informed the Senior Employees that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

55.     On March 12, 2009, Madoff was sent to jail after pleading guilty to 11 felony counts.

An article published in *The Wall Street Journal* on March 13, 2009 entitled "Madoff Jailed After Admitting Epic Scam" stated, in relevant part, that:

Mr. Madoff pleaded guilty to 11 felony counts and for the first time publicly described how he managed the global, multibillion-dollar Ponzi scheme and concealed it from federal authorities and investors for more than a decade. He pleaded guilty after waiving a grand-jury indictment and criminal trial in hopes of receiving a more lenient sentence from the judge. He faces a maximum sentence of 150 years, but is more likely to get about 20 years in prison, if sentences run concurrently.

U.S. District Judge Denny Chin revoked Mr. Madoff's bail, no longer allowing him to remain in his $7 million Manhattan penthouse where he has been living under 24-hour security guard since mid-December. He was sent directly to jail, pending his sentencing June 16. The decision drew a burst of applause from a crowd of Madoff investors and other spectators in the courtroom.

\*       \*       \*

Mr. Madoff did shed some light on why he started the fraud and whether he knew he would get caught. He said when the fraud started in the early 1990s, he felt "compelled" to give institutional investors strong returns despite the weak stock market and national recession. "When I began the Ponzi scheme I believed it would end shortly and I would be able to extricate myself and my clients from the scheme," he told the court. "However, this proved difficult and ultimately impossible."

- 22 -

56.     Madoff explained how he perpetrated the fraud in his criminal allocution, which

Madoff read in open court on March 12, 2009:

> To the best of my recollection, my fraud began in the early 1990s. At that
> time, the country was in a recession and this posed a problem for investments in the
> securities markets. Nevertheless, I had received investment commitments from
> certain institutional clients and understood that those clients, like all professional
> investors, expected to see their investments out-perform the market. While I never
> promised a specific rate of return to any client, I felt compelled to satisfy my clients'
> expectations, at any cost. I therefore claimed that I employed an investment strategy
> I had developed, called a "split strike conversion strategy," to falsely give the
> appearance to clients that I had achieved the results I believed they expected.
>
> Through the split-strike conversion strategy, I promised to clients and
> prospective clients that client funds would be invested in a basket of common stocks
> within the Standard & Poor's 100 Index, a collection of the 100 largest publicly
> traded companies in terms of their market capitalization. I promised that I would
> select a basket of stocks that would closely mimic the price movements of the
> Standard & Poor's 100 Index. I promised that I would opportunistically time these
> purchases and would be out of the market intermittently, investing client funds
> during these periods in United States Government-issued securities such as United
> States Treasury bills. In addition, I promised that as part of the split strike
> conversion strategy, I would hedge the investments I made in the basket of common
> stocks by using client funds to buy and sell option contracts related to those stocks,
> thereby limiting potential client losses caused by unpredictable changes in stock
> prices. In fact, I never made the investments I promised clients, who believed they
> were invested with me in the split strike conversion strategy.
>
> To conceal my fraud, I misrepresented to clients, employees and others, that I
> purchased securities for clients in overseas markets. Indeed, when the United States
> Securities and Exchange Commission asked me to testify as part of an investigation
> they were conducting about my investment advisory business, I knowingly gave false
> testimony under oath to the staff of the SEC on May 19, 2006 that I executed trades
> of common stock on behalf of my investment advisory clients and that I purchased
> and sold the equities that were part of my investment strategy in European markets.
> In that session with the SEC, which took place here in Manhattan, New York, I also
> knowingly gave false testimony under oath that I had executed options contracts on
> behalf of my investment advisory clients and that my firm had custody of the assets
> managed on behalf of my investment advisory clients.
>
> To further cover-up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike conversion strategy,
> as well as other individual clients I defrauded who believed they had invested in

securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations. I knew those false confirmations and account statements would be and were sent to clients through the U.S. mails from my office here in Manhattan.

Another way that I concealed my fraud was through the filing of false and misleading certified audit reports and financial statements with the SEC. I knew that these audit reports and financial statements were false and that they would also be sent to clients. These reports, which were prepared here in the Southern District of New York, among things, falsely reflected my firm's liabilities as a result of my intentional failure to purchase securities on behalf of my advisory clients.

Similarly, when I recently caused my firm in 2006 to register as an investment advisor with the SEC, I subsequently filed with the SEC a document called [] Form ADV Uniform Application for Investment Adviser Registration. On this form, I intentionally and falsely certified under penalty of perjury that Bernard L. Madoff Investment and Securities had custody of my advisory clients' securities. That was not true and I knew it when I completed and filed the form with the SEC, which I did from my office on the 17th floor of 855 Third Avenue, here in Manhattan.

In more recent years, I used yet another method to conceal my fraud. I wired money between the United States and the United Kingdom to make it appear as though there were actual securities transactions executed on behalf of my investment advisory clients. Specifically, I had money transferred from the U.S. bank account of my investment advisory business to the London bank account of Madoff Securities International Ltd., a United Kingdom corporation that was an affiliate of my business in New York. Madoff Securities International Ltd. was principally engaged in proprietary trading and was a legitimate, honestly run and operated business. Nevertheless, to support my false claim that I purchased and sold securities for my investment advisory clients in European markets, I caused money from the bank account of my fraudulent advisory business, located here in Manhattan, to be wire transferred to the London bank account of Madoff Securities International Limited.

There were also times in recent years when I had money, which had originated in the New York Chase Manhattan bank account of my investment advisory business, transferred from the London bank account of Madoff Securities International Ltd. to the Bank of New York operating bank account of my firm's legitimate proprietary and market making business. That Bank of New York account was located in New York. I did this as a way of ensuring that the expenses associated with the operation of the fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making businesses.

In connection with the purported trades, I caused the fraudulent investment advisory side of my business to charge the investment advisory clients $0.04 per

- 24 -

share as a commission.  At times in the last few years, these commissions were transferred from Chase Manhattan bank account of the fraudulent investment advisory side of my firm to the account at the Bank of New York, which was the operating account for the legitimate side of Bernard L. Madoff Investment Securities – the proprietary trading and market making side of my firm.  I did this to ensure that the expenses associated with the operation of my fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making businesses.  It is my belief that the salaries and bonuses of the personnel involved in the operation of the legitimate side of Bernard L. Madoff Investment Securities were funded by the operations of the firm's successful proprietary trading and market making businesses.

57.     On June 29, 2009, Madoff was sentenced to 150 years in prison. An article published in *The Wall Street Journal* on June 30, 2009 entitled "'Evil' Madoff Gets 150 Years in Epic Fraud" stated, in relevant part, that:

> Bernard Madoff, the self-confessed author of the biggest financial swindle in history, was sentenced to the maximum 150 years behind bars for what his judge called an "extraordinarily evil" fraud that shook the nation's faith in its financial and legal systems and took "a staggering toll" on rich and poor alike.
>
> The landmark sentence, one of the stiffest ever given for a white-collar crime, came just six months after Mr. Madoff, a pioneer on Wall Street, allegedly told his sons that his entire business was a massive Ponzi scheme.  The penalty sparked a burst of applause in a courtroom packed with victims of the fraud.

58.     Madoff perpetrated his fraudulent scheme through his New York and London offices, where directors and shareholders included family members and associates of Madoff.  Madoff used his London office to launder over $250 million of client monies generated by his New York investment advisory business.  The money was first transferred to London and then transferred back to the New York office to benefit Madoff personally and BMIS.  These transfers gave the appearance that Madoff was trading his clients' monies in Europe – a false claim that Madoff proffered when probed by investors about his trading strategy.

59.     Shortly after Madoff's guilty plea, Madoff's auditor, David Friehling ("Friehling"), was charged by federal prosecutors with falsely certifying that he audited financial statements for

- 25 -

BMIS.  According to an article in *The Wall Street Journal* published on March 19, 2009 entitled

"Accountant Arrested for Sham Audits," Friehling knowingly and improperly rubberstamped

Madoff's financial statements without conducting a comprehensive audit:

> In the criminal complaint against Mr. Friehling, a Federal Bureau of Investigation agent said the auditor didn't verify the existence of assets that Mr. Madoff said he held or securities trades Mr. Madoff said he made.  The agent also said Mr. Friehling didn't examine a bank account through which billions of dollars of client funds flowed, among other things.

> Mr. Friehling, 49 years old, was the sole auditor at Friehling & Horowitz, a storefront accounting firm in New City, N.Y., a New York City suburb.  The government said he audited Mr. Madoff's financial statements since 1991.  Since Mr. Madoff's arrest, auditing experts not involved in the case have said they were skeptical that one individual could have audited such a big company.  Mr. Madoff's firm, which had several businesses, including a division that facilitated securities trades between investors, had $1.1 billion in assets, according to 2007 financial statements prepared by Mr. Friehling that were reviewed by The Wall Street Journal.

> In a separate civil complaint that mirrored the criminal charges, the SEC also alleged that Mr. Friehling and his family had investment accounts at the Madoff firm worth more than $14 million, a "blatant" conflict of interest that violated auditing rules, according to the complaint.  He and his family withdrew at least $5.5 million since 2000, the SEC said.

60.     On November 3, 2009, Friehling pleaded guilty to securities fraud, aiding and

abetting investment advisor fraud, three counts of obstructing or impeding the administration of

Internal Revenue laws and four counts of making false filings with the SEC.  He admitted that he

failed to conduct independent audits of BMIS's financial statements, saying he took the information

given to him by Madoff or Madoff's employees at "face value."

61.     A reasonable due diligence inquiry into Madoff auditor's accounting practices would

have alerted a reasonable investor to the Madoff Ponzi scheme.  According to an opinion piece by

the *Business Mirror*, published on March 25, 2009 entitled "Missing An Easy Clue," it is "Due

Diligence 101" to inquire into the auditor's accounting practices:

588910_1

Investors may have avoided about $74 billion in losses if they had examined – or just tried to shake hands with – accountants supposedly verifying the books.

"Due Diligence 101 should demand that you check out the auditing firm and find out if it exists," said Richard Dietrich, an accounting professor at Ohio State University in Columbus. "Then, you have to find out if they are qualified."

              \*      \*      \*

"Too many Larry, Moe & Curly accounting firms" are now auditing money managers, said James Cox, a law professor at Duke University in Durham, North Carolina. "While we made progress with accounting for reporting companies, we have not with investment advisers."

              \*      \*      \*

Money managers should be required to disclose to regulators who audits their books, handles their trades and has custody of their assets, Cox said. Fund managers typically disclose those details privately to investors, who may try to independently verify them. Many don't.

Friehling, Madoff's accountant, operated from an office in the Georgetown Office Plaza, sandwiched between a medical practice and a pediatrician's office. Prosecutors and the SEC said Friehling, 49, vouched for Madoff's books without taking meaningful steps to verify them.

62.     Madoff feeder funds and sub-feeder funds have already been punished by numerous authorities for bilking investors of their entire investments and for the wholly unearned and unjust management fees that they levied on investors for merely handing over their clients' investment assets to Madoff. The Austin Capital Defendants' actions have mirrored the behavior of these other feeder funds, wherein they failed to perform adequate due diligence and concealed the fact that investments made on behalf of the Austin Capital Funds (and investors in those funds) were sub-managed by Madoff. Many members of the Class lost significant sums of money due to this misconduct and Defendants have been unjustly enriched in the form of undeserving management and administrative fees.

- 27 -

**The Investments of the Austin Capital Funds**

63.      Austin Capital invested in the Rye Select Prime Fund, managed by Tremont Group

Holdings, Inc., Tremont Partners, Inc. and Tremont (Bermuda) Limited (collectively "Tremont").

The Austin Capital Defendants' initial investment with Madoff occurred in 1997.

64.      Tremont served as a nominal investment manager to the Rye Select Prime Fund, but

all investment decisions and all trades were "executed" by Madoff.  Madoff was also the custodian

of all the securities owned by the funds he managed.

65.      Despite knowingly investing with Madoff, and despite representing that they would

perform active due diligence and investment monitoring, the Austin Capital Defendants recklessly

failed to conduct meaningful due diligence investigation into Madoff or BMIS and failed to oversee

capital investment.  Instead, the Austin Capital Defendants lost more than $180 million of Plaintiffs'

and the Class' money invested in the Austin Capital Funds, which invested in Madoff through the

Rye Select Prime Fund.

66.      The loss of Class assets was foreseeable in light of the numerous red flags concerning

Madoff's operations and the significant risk that Madoff was misappropriating investor funds.  The

materialization of this significant risk caused the loss of Class assets.  In addition, Defendants'

misstatements and omissions described herein concealed the risk that Madoff was a fraud.  Absent

the concealment, Plaintiffs and the other Class members would have been spared all or a substantial

portion of the loss.

**False and Misleading Statements Concerning Austin Capital's Purported Due Diligence,
Risk Management Practices and Financial Performance**

67.      The Austin Capital Defendants uniformly promoted Austin Capital's due diligence

procedures to potential investors in meetings and presentations.  The presentations, including the

representations set out in this and the following paragraph, were made to Texas Safekeeping on or

- 28 -

about August 1, 2006, to the New Mexico ERB on or about August 24, 2006, to the Laborer's District Council of Western Pennsylvania Welfare and Pension Fund on or about December 10, 2007, to the Operating Engineers on or about April 22, 2008 and to the Local 705 on or about August 3, 2007.   On information and belief, Plaintiffs allege that a substantially identical presentation was made as a matter of course to all Austin Capital Fund investors.  In a section of the presentations entitled "Due Diligence," Austin Capital described its extensive initial due diligence procedure at length as requiring the following:

- "Substantially complete Due Diligence Questionnaire."

- An "On-site visit with investment team to review manager's investment process, portfolio construction, risk management and liquidity."

- A "Detailed review of how manager prices investments."

- "Meet and evaluate back-office personnel and processing."

- "Evaluate the health of the manager business with core focus on compensation."

- "Thoroughly review offering docs & audits."

68.    In the same presentations, the Austin Capital Defendants similarly assured investors that Austin Capital followed extensive and ongoing risk management practices which included understanding the following:

- Understanding of portfolio management guidelines of underlying hedge fund managers (max position size, risk budge, volatility bands, drawdown sensitivity).

- Analysis of operational capabilities of underlying hedge fund managers.

- Portfolio-level analysis (manager correlations, gross/net exposures, sector/region exposures, factors, leverage).

- Aggregate exposure to individual underlying securities.

- Scenario analysis (performance in historically stressful markets, e.g. Summer 1998, April/May 2005).

- 29 -

- Complete understanding of valuation methodology of underlying hedge fund, including role of administrator and prime broker in valuation process.

- Is the underlying hedge fund manager running a profitable, successful business?

- Policies and procedures of the underlying hedge fund managers.

- Agreements with service providers.

- Liquidity risk at strategy level.

69.     The Austin Capital Defendants similarly made uniform misrepresentations to Plaintiffs and other investors in the offering memoranda for the various funds that they marketed. For example, in the November 1, 2007 Offering Memorandum for the Austin Capital Safe Harbor ERISA Dedicated Fund, Ltd., Defendants stated that:

**Advantages of Investing in the Fund**

*     *     *

- [p]rofessional selection and monitoring of hedge fund managers by the Investment Manager . . . .

*     *     *

**Investment Manager Evaluation and Selection Criteria**

The Investment Manager will utilize its experience in evaluating and selecting hedge fund managers and private investment partnerships. . . .

*     *     *

- The hedge fund manager should invest a majority of his own investment capital in the same pool of funds that he invests for his investors. This is intended to minimize possible conflicts of interest and to keep the hedge fund manager focused on managing the investment partnership.

- The hedge fund manager's primary compensation should be based on profits (usually 20% of profits) generated for investors. This is intended to focus the hedge fund manager on generating positive returns regardless of the direction of the stock market.

- 30 -

- The compensation of the hedge fund manager should be subject to a "high water mark" which requires that investors recoup any net losses before the hedge fund manager shares in the profits of the hedge fund.

*          *          *

- The hedge fund manager should be knowledgeable, focused and dedicated with a clearly defined investment strategy. This is intended to aid the Investment Manager in selecting a diversified group of hedge fund managers.

*          *          *

- The hedge fund manager should run a "good shop." He should be well organized and employ highly competent individuals in all key positions.

- The private investment partnership managed by the hedge fund manager must be audited by a well-known, reputable certified public accountant firm. Recent audited financial statements should be available for review.

*          *          *

[N]o exception will be made to the requirement of annual audited financial statements.

*          *          *

This requires the Investment Manager to monitor investments and determine whether to modify the investment strategies and retain or terminate hedge fund managers.

Substantially identical misrepresentations were made in the December 1, 2003 Offering Memorandum for the Austin Capital All Seasons Offshore Fund, Ltd., in the May 1, 2006 Offering Memoranda for the Austin Capital All Seasons Offshore Fund, Ltd., and in the November 1, 2005 Offering Memorandum for the Austin Capital Safe Harbor Offshore Fund, Ltd., as amended on May 1, 2006. Upon information and belief, Plaintiffs allege that these same standard misrepresentations were made as a matter of course in each of the offering memoranda that the Austin Capital Defendants published throughout the Class Period.

70. The representations made in the presentation materials and offering memoranda were false and misleading. Contrary to those representations, Madoff had not invested a majority of his own capital in the Rye Select Prime Fund. In addition, Madoff's primary compensation was not based on profits generated for investors, but instead was based on market rate commissions,

- 31 -

inexplicably causing Madoff to forgo hundreds of millions of dollars in potential fees and without being subject to any "high water mark" to allow investors to recoup losses. Nor did Madoff apply a clearly defined investment strategy, but instead insisted on secrecy. In fact, all competent investment professionals who attempted to replicate or even understand Madoff's purported investment strategies concluded that the strategy was unworkable, that Madoff was likely doing something else or that Madoff was in fact perpetrating a fraud. Nor was there any reason to believe that Madoff was running a good shop. Instead, key positions were held by family members, Madoff's SEC filing admitted that he only relied on approximately five people to run the consulting business and the business lacked technology as rudimentary as email communication with clients. Finally, Madoff was not audited by a well-known, reputable accounting firm, but instead was audited by a no-name firm with a single active auditor. Indeed, after Madoff was arrested, the government auditor who examined the purported audit papers quickly determined, within a few hours, that no audits had in fact been conducted of Madoff's business.

71.     In addition, the Austin Capital Defendants falsely assured investors that their initial due diligence involved onsite visits to and background checks of the investment manager and that they visited each of the Austin Capital Funds' asset managers at least once, but generally twice a year as part of their on-going risk management, including a visit by the Austin Capital Fund's portfolio manager to review investment issues and a visit by the fund's risk manager to evaluate the asset manager's back office, operations and technology.

72.     For example, in an April 11, 2007 response to a Request for Information on behalf of Operating Engineers, Austin Capital represented that:

> **Prior to selecting a hedge fund manager, what organizational/structural due diligence occurs as it relates to the manager's operations/accounting/reporting, back office functions, and background checks. Please discuss whether you use any third parties to assist in this process.**

There are three ways that we perform due diligence on managers, prior to investing, that is unrelated to the manager's investment process. First, Kyle McDaniel, our Risk Manager, will travel to the prospective manager's office, often with the Portfolio Manager, to conduct his own due diligence of operations, accounting, technology and various back office functions. In doing so, he is attempting to identify all business risk associated with the firm. Second, we will call on industry contacts that have had or still do have relationships with the prospective manager to assess their opinions and form a more unbiased perspective on the manager's business operations. Finally, we employ Fidelifacts to conduct formal background checks on all the principals of a prospective manager.

*　　　*　　　*

**Describe the process for communicating with managers once they are hired. How often do you normally meet with the hedge fund managers and what does the agenda include?**

Once a new manager is hired, our communication process becomes regimented in that we schedule formal quarterly updates calls as well as office visits at least once a year by both the portfolio manager and the risk managers (separate visits, if possible). In addition, the portfolio manager typically speaks with each manager at least once or twice a month via email or telephone to discuss anything from performance to new business developments. This combination of formal and informal communications helps us to build a more complete picture of the manager and gives us more insight into their portfolio.

73.     The Austin Capital Defendants made similar representations in Requests for Proposals responses to Texas Safekeeping, Massachusetts Pension Reserves Investment Management Board ("Mass PRIM"), and in their initial due diligence meetings with New Mexico ERB, Plaintiffs alleged upon such information and belief, that the Austin Capital Defendants made similar uniform representations in their initial meetings with each of their investors.

74.     Contrary to the Austin Capital Defendants' representations, however, Friedman, McDaniel and Van Ert admitted during conference calls on December 12 and 16, 2008 with the Mass PRIM, as reflected by that investor's official minutes, that their last on-site due diligence review of Madoff had been in late 2005.

75.     Similarly, in December 11 and 17, 2008 telephone calls with representatives of Investment Performance Services, a professional investment advisor, McDaniel and Van Ert

admitted that Austin Capital had relied on Tremont to conduct the initial due diligence and ongoing

risk management and had failed to conduct its annual risk management reviews. McDaniel and Van

Ert further admitted that they were aware that Madoff's operation acted as its own asset custodian,

supplying its own asset records and relied on its own brokerage operations, which generated its own

trade documentation. McDaniel further admitted that although Austin Capital has visited or called

Tremont various times over the life of the investment, he was only able to identify a single instance,

in 2005, when he had visited Madoff.

76.     Notwithstanding the purported due diligence and risk management procedures that

the Austin Capital Defendants represented to Plaintiffs and the Class that they undertook, the Austin

Capital Funds invested in the largest Ponzi scheme in history. This is due to the fact that the Austin

Capital Defendants turned a blind eye to the numerous red flags that indicated that Madoff's

operations were fraudulent. Defendants further induced Plaintiffs and members of the Class into

investing with them while concealing their failure to carry out the due diligence and investment

monitoring they represented to undertake. Defendants pursued and persisted in this wrongful course

of conduct in order to reap the inflated management fees that were available only through investing

with Madoff.

77.     Tremont and Madoff touted consistent returns and a strong investment strategy – i.e.,

the split-strike conversion strategy – to the Austin Capital Defendants. Instead of conducting a

meaningful due diligence, including a risk management review of Madoff-controlled funds, the

Austin Capital Defendants touted the investment strategy and consistent returns offered by the

Austin Capital Funds. Because the Austin Capital Defendants both defrauded investors and

breached their fiduciary duties to the Class, all of the assets that Austin Capital allowed to be

invested with Madoff were lost.

588910_1

78.     Had the Austin Capital Defendants performed the adequate and comprehensive due diligence review of Madoff and BMIS that they promised investors they would undertake, they would have confirmed the significant risks of investing with Madoff.

79.     In stark contrast to the promises made, the Austin Capital Defendants utterly failed to conduct a meaningful due diligence review into whether Madoff was actually making trades, or whether he was instead holding assets in order to pay redemption requests by more senior investors. The Austin Capital Defendants were aware, having received for example Rye Broad Markets' Relationships Overview, but did not question the fact that Madoff was both the custodian of the assets and the executing broker.  In other words, even if Austin Capital did check the custodian's records against the broker's records, it would have been in essence checking one piece of information received from Madoff against other information received from Madoff.  This lack of third-party corroboration should have dissuaded the Austin Capital Defendants from investing with Madoff through the Rye Select Prime Fund.

80.     Throughout the Class Period, the Austin Capital Defendants also made repeated false representations concerning the performance and asset value of the Austin Capital Funds that were invested in the Rye Select Prime Fund.  False or misleading performance and numbers were reported in the presentation materials for the Austin Capital Funds, including the Performance Analysis sections, and in Austin Capital's monthly Performance Update reports.  Those representations were false and misleading because the asset values listed for the Austin Capital Funds did not account for the fraudulent values attributed to those assets by Madoff and/or BMIS.  Similarly, the misrepresentations for each of the Austin Capital Funds would necessarily have been closely uniform since the undisclosed loss for any particular fund would be the same for each investor in that fund.

- 35 -

81.     Despite the numerous "red flags," the Austin Capital Defendants determined to keep investor money in the Austin Capital Funds invested in Madoff through Rye Select Prime Fund.

82.     The Austin Capital Defendants recklessly relied on the due diligence efforts of Tremont and others. The Austin Capital Defendants, however, were fiduciaries who had their own fiduciary obligations, which included the duty to conduct their own adequate due diligence on Madoff. The Austin Capital Defendants shirked these fiduciary duties and are directly responsible for the losses suffered by the Class.

### Despite Numerous "Red Flags," Defendants Failed to Perform an Adequate Due Diligence Review

83.     Austin Capital's marketing materials repeatedly touted the firm's extensive due diligence, risk management and investment monitoring practices.

84.     In fact, however, Defendants failed to conduct the due diligence necessary to protect the capital invested in the Austin Capital Funds by Plaintiffs and the Class and instead exposed these investments to the largest Ponzi scheme in history, imprudently and indeed recklessly causing significant losses.

85.     Defendants did not attempt to perform appropriate due diligence on their ultimate investment in Madoff; had they done so they would have learned that Madoff did not respond fully and candidly to routine requests for information, and provided inconsistent and demonstrably false explanations for the huge options volume he purportedly traded in order to implement his ostensibly hedged investment strategy. Hedge funds are complex investment funds that often lack transparency, and the mere disclosure of a fund's investment holdings would not adequately reveal the types and magnitudes of risks that a hedge fund manager undertakes. Accordingly, the unique and complex nature of hedge funds requires a level of robust, proactive due diligence above and beyond what is required for more transparent investments that are strictly regulated.

86.    Particular care must be exercised in due diligence of hedge managers and their funds, because of: (i) their more complex investment strategies; (ii) the possibilities of concentrated exposure to market and counterparty risks; (iii) their use of leverage and the associated risks; and (iv) the minimal regulation of these firms.  Funds of funds, such as Austin Capital, have a fiduciary duty to understand how a hedge fund or hedge fund manager may perform in a variety of future scenarios, and to review its organizational culture, internal economic incentives and conflicts of interest.

87.    On the flipside of the "due diligence coin," monitoring a hedge fund or a hedge fund manager is a continuation of the initial, fiduciary-grounded due diligence process.  While the initial due diligence serves to qualify a hedge fund as a desirable investment, the ongoing risk management monitoring process continually and periodically reconfirms that the conclusions and assumptions used in the initial evaluation and selection remain valid.  Fiduciaries, as well as institutional investment staff and consultants, must take reasonable steps to identify any events or circumstances that may result in the hedge fund/hedge fund manager failing to meet the standards and expectations that were originally required in the selection process.

88.    Funds of hedge funds are a common entry point for institutional investors to invest in alternative investments such as hedge funds because they provide diversity within that investment class, and because their managers perform the necessary due diligence in connection with each underlying hedge fund investment.  These are important factors to conservative institutional investors such as Plaintiffs and other members of the Class.  In fact, superior qualitative judgment and quantitative analysis often distinguish hedge fund investment managers from one another.  Managers of funds of funds, such as Austin Capital, are expected to perform in-depth due diligence on their underlying hedge fund investments.

89.    In fact, Harry Markopolos ("Markopolos"), a former money manager based in Boston, started complaining to the SEC in 2000 that Madoff was committing fraud of some sort – either front-running his clients' money or operating a Ponzi scheme. In a 19-page document sent to the SEC in November 7, 2005, entitled "The World's Largest Hedge Fund is a Fraud," he argued that it was impossible for Madoff's firm to collect as much money as it did from feeder funds and still execute his purported split-strike strategy, and identified 29 "red flags" that should have caused investment managers to further investigate Madoff's operations to dispel these warning signs or decide not to invest with Madoff and/or BMIS. These "red flags" included:

(a)    **Madoff's Fund Structure:** Unlike most private pooled investments where the investor is charged a fee by a fund manager, most investors with Madoff were invested in secondary fund of funds, such as Tremont, and were charged management fees by the respective fund of funds, but not by Madoff. Notwithstanding the fact that Madoff could easily have collected management or performance fees, Madoff chose to forgo hundreds of millions of dollars in fees, and only collected "market rate" commissions charged on each trade;

(b)    **Madoff's Secrecy:** Madoff insisted on a policy of secrecy, rather than transparency, regarding his purported management of investments. Madoff's purported returns went unverified. Madoff's trade tickets also went unverified. In fact, Defendants could have confirmed that Madoff's trade tickets were fraudulent had Defendants just asked to see them to compare them to information available from the Option Price Reporting Authority ("OPRA"), as discussed *infra*;

(c)    **Impossible Options Volume:** The total amount of call options outstanding was not nearly enough to generate $50 billion of assets under management. Moreover, the price percentages at which Madoff claimed to purchase the put options were unreasonably underpriced, and "there [were] not enough index option put contracts in existence to hedge the way [Madoff said]

- 38 -