**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                        )
IN RE AUSTIN CAPITAL MANAGEMENT, )      Case No. 1:09-MD-02075-TPG
LTD. SECURITIES & EMPLOYEE       )
RETIREMENT INCOME SECURITY ACT   )      **Hon. Thomas P. Griesa**
(ERISA) LITIGATION               )
                                 )
                                 )
                                 )
                                 )
_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
**DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................ iv

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ....................................................................................................... 3

    A.    Austin Capital And The Austin Capital Funds ....................................... 4

    B.    Austin Capital's Indirect And Limited Exposure, Via The Rye Fund, To Madoff And BMIS ................................................................................. 5

    C.    The Effect Of The Madoff Arrest ......................................................... 6

    D.    The Defendants ....................................................................................... 7

    E.    Plaintiffs' Claims ................................................................................... 7

ARGUMENT ............................................................................................................ 8

I.    Plaintiffs Lack Standing To Assert Claims Relating To Funds In Which They Did Not Invest .................................................................................. 9

II.    The Complaint Does Not Satisfy The Heightened Pleading Requirements Of Rule 9(b) Or The PSLRA ........................................................................ 10

    A.    All Claims Must Be Pleaded With Particularity ..................................... 11

        1.    The Entire Complaint Sounds In Fraud ..................................... 11

        2.    The "Disclaimer" Is Ineffective To Exempt The Section 12 Claim From Rule 9(b)'s Heightened Pleading Requirements ............................... 12

    B.    The Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference That Any Defendant Acted With Scienter ............................... 13

        1.    Plaintiffs Do Not Allege Any Plausible Motive To Commit Fraud .......... 14

        2.    Plaintiffs Do Not Allege Strong Circumstantial Evidence From Which Scienter May Be Inferred ..................................................... 16

            (a)    The "Red Flag" Allegations Do Not Raise An Inference Of Scienter ....................................................................... 16

            (b)    There Is No Well-Pleaded Allegation That Defendants Were Reckless In The Performance Of Their Due Diligence ................. 18

        3.    Any Inference Of Scienter Is Not Cogent And Is Less Compelling Than An Inference Of Non-Fraudulent Intent ............................. 19

    C.    The Complaint Impermissibly Lumps All The Defendants Together ............ 21

    D.    The Complaint Fails To Plead Particularized Facts Demonstrating The Falsity Of Any Alleged Misrepresentation ............................................. 23

        1.    Plaintiffs Do Not Allege The Contemporaneous Falsity Of Any Supposed Misrepresentation Regarding Investment Criteria ................. 24

# TABLE OF CONTENTS

**Page**

2.    Plaintiffs Do Not Allege The Contemporaneous Falsity Of Any Purported Misrepresentation Regarding Onsite Visits To Managers .........25

3.    Plaintiffs Do Not Allege The Contemporaneous Falsity Of Any Alleged Misrepresentation Regarding Due Diligence On Underlying Investments ................................................................................25

III.    The Section 20(a) Claim Must Be Dismissed Because The Complaint Does Not Plead A Primary Violation ................................................................................26

IV.    The Section 12(a)(2) Claim Must Be Dismissed Because Private Placement Memoranda Do Not Give Rise To Section 12 Liability ................................27

V.    The ERISA Claims Must Be Dismissed Because The Complaint Fails To Plead Either The Fiduciary Status Of Most Defendants Or A Breach Of Fiduciary Duty ..........28

    A.    Plaintiffs Have Failed To Plead A Fiduciary Status For All Defendants Except Austin Capital ................................................................................28

        1.    The Defendants' Titles And Corporate Relationships Are Insufficient To Establish Fiduciary Status ................................28

        2.    Allegations That Lump All The Defendants Together Are Insufficient To Establish Fiduciary Status ................................31

    B.    Plaintiffs Have Failed To Plead A Plausible Claim For Breach Of A Fiduciary Duty Under ERISA ................................................................33

        1.    Plaintiffs Have Not Plausibly Alleged Imprudence ...................................33

        2.    Hindsight And So-Called "Red Flags" Cannot Serve As The Basis For A Breach Of Fiduciary Duty Claim ................................36

        3.    *Beacon Associates* Shows Why Plaintiffs' Claims Fail Here ....................38

    C.    The ERISA Claims For Prohibited Transactions and Co-Fiduciary Liability Also Fail ................................................................................40

VI.    The Common-Law Claims Must Be Dismissed ................................................................41

    A.    All Common-Law Claims Except Fraud Are Preempted By The Martin Act........41

    B.    SLUSA Preempts All Of The Common-Law Claims ................................42

        1.    This Is A Covered Class Action................................................................43

        2.    Misrepresentations And Omissions Underpin Plaintiffs' Claims ..............44

        3.    Plaintiffs Allege The Purchase And Sale Of "Covered" Securities "In Connection With" Alleged Misrepresentations Or Omissions ............45

    C.    The Claims For Breach Of Fiduciary Duty, Unjust Enrichment, Breach Of Contract, And Gross Negligence Must Be Dismissed Because They Are Derivative, Not Direct................................................................................47

**TABLE OF CONTENTS**

**Page**

D.     The Unjust Enrichment Claim Fails Because There Is A Contract .......................48

VII.    The Texas And New Mexico Blue-Sky Claims Must Be Dismissed ..................49

VIII.   The Claims Against Defendant Dugas Must Be Dismissed ...............................50

CONCLUSION...............................................................................................................................50

# TABLE OF AUTHORITIES

Page

## CASES

*Abbey v. 3F Therapeutics, Inc.*,
No. 06 Civ. 409 (KMW), 2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009)..................................42

*Anwar v. Fairfield Greenwich Ltd.*,
-- F. Supp. 2d --, 2010 WL 3341638 (S.D.N.Y. 2010)..........................................................22

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ..................................................................... 8-9, 28, 33, 40

*Atkinson v. Morgan Asset Mgmt., Inc.*,
664 F. Supp. 2d 898 (W.D. Tenn. 2009)..................................................................45

*ATSI Commc'ns, Inc. v. Shaar Fund*,
493 F.3d 87 (2d Cir. 2007)..................................................................4, 10

*Backus v. Connecticut Comm. Bank, N.A.*,
No. 09-CV-1256, 2009 WL 5184360 (D. Conn. Dec. 23, 2009)............................................43

*Baker v. Andover Assocs. Mgmt. Corp.*,
Index No. 6179/09, slip op. (N.Y. Sup. Ct. Nov. 30, 2009) ............................................ 48-49

*Barron v. Igolnikov*,
No. 09 Civ. 4471(TPG), 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) .................42-43, 45-46

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................... 8-9, 28, 33, 36

*Brown v. Hutton Group*,
795 F. Supp. 1317 (S.D.N.Y. 1992)..................................................................26

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)..................................................................4

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006)..................................................................37

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
70 N.Y.2d 382 (1987) ..................................................................49

*Cotton v. Mass. Mut. Life Ins. Co.*,
402 F.3d 1267 (11th Cir. 2005) ..................................................................32

*Dardaganis v. Grace Capital, Inc.*,
889 F.2d 1237 (2d Cir. 1989)..................................................................29

# TABLE OF AUTHORITIES

**Page**

*Defer LP v. Raymond James Fin., Inc.*,
654 F. Supp. 2d 204 (S.D.N.Y. 2009)..................................................................22

*Dover Ltd. v. A.B. Watley, Inc.*,
423 F. Supp. 2d 303 (S.D.N.Y. 2006)..................................................................42

*ECA, Local 134 IBEW Joint Pension Trust of Chicago  v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................ 13-16

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
551 F. Supp. 2d 210 (S.D.N.Y. 2008)..................................................................14

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)............................................................................................10

*Falkowski v. Imation Corp.*,
309 F.3d 1123 (9th Cir. 2002), *amended by* 320 F.3d 905 (9th Cir. 2003) ............46

*Felton v. Morgan Stanley Dean Witter & Co.*,
429 F. Supp. 2d 684 (S.D.N.Y. 2006).......................................................... 44-45

*First Nationwide Bank v. Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994)....................................................................................9

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)................................................................................13

*Gardner v. Parker*,
[2003] EWHC 1463 (Ch), 2003 WL 21353425
(Court of Justice, Chancery Division) .................................................................48

*Goldman v. Metro. Life Ins. Co.*,
5 N.Y.3d 561 (2005) ...........................................................................................49

*Gotham Holdings, LP v. Health Grades, Inc.*,
534 F. Supp. 2d 442 (S.D.N.Y. 2008)..................................................................27

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995)............................................................................................27

*Hart v. Internet Wire, Inc.*,
145 F. Supp. 2d 360 (S.D.N.Y. 2001)............................................................ 18-19

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................................... 9, 14-15, 22

# TABLE OF AUTHORITIES

**Page**

*In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*,
No. 02 MDL 1500, 2005 WL 563166 (S.D.N.Y. Mar. 10, 2005) ...........................................31

*In re Bank of Am. Corp. Secs., Derivative & ERISA Litig.*,
No. 09 MD 2058 (PKC), 2010 WL 3448197 (S.D.N.Y. Aug. 27, 2010) ...............................31

*In re Bayou Hedge Fund Litig.*,
534 F. Supp. 2d 405 (S.D.N.Y. 2007)......................................................................... 19-21, 41

*In re Beacon Assocs. Litig.*,
No. 09 Civ. 777 (LBS), 2010 WL 3895582
(S.D.N.Y. Oct. 5, 2010) ..................................................................................... *passim*

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005).....................................................................................23

*In re Citigroup ERISA Litig.*,
No. 07 Civ. 9790, 2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009) ...........................................28

*In re Citigroup Inc. S'holder Derivative Litig.*,
964 A.2d 106 (Del. Ch. 2009)................................................................................................37

*In re Citigroup Inc. S'holder Derivative Litig.*,
No. 07 Civ. 9841 (SHS), 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) ...............................37

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).....................................................................................23

*In re Constellation Energy Group, Inc.*,
-- F. Supp. 2d --, 2010 WL 3221821 (D. Md. Aug. 13, 2010) ...............................................37

*In re Global Crossing, Ltd. Sec. Litig.*,
471 F. Supp. 2d 338 (S.D.N.Y. 2006).......................................................................................4

*In re Hollinger Int'l, Inc. Secs. Litig.*,
No. 04C 0834, 2006 WL 1806382 (N.D. Ill. June 28, 2006) .................................................43

*In re Huntington BancShares, Inc. ERISA Litig.*,
620 F. Supp. 2d 842 (S.D. Ohio 2009) ...................................................................................28

*In re IAC/InterActiveCorp Sec. Litig.*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007)............................................................................... 10-11

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................................................12

# TABLE OF AUTHORITIES

**Page**

*In re Lehman Bros.*,
    683 F. Supp. 2d 294 (S.D.N.Y. 2010)........................................................................ 29-30, 36

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................................................................44

*In re McKesson HBOC Inc. ERISA Litig.*,
    No. C00-20030RMW, 2002 WL 31431588 (N.D. Cal. Sept. 30, 2002) ...............................32

*In re Polaroid ERISA Litig.*,
    362 F. Supp. 2d 461 (S.D.N.Y. 2005)................................................................................32

*In re Providian Fin. Corp. ERISA Litig.*,
    No. C 01-05027 CRB, 2002 WL 31785044 (N.D. Cal. Nov. 14, 2002)................................31

*In re Refco, Inc. Secs. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................................................................12

*In re Tremont Secs. Law, State Law and Ins. Litig.*,
    703 F. Supp. 2d 362 (S.D.N.Y. 2010).......................................................................... *passim*

*In re WorldCom Inc.*,
    263 F. Supp. 2d 745 (S.D.N.Y. 2003)................................................................................43

*Instituto de Prevision Militar v. Merrill Lynch*,
    546 F.3d 1340 (11th Cir. 2008) ........................................................................................46

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..............................................................................................16

*Kassover v. UBS AG*,
    619 F. Supp. 2d 28 (S.D.N.Y. 2008)........................................................................... 41-42

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)................................................................................................4

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    No 08 Civ. 0976 (LAP), 2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008).......................... 11-12

*Levinson v. PSCC Servs., Inc.*,
    No. 09 CV 00269 (PCD), 2009 WL 5184363 (D. Conn. Dec. 23, 2009)................... 43, 45-46

*Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*,
    No. 09 Civ. 3708 (TPG), 2010 WL 1257567 (S.D.N.Y. Mar. 31, 2010) ............. 20-21, 42, 47

# TABLE OF AUTHORITIES

**Page**

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
   547 U.S. 71 (2006)..................................................................................................45

*Metro. Elec. Mfg. Co. v. Herbert Constr. Co., Inc.,*
   583 N.Y.S.2d 497 (N.Y. App. Div. 1992) ............................................................49

*Miller v. Nationwide Life Ins. Co.,*
   391 F.3d 698 (5th Cir. 2004) ................................................................................45

*Mills v. Polar Molecular Corp.,*
   12 F.3d 1170 (2d Cir. 1993)..................................................................................10

*Motorola, Inc. v. Chapman,*
   761 F. Supp. 458 (S.D. Tex. 1991) .......................................................................47

*Nauslar v. Coors Brewing Co.,*
   170 S.W.3d 242 (Tex. App. 2005)................................................................... 47-48

*Newman v. Family Mgmt. Corp.,*
   No. 08 Civ. 11215 (LBS), 2010 WL 4118083 (S.D.N.Y. Oct. 20, 2010) ...................... *passim*

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000)..................................................................................13

*NYSA-ILA Med. & Clinical Servs. Fund v. Catucci,*
   60 F. Supp. 2d 194 (S.D.N.Y. 1999)....................................................................29

*Owens v. Gaffken & Barriger Fund, LLC,*
   No. 08 CIV. 8414 (PKC), 2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009) ............................42

*Pegram v. Herdrich,*
   530 U.S. 211 (2000)..............................................................................................32

*Pietrangelo v. NUI Corp.,*
   No. Civ. 04-3223 (GEB), 2005 WL 1703200 (D.N.J. July 20, 2005)....................................31

*Pro Bono Invs., Inc. v. Gerry,*
   No. 03-cv-4347 (JGK), 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005) ............................42

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.,*
   714 F. Supp. 2d 475 (S.D.N.Y. 2010)............................................................... 9-10

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004)................................................................. 11-12, 24, 26

# TABLE OF AUTHORITIES

Page

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000).........................................................................................4

*S. Cherry St., LLC v. Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009)............................................................................14, 17, 19

*S.E.C. v. Cohmad Sec. Corp.*,
  No. 09 Civ. 5680 (LLS), 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ............................... 20-21

*S.E.C. v. Patel*,
  No. 07-CV-39, 2008 WL 782483 (D.N.H. Mar. 24, 2008) .....................................................22

*S.E.C. v. Zandford*,
  535 U.S. 813 (2002)..................................................................................................46

*Saint Vincent Catholic Med. Ctrs. v. Morgan Stanley Inv. Mgmt. Inc.*,
  No. 09 Civ. 9730 (PKC), 2010 WL 4007224 (S.D.N.Y. Oct. 4, 2010)..................................36

*Schnorr v. Schubert*,
  No. 05-303, 2005 WL 2019878 (W.D. Okla. Aug. 18, 2005) ................................................46

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*,
  No. 03 Civ. 3120 (LTS), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ................................41

*Shields v. CityTrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)...............................................................................16, 18, 23

*Sofonia v. Principal Life Ins. Co.*,
  465 F.3d 873 (8th Cir. 2006) .......................................................................................45-46

*Stephenson v. Citco Group Ltd.*,
  700 F. Supp. 2d 599 (S.D.N.Y. 2010)............................................................................ 16, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................. 10, 13-14

*Trustees of the Local 464A UFCW Pension Fund v. Wachovia Bank, N.A.*,
  No. 09 Civ. 668 (WJM), 2009 WL 2152074 (D.N.J. July 14, 2009) .....................................31

*Trustees of S. Cal. IBEW-NECA Defined Contrib. Plan v. Bank of New York Mellon Corp.*,
  No. 09 Civ. 7273 (RMB-AJP), 2010 WL 1558587 (S.D.N.Y. Apr. 14, 2010),
  *vacated to allow repleading by* 2010 WL 3958790................................................................37

*Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*,
  335 F. Supp. 2d 335 (N.D.N.Y. 2004).............................................................................37

# TABLE OF AUTHORITIES

**Page**

*Winn v. Schafer*,
499 F. Supp. 2d 390 (S.D.N.Y. 2007)..................................................................48

*Wolf Living Trust v. FM Multi-Strategy Inv. Fund, LP*,
No. 09 Civ. 1540 (LBS), 2010 WL 4457322 (S.D.N.Y. Nov. 2, 2010) ...................................9

*Yung v. Lee*,
432 F.3d 142 (2d Cir. 2005)..................................................................27

## RULES AND STATUTES

Fed. R. Civ. P. 8(a) ..................................................................31

Fed. R. Civ. P. 9(b) .................................................................. *passim*

15 U.S.C. § 77p (2006)..................................................................43, 45

15 U.S.C. § 77r (2006)..................................................................45

15 U.S.C. § 78bb (2006)..................................................................43, 45

15 U.S.C. § 78u-4(b) (2006) ..................................................................10

29 U.S.C. § 1104 (2006)..................................................................40

29 U.S.C.A. § 1109 (2006) ..................................................................41

17 C.F.R. § 240.10b-5 (2010) .................................................................. *passim*

N.M. Stat. Ann. § 58-13C-509 (2010)..................................................................50

N.Y. Gen. Bus. Law § 352 (McKinney 1996)..................................................................41

TX Revised Civil Statute Article 581-33..................................................................49

## PRELIMINARY STATEMENT

This action arises out of Bernard L. Madoff's "historic Ponzi scheme." *See Newman v. Family Mgmt. Corp.*, No. 08 Civ. 11215 (LBS), 2010 WL 4118083, at *1 (S.D.N.Y. Oct. 20, 2010). "For twenty years, Madoff operated this fraud without being discovered and with only a handful of investors withdrawing their funds as a result of their suspicions." *Id.* at *8. Though courts have determined that "[t]he actions of the minority cannot support an inference of intent to defraud as to the numerous other investors who were still in the dark," *id.*, this is precisely what plaintiffs attempt to do here: impose liability on defendants who, like the vast majority of investors, were simply in the dark and defrauded by Madoff's extraordinary deceit.

Trying to make an inference of wrongdoing against defendants appear plausible, the Complaint obscures the nature of the investors and investments that are at issue here.[1] The Complaint reads as if it were brought against one of the so-called "feeder funds," funds that invested directly—and entirely or almost entirely—with Bernard L. Madoff Investment Securities LLC or its founder. The funds at issue here, however, did neither. Rather, the Austin Capital Funds[2] were diversified funds-of-hedge-funds that invested their assets in dozens of different underlying hedge funds. One of the funds in which the Austin Capital Funds invested was the Rye Select Broad Market Prime Fund (the "Rye Fund"), to which only about 7.5% of the Austin Capital Funds' assets were allocated. (*See* 4/22/08 Safe Harbor Fund Presentation at 6, 35 (cited at ¶ 29).) The Rye Fund was managed by Tremont Partners, Inc. ("Tremont"), a subsidiary of

---

[1] We refer to the Consolidated Second Amended Class Action Complaint as the "Complaint" in this memorandum, and all paragraph references are to the Complaint ("¶ __").

[2] "Austin Capital Funds," as used in this memorandum, refers only to the five funds in which the named plaintiffs actually invested: Austin Capital All Seasons Offshore Fund, Ltd. ("All Seasons Fund"); Austin Capital Safe Harbor Portable Alpha Offshore Fund One, Ltd. ("Portable Alpha One Fund"); Austin Capital Safe Harbor QP Fund ("Safe Harbor QP Fund"); Austin Capital Safe Harbor ERISA Dedicated Fund, Ltd. ("ERISA Fund"), and the Austin Capital Safe Harbor Offshore Fund ("Safe Harbor Offshore Fund"). (¶¶ 9, 11, 13, 15, 17, 17(a).) The term does not include the other twelve funds in which plaintiffs did not invest (*see* Compl. Introduction n.1; ¶ 19) and as to which plaintiffs lack standing to assert any claims. *See infra* Section I.

MassMutual and Oppenheimer Funds that managed a network of hedge funds.  The Rye Fund was audited by Ernst & Young and KPMG.  Tremont retained Madoff to invest the assets of the Rye Fund, and those assets were lost as a consequence of Madoff's crimes.

The plaintiffs' effort to veil the true nature of the investors and investments at issue here—by conflating Austin Capital Management Ltd. ("Austin Capital") with Tremont and blurring the distinction between the Austin Capital Funds and the Rye Fund—cannot disguise the host of deficiencies in the Complaint that warrant its dismissal.

*First*, all claims relating to funds in which plaintiffs did not invest must be dismissed. Plaintiffs have standing to assert claims relating only to the five Austin Capital Funds in which they invested.  They lack standing as to the other twelve funds cited in the Complaint.

*Second*, no claim is pleaded with the particularity required by Rule 9(b) or the Private Securities Litigation Reform Act ("PSLRA").  Plaintiffs have not alleged particularized facts giving rise to an inference that defendants intended to defraud plaintiffs, much less a "strong inference."  To the contrary, the factual allegations overwhelmingly support an inference that the defendants—just like the regulators and nearly every other investor—were themselves deceived by Madoff and his elaborate scheme.  Nor have plaintiffs pleaded with particularity "circumstances constituting fraud" because they have impermissibly lumped the defendants together and they have not alleged facts demonstrating that any alleged misrepresentation was false when made.  Because the entire Complaint sounds in fraud, the failure to plead with particularity requires that it be dismissed *in toto*.

*Third*, the Section 20(a) claim must be dismissed because plaintiffs have not stated a primary violation under Section 10(b).

*Fourth*, the Section 12 claim fails because the private placement memoranda pursuant to which plaintiffs purchased interests in the Austin Capital Funds cannot support Section 12 liability.

*Fifth*, the ERISA claims must be dismissed because plaintiffs have failed to adequately allege a fiduciary relationship between them and any defendant except Austin Capital.  Even as to Austin Capital, the claims fail to meet the plausibility test.  They rest on 20/20 hindsight and lack plausible factual allegations to support the conclusion that Austin Capital knew or should have known of Madoff's fraud or that it breached any fiduciary duty.

*Sixth*, plaintiffs' common-law and blue-sky-law claims fail for multiple reasons: (1) all are preempted by SLUSA; (2) all but the fraud claim are preempted by the Martin Act; (3) the claims for breach of fiduciary duty, unjust enrichment, breach of contract, and gross negligence are derivative claims for which plaintiffs lack standing and, even if they had standing, they have failed to satisfy the demand requirement; (4) the Texas blue-sky claims are preempted and improperly pleaded; (5) the New Mexico blue-sky claims—in addition to being preempted and improperly pleaded—are brought under a statute that was not even effective until January 1, 2010; and (6) the unjust enrichment claim fails because there is a written contract governing the same subject matter.

## BACKGROUND

Plaintiffs acknowledge that their Complaint relies on, among other things, "papers and pleadings filed in actions pending in various federal courts."  (Compl., Introduction.)  In light of that acknowledgement, as well as the involvement of certain plaintiffs in other Madoff-related litigation pending before the Court,[3] we refer to some of those "papers and pleadings" to clarify and provide context for the allegations regarding the Austin Capital Funds and their limited and

---

[3] Laborers Local 17 Pension Plan ("Local 17") and Daniel Jackson, two of the named plaintiffs in this action (¶¶ 15, 16), also are plaintiffs in another Madoff-related action pending before the Court, and Austin Capital was a defendant in that action until the Local 17's claims were separated from that complaint and consolidated here.  (*See* Consolidated and Am. Class Action and Verified Derivative Compl., No. 08 Civ. 11183 (TPG) (State Law Action), *In re Tremont Secs. Law, State Law and Ins. Litig.*, (S.D.N.Y., filed Apr. 20, 2009) ("*Tremont* ¶ __"), Ritts Decl. Ex. A.)

indirect exposure to Madoff.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.

2002) ("[O]n a motion to dismiss, a court may consider . . . 'documents either in plaintiffs'

possession or of which plaintiffs had knowledge and relied on in bringing suit.'") (internal citation

omitted).  Solely for purposes of this motion to dismiss, we accept as true the Complaint's well-

pleaded allegations.  *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007).[4]

A.     **Austin Capital And The Austin Capital Funds.**

As a registered investment advisor with the SEC since 1997, and a manager of funds-of-

hedge-funds, Austin Capital "oversees hedge fund investment portfolios for individuals and

institutional clients."  (¶ 19; 8/24/06 Safe Harbor Fund Presentation at 3 (cited at ¶ 67), Ritts Decl.

Ex. B.)  Plaintiffs, several pension plans and their fiduciaries, allege they invested in the Austin

Capital Funds.  (¶¶ 9-17.)

The Austin Capital Funds sought to minimize their exposure to losses from any particular

fund by investing in "[t]hirty to thirty-five manager allocations diversified across seven (7) broad

strategies."  (*See* 4/22/08 Safe Harbor Fund Presentation at 6, 35 (cited at ¶¶ 29, 67), Ritts Decl.

Ex. C; *see also* 11/1/07 ERISA Fund Private Offering Memorandum ("POM") at 13 (cited at ¶ 69),

Ritts Decl. Ex. D (stating Austin Capital's intention to invest the fund assets with "a group of

hedge fund managers to achieve complimentary diversification by style and strategy" to "reduce

the volatility and risk attendant to any one investment approach").  Allocations to each underlying

---

[4] Defendants also refer to the content of certain documents of which the court may take judicial notice, including: (i) matters of public record, including the contents of documents required to be filed with the Securities and Exchange Commission (the "SEC"); (ii) documents referenced in or integral to the Complaint; and (iii) any other documents "that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 343 (S.D.N.Y. 2006).  Documents referred to in the Complaint or otherwise properly considered on a motion to dismiss are being filed separately as exhibits to the Declaration of Geoffrey J. Ritts in support of this motion ("Ritts Decl. Ex. __").

hedge fund—including to Tremont's Rye Fund—were all less than 10%.  (*See* 4/22/08 Safe

Harbor Fund Presentation at 27 (cited at ¶¶ 29, 67), Ritts Decl. Ex. C.)

Plaintiffs do not allege (nor could they) that *all* the money, or *most* of the money, or even a

considerable portion of the money they invested with Austin Capital was exposed to Madoff

through the Rye Fund.  (¶¶ 9 (alleging that only "a portion of" plaintiffs' total investment in one of

the Austin Capital Funds was exposed to Madoff and/or BMIS); 11, 13, 15, 17 (same); *see also*

12/18/08 Austin Capital Statement (cited at ¶ 106), Ritts Decl. Ex. E (Austin Capital invested "a

limited amount" of its funds' assets in the Rye Fund).)

### B. Austin Capital's Indirect And Limited Exposure, Via The Rye Fund, To Madoff And BMIS.

The Rye Fund, a Delaware limited partnership formed in 1997, was one of a group of

hedge funds set up and managed by Tremont.  (*Tremont* ¶¶ 49, 85.)  Tremont, the Rye Fund's

general partner and investment manager, is a leading hedge fund management and consulting firm;

its direct corporate parent is Tremont Group Holdings, Inc.  (*Tremont* ¶¶ 33, 49; *see also* ¶ 63.)

Tremont Group Holdings, Inc., in turn, is a wholly-owned subsidiary of Oppenheimer Acquisition

Corporation, whose parents are MassMutual Holding Company and Massachusetts Mutual Life

Insurance Company.  (*Tremont* ¶¶ 26-28, 31.)

The Rye Fund was audited by well-respected auditing firms: first Ernst & Young and then

KPMG.  (*Tremont* ¶¶ 323, 325, 328, 331.)  Bank of New York Mellon Corporation served as the

Rye Fund's administrator, performing "monthly calculation of the Net Asset Value," as well as

"independent portfolio monitoring, accounting and account reconciliation, coordination of audits,

asset management, reconciliation of trading activities, and fulfillment of reporting requirements."

(*Tremont* ¶¶ 40, 368.)  SSC Fund Services provided professional fund administration, valuation,

and custodial services to the Rye Fund.  (*Tremont* ¶ 43.)

The Rye Fund was managed by Tremont.  Tremont, in turn, selected Madoff as its sub-advisor.  (¶¶ 63-64.)  Tremont's "[e]xacting" due diligence process was "at the core of [its] marketing pitch" (*Tremont* ¶ 315), and it "claimed to have conducted exhaustive due diligence regarding all aspects of the Rye Funds' operations, investments and management" (*Tremont* ¶ 314; *see also Tremont* ¶¶ 314-319 (quoting Tremont market materials, Tremont's SEC filings, website, and other representations regarding its due diligence)).

> ### C.      The Effect Of The Madoff Arrest.

On December 11, 2008, defendants—along with the rest of the world—learned the truth about Madoff and BMIS.  (¶ 54.)  At no point do (or could) plaintiffs allege that Austin Capital had actual knowledge of the truth about Madoff before December 11, 2008.  The complexity and comprehensiveness of Madoff's scheme is undisputed.  (*See* ¶¶ 54-56, 58.)  Indeed, "[p]rior to Madoff's arrest, neither Tremont Group and its predecessors nor Tremont Partners gave the slightest indication that anything was amiss with respect to their investments through the Rye Funds."  (*Tremont* ¶ 241.)  "[R]evelations of Madoff's scheme and BMIS's implosion completely sandbagged the Rye Funds' investors."  (*Tremont* ¶ 242.)

As a result of the discovery that Madoff had misappropriated the assets of the Rye Fund, the net asset value of the Austin Capital Funds declined, just as the net asset value would have declined if the value of any other investment holding had decreased.  (*See* ¶ 106.)  (The Complaint studiously avoids saying by how much the Austin Capital Funds' net asset values declined; a more factual pleading would have noted that the decline was about 7.5%.)

At its core, the Complaint alleges nothing more than that one investment out of many in the portfolios of these diversified funds turned out to be unsuccessful.  Implausibly, plaintiffs attempt to state a claim without alleging anything about the overall performance of the Austin Capital Funds, or about plaintiffs' gains or losses from their overall investment with Austin

Capital.  Those allegations are absent because a complete and precise Complaint would have to concede that, even after taking into account the Rye Fund loss in December 2008, nearly all the Austin Capital Funds outperformed benchmarks for 3-, 5-, 10-year, and life-of-fund periods.

### D.   The Defendants.

Austin Capital's general partner, Austin Capital Management GP Corp. ("ACM GP"), and Austin Capital's limited partner, KeyCorp, are also named as defendants (¶¶ 19-21), as is Victory Capital Management, a wholly-owned asset-management subsidiary of KeyCorp (¶ 23).  The Complaint alleges liability of numerous individuals who are said to have had some role with Austin Capital.  (¶¶ 32-41.)  Except for Ronald J. Dugas, each of the individual defendants is alleged to have held an Austin Capital-related position either throughout or at some point during the putative class period of January 2, 2005 through December 11, 2008 and/or to have "determine[d] general investment advice to be given to clients" at some point during the class period.  (*E.g.*, ¶ 35 (citing 1/12/07 Form ADV Part II, Ritts Decl. Ex. F).)  No reference to Mr. Dugas precedes 2009, by which time Madoff's fraud had been revealed.  (*See* ¶ 41.)

### E.   Plaintiffs' Claims.

The Complaint says defendants failed to detect supposed "red flags" about Madoff that they should have noticed.  (*E.g.*, ¶ 81.)  But it does not allege defendants believed the Rye Fund was anything other than a sound, legitimate investment, or that any defendant received a special or improper benefit from the Rye Fund, or that any of them had anything to gain from investing in a fund exposed to what turned out to be an historic fraud.  Indeed, plaintiffs previously have alleged that Rye Fund investors like Austin Capital "were never alerted to the indicia of criminality and/or gross irregularities in Madoff's operations, [and] never had a reasonable opportunity to withdraw their funds from Madoff's control before it was too late."  (*Tremont* ¶ 444.)

Plaintiffs contend that if Austin Capital had conducted more or different due diligence, it "would have" discovered Madoff's fraudulent scheme, even though the Rye Fund's own manager, auditors, administrators, lenders, and government regulators (including the SEC and the Financial Industry Regulatory Authority ("FINRA")) did not.  (*See* ¶¶ 4, 61, 78, 85, 93-94, 96.)  Though Austin Capital, like thousands of others, did not uncover the truth of Madoff's elaborate scheme, plaintiffs nevertheless summarily conclude, without any supporting facts, that Austin Capital's representations regarding its due diligence and investment practices must have been fraudulent or misleading, because otherwise it would have unearthed the fraud.

The Complaint charges defendants with violations of the Securities Exchange Act of 1934 (¶¶ 127-131, 132-133) (Counts I, II), the Securities Act of 1933 (¶¶ 134-139) (Count III), and ERISA (¶¶ 140-149, 150-156, 157-159, 160-166) (Counts IV-VII).  It also asserts state-law claims for breach of fiduciary duty (¶¶ 167-171) (Count VIII), common-law fraud (¶¶ 172-181) (Count IX), unjust enrichment (¶¶ 182-185) (Count X), breach of contract (¶¶ 186-192) (Count XI), negligent misrepresentation (¶¶193-202) (Count XII), gross negligence (¶¶ 203-206) (Count XIII), and violation of New Mexico and Texas blue-sky laws (¶¶ 207-210, 211-214) (Counts XIV, XV).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  If, by contrast, the facts are "merely consistent with defendant's liability," the complaint must be dismissed.  *Id*.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Though a complaint need not supply "detailed factual allegations," it must consist of more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"[C]onclusions of law" and "unwarranted deductions of fact" must be disregarded.  *First*

*Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (internal quotations

omitted); *see also Iqbal*, 129 S. Ct. at 1949.  Nor should the Court credit averments "that are

contradicted either by statements in the complaint itself or by documents upon which its pleadings

rely, or by facts of which the court may take judicial notice."  *In re Alstom SA Sec. Litig.*, 406 F.

Supp. 2d 433, 477 n.40 (S.D.N.Y. 2005) (internal quotations omitted).

Where, as here, the Complaint lacks well-pleaded allegations to "nudge[] [its] claims

across the line from conceivable to plausible," it must be dismissed.  *Twombly*, 550 U.S. at 570.

## I.    Plaintiffs Lack Standing To Assert Claims Relating To Funds In Which They Did Not Invest.

Plaintiffs purport to assert claims relating to seventeen funds managed by Austin Capital

(Compl. Introduction n.1), but they lack standing to bring suit as to any fund except the five

Austin Capital Funds in which they actually invested.  *See, e.g.*, *Wolf Living Trust v. FM Multi-*

*Strategy Inv. Fund, LP*, No. 09 Civ. 1540 (LBS), 2010 WL 4457322, at *5 (S.D.N.Y. Nov. 2,

2010) (concluding that plaintiffs who invested in a fund, which, in turn, invested in a Madoff

feeder fund had standing to sue only as to that fund "in which they invested and sustained a loss").

The only five funds in which any of the plaintiffs claim to have invested are the ERISA

Fund (¶¶ 9 (Operating Engineers), 15 (Local 17 Pension Plan)), the Portable Alpha One Fund (¶

11 (Local 705)), the All Seasons Fund (¶ 13 (Sheet Metal Workers)), the Safe Harbor Offshore

Fund (¶ 17(a) (Texas Treasury Safekeeping Trust (the "Texas Trust")), and the Safe Harbor QP

Fund (¶ 17 (New Mexico ERB)).  No plaintiff claims to have invested in any of the other twelve

funds,[5] and so all claims relating to those funds must be dismissed.  *See Pub. Employees' Ret. Sys.*

---

[5] The twelve funds for which plaintiffs lack standing to assert claims are: Austin Capital All Seasons Offshore Fund II, Ltd.; Austin Capital Multi-Strategy Offshore Fund, Ltd.; Austin Capital Safe Harbor Portable Alpha Offshore Fund Two, Ltd.; Austin Capital All Seasons Master Account, G.P.; Austin Capital Safe Harbor Master

*of Miss. v. Merrill Lynch & Co., Inc.*, 714 F. Supp. 2d 475, 480-81 (S.D.N.Y. 2010) (dismissing with prejudice claims relating to securities that plaintiffs did not purchase).

## II.     The Complaint Does Not Satisfy The Heightened Pleading Requirements Of Rule 9(b) Or The PSLRA.

Rule 9(b) and the PSLRA require securities fraud and other fraud-based claims to be pleaded with particularity or else be dismissed.  *See ATSI Commc'ns*, 493 F.3d at 99 (securities fraud claims must satisfy the PSLRA and Rule 9(b)); Fed. R. Civ. P. 9(b) ("[T]he circumstances constituting fraud . . . shall be stated with particularity.").  The PSLRA requires a plaintiff to "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007).  The required state of mind is an intent "to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In addition to pleading a strong inference of scienter, the PSLRA mandates that a plaintiff "specify *each* statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b) (emphasis added); *see also ATSI Commc'ns*, 493 F.3d at 99.

Like the PSLRA, Rule 9(b) requires a plaintiff to allege particularized facts.  *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) ("The Second Circuit evaluates a securities complaint's compliance with Rule 9(b) and the PSLRA by means of a common formulation.") (internal citation omitted); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).  To satisfy these heightened pleading requirements, the Complaint must not only "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

---

(continued…)

Account, G.P.;  Austin Capital Next Generation QP Fund; Next Generation Offshore Fund; Austin Capital All Seasons QP Fund; Austin Capital Safe Harbor ID Fund; All Seasons ID Fund; Austin Capital Multistrategy QP Fund; and Austin Capital Balanced Fund.  (Compl. Introduction n.1.)

[and] (3) state where and when the statements were made," but also "(4) explain why the statements were fraudulent." *In re IAC/InterActiveCorp*, 478 F. Supp. 2d at 585; *see also Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).

Where, as here, all the claims in the Complaint are based on the same underlying allegations of fraudulent misconduct, all must satisfy these heightened pleading requirements. *See Rombach*, 355 F.3d at 172. Because the Complaint falls short of that mark, it must be dismissed.

### A. All Claims Must Be Pleaded With Particularity.

#### 1. The Entire Complaint Sounds In Fraud.

A complaint sounds in fraud and is subject to heightened pleading requirements where "the wording and imputations of the complaint are classically associated with fraud." *Id.* This Complaint is replete with fraud-based allegations, including that:

- Defendants were "participant[s] in a fraudulent scheme and course of business that operated as a fraud or deceit upon plaintiffs." (¶ 49.)

- Defendants "conceal[ed] material adverse facts" (¶ 49), "defrauded investors" (¶ 77), "falsely assured investors" about the initial and ongoing due diligence (¶ 71), and "made repeated false representations" about the performance of the Austin Capital Funds (¶ 80).

- Defendants "induced" plaintiffs and members of the putative class into investing with them while "concealing" their failure to carry out the due diligence and investment monitoring they represented to undertake. (¶ 76.)

- The payment of the management fees was based on "false information." (¶ 7.)

- Defendants "were aware" that "false and misleading statements were being issued" to Austin Capital investors, but nonetheless "approved or ratified" these misstatements. (¶ 50.)

Each cause of action incorporates all of the same fraud-based factual allegations. (*See* ¶¶ 127, 132, 134, 140, 150, 157, 160, 167, 172, 182, 186, 193, 203, 207, 211.)

Because the Complaint is riddled with allegations sounding in fraud, the entire pleading sounds in fraud and must be pleaded with particularity. *See, e.g.*, *Ladmen Partners, Inc. v.*

*Globalstar, Inc.*, No 08 Civ. 0976 (LAP), 2008 WL 4449280, at *11 (S.D.N.Y. Sept. 30, 2008) (applying Rule 9(b)'s heightened pleading standards to a complaint "riddled with allegations" that "defendants had actual knowledge . . . [and] deliberately withheld" information).

### 2. The "Disclaimer" Is Ineffective To Exempt The Section 12 Claim From Rule 9(b)'s Heightened Pleading Requirements.

For just one of the Complaint's claims—the Section 12 claim—plaintiffs attempt to disclaim reliance on fraud. (¶ 134.)  A plaintiff "cannot evade the Rule 9(b) strictures," however, "by summarily disclaiming any reliance on a theory of fraud or recklessness." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).  Instead, a plaintiff must "specifically [plead] alternate theories of fraud and negligence" in order to avoid heightened pleading standards for Securities Act claims. *In re Refco, Inc. Secs. Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007).  Plaintiffs have not pleaded in the alternative with respect to their Section 12 claim, purporting instead simply to disclaim reliance on any allegation "that could be construed as alleging fraud or intentional or reckless misconduct." (¶ 134.)  That boilerplate disclaimer is ineffective. *See Rombach*, 355 F.3d at 171 ("[W]hile a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)."); *JP Morgan*, 363 F. Supp. 2d at 635 (same).

As detailed above, the whole Complaint sounds in fraud and the allegations relating to offering documents are no exception.  Plaintiffs contend that Section 12 liability exists because the offering documents made statements the defendants knew to be false and because defendants used those false statements to induce plaintiffs to buy shares in the Austin Capital Funds.  (¶¶ 49, 76, 136-137.)  The Complaint alleges defendants "induced Plaintiffs and members of the Class into investing with them while concealing their failure to carry out the due diligence and investment

monitoring they represented to undertake" (¶ 76), and purposely made "false and misleading" representations in their presentations and offering memoranda (¶¶ 69, 70).

Plaintiffs' futile attempt to evade the pleading requirements of Rule 9(b) as to their Section 12 claim should be ignored.  Because, as demonstrated below, neither that claim nor any other claim in the Complaint is pleaded with the requisite particularity, all should be dismissed.

### B.   The Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference That Any Defendant Acted With Scienter.

The PSLRA requires a plaintiff who is pursuing securities fraud claims to "state with particularity facts giving rise to a strong inference" of scienter, either by alleging particularized facts demonstrating that each defendant had both motive and opportunity to commit fraud, or strong circumstantial evidence of conscious misbehavior or recklessness.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000); *see also Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000).  Negligence is never sufficient  to establish scienter; recklessness suffices only where it "approximat[es] actual intent."  *Novak*, 216 F.3d at 312.

For a securities fraud complaint to proceed, the inference of scienter must be strong, which means it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  The court must examine "all of the facts alleged, taken collectively," and determine whether they "give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323.

And, because "[a]n inference of fraudulent intent may be plausible, yet *less cogent* than other, nonculpable explanations for the defendant's conduct," the court must consider "competing inferences rationally drawn from the facts alleged."  *Id.* at 314; *see also ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  The

inquiry is thus: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. Because the answer here is "no," the Complaint should be dismissed.

### 1.     Plaintiffs Do Not Allege Any Plausible Motive To Commit Fraud.

To plead a motive to commit fraud, plaintiffs must demonstrate that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307-08)); *see also In re Alstom*, 406 F. Supp. 2d at 446 (plaintiff must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged"). The Complaint does not do this.

Plaintiffs repeatedly point to the management fees Austin Capital received for operating the Austin Capital Funds and suggest that the fees motivated defendants to commit fraud. (*See* ¶¶ 2, 31, 43, 48, 62, 76, 108, 110, 111.) The Second Circuit has held that those allegations are insufficient to establish motive. *See, e.g.*, *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 113 (2d Cir. 2009) ("South Cherry II") ("The only fact cited . . . as to a possible motive for such [fraudulent] intent is that [the defendant] receives a fee when a client invests in a recommended fund, and South Cherry suggests that [the defendant] wanted to receive its fee without incurring the expense of performing the promised due diligence . . . . This is hardly a cogent or compelling suggestion."); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute.").

Here, plaintiffs allege that defendants benefitted because Austin Capital received management fees of 1 to 1.5% of the net asset value of the Austin Capital Funds. (¶¶ 43, 108.) Plaintiffs do not contend that those fees were excessive, or even that they were higher than the industry standard. *See Newman*, 2010 WL 4118083, at *7 (describing motive allegations as

"misguided" where plaintiffs "fail to allege facts that demonstrate these fees are exorbitant or at all in excess of the industry standard").  Nor do plaintiffs allege that Austin Capital earned a higher fee by investing a small portion of the Austin Capital Funds' assets in the Rye Fund rather than in the dozens of other hedge funds in which the Austin Capital Funds invested.  Plaintiffs concede that the management fee was calculated, "[a]s with other investment funds," as a flat percentage of net asset value of all funds under management.  (¶ 108.)  The Complaint does not allege a single particularized fact suggesting that any of the defendants had anything to gain by investing assets of the Austin Capital Funds in the Rye Fund rather than in one of the other hedge funds in which the Austin Capital Funds held positions.

The allegation that Austin Capital was motivated to commit fraud by its desire to get new investors also should be rejected.  (¶ 76.)  "Motives that can be ascribed to virtually all corporate insiders, or any publicly owned, for profit endeavor are not sufficient to support a claim of fraud." *In re Alstom*, 406 F. Supp. 2d at 446 (internal quotations omitted); *see also ECA*, 553 F.3d at 197. Because every investment manager wants to attract clients and be successful, this type of allegation cannot contribute to any inference of scienter.

Nor does the Complaint contain any allegation that any defendant stood to reap "personal" or "concrete" benefits from defrauding plaintiffs.  *See ECA*, 553 F.3d at 197.  It does not allege that any defendant received anything of value from the Rye Fund, Tremont, Madoff, or anyone else that would have provided defendants with a reason to deceive their investors.  The absence of any allegation that any defendant stood to benefit, or in fact did benefit, from defrauding plaintiffs is especially telling where, as here, Austin Capital's own employees, including certain of the individual defendants, invested in the Austin Capital Funds alongside plaintiffs and the would-be

class members.  (*See, e.g.*, 4/11/07 Request for Information at 6, Ritts Decl. Ex. G ("ACM employees have over $12 million invested in the Austin Capital Funds.").)

Courts recognize that it is "economically irrational to risk your professional reputation, license, and the possibility of legal liability simply in return for a professional services fee." *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 621 (S.D.N.Y. 2010) (citing *Shields v. CityTrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).  To suggest that defendants engaged in economically irrational conduct that did not benefit them in any personal or concrete way is neither plausible nor cogent, and cannot give rise to a strong inference of scienter.

### 2. Plaintiffs Do Not Allege Strong Circumstantial Evidence From Which Scienter May Be Inferred.

Because plaintiffs fail to plead a plausible motive for fraud, they must "raise a strong inference of scienter under the 'strong circumstantial evidence' prong," in which case, "the strength of the circumstantial allegations must be correspondingly greater."  *ECA*, 553 F.3d at 199 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  Plaintiffs have not met the standard.

### (a) The "Red Flag" Allegations Do Not Raise An Inference Of Scienter.

The Complaint alleges that defendants ignored supposed "red flags" that revealed that Madoff was a fraud or, at least, counseled against investing with Madoff.  (¶¶ 89, 106.)  The litany of "red flags" in the Complaint is taken nearly verbatim from a now highly-publicized but previously confidential document that was submitted to the SEC by a former competitor of Madoff.  (¶ 89.)[6]  This document was made public only after Madoff's scheme was exposed.

---

[6] The now-familiar list includes: (a) that Madoff did not collect a management or performance fee from investors in the feeder funds; (b) Madoff's insistence on secrecy and that his returns and trade tickets "went unverified"; (c) "impossible" options volume; (d) "compelling" media articles questioning Madoff's strategy and returns; (e) "impossibly low" correlation to the S&P 100; (f) Madoff's "boast[ing]" to "several" unidentified feeder funds that he engaged in smoothing his returns; (g) Madoff's "[o]bscure and [i]ll-equipped" auditor; (h) that Madoff did not use an independent custodian; (i) that Madoff's family members held high positions with entities that, as a

Courts that have "consider[ed] similar red flag allegations in the aftermath of the Madoff affair" have found such allegations "insufficient to establish scienter." *Newman*, 2010 WL 4118083, at *8 (citing *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (Griesa, J.)).   In so concluding, courts have found notable what plaintiffs do not allege in their recitation of the supposed red flags:  "plaintiffs do not assert that the [defendants] knew that Madoff's returns could not be replicated by others, and plaintiffs do not claim that investors who elected not to deal with Madoff informed the [defendants] of their decisions." *Id.* (quoting *In re Tremont*, 703 F. Supp. 2d at 371) (dismissing claims by investors of fund that invested assets in feeder fund because plaintiffs did not adequately plead scienter).

As in *Newman* and *In re Tremont*, plaintiffs here do not allege that any defendant had access to additional information that was unavailable to other financial professionals.  *Id.*; *In re Tremont*, 703 F. Supp. 2d at 371.  The Complaint is also devoid of any suggestion that Austin Capital knew or was even aware of any of the alleged red flags, much less all of them, or that it perceived the color of any flags the same way that plaintiffs do now with the benefit of 20/20 hindsight.  Even more telling, the Complaint does not allege that Austin Capital knew, believed, or even suspected that the Rye Fund was not a sound investment.  Plaintiffs fail to identify a single document or communication suggesting that any person at Austin Capital suspected foul play at the Rye Fund at any point since the investment began in 1997.  (*See* ¶ 63.)  Instead, they simply repeat a hindsight-based "red flag theory"—had Austin Capital done something more or different, it surely would have discovered that Madoff was a fraud—that the Second Circuit already has rejected.  *Newman*, 2010 WL 4118083, at *8 (citing *South Cherry II*, 573 F.3d at 112).

---

(continued…)

result, would not be inclined to doubt him or BMIS; (j) that Madoff's 13F filings with the SEC disclosed only small positions in small equities; and (k) that BMIS's office space was "[q]uestionable."  (¶ 89.)

**(b)      There Is No Well-Pleaded Allegation That Defendants Were Reckless In The Performance Of Their Due Diligence.**

Conclusory allegations that defendants knew or were reckless in not knowing the true facts do not satisfy plaintiffs' pleading burden, yet that is all they allege.  *See Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 366 (S.D.N.Y. 2001) (citing *Shields*, 25 F.3d at 1129).  The Complaint's crux is that defendants recklessly performed due diligence and that that recklessness establishes scienter.

Plaintiffs allege that when defendants Friedman, McDaniel, and Van Ert "admitted" that Austin Capital's last on-site due diligence review of *Madoff* was in late 2005, this "admission" demonstrated that Austin Capital was reckless in the performance of its due diligence.  (¶ 74.)  The Complaint, however, says virtually nothing about the nature, extent, frequency, or quality of Austin Capital's due diligence of *Tremont* or *the Rye Fund*—although it does admit that Austin Capital personnel "ha[d] visited or called Tremont various times over the life of the investment" (¶ 75).  Furthermore, though the Complaint charges defendants with recklessness for relying on Tremont's due diligence and monitoring of the Rye Fund and of the manager whom Tremont retained to execute the Rye Fund's investment strategy, the Complaint is silent about why it would have been unreasonable—much less reckless or fraudulent—for Austin Capital to receive and rely upon, for example, year after year of unqualified audit reports from Ernst & Young and KPMG showing hundreds of millions of dollars of assets in the Rye Fund.[7]  (*See* ¶ 82.)  Simply put, the

---

[7] Indeed, at the time of investment, Austin Capital explicitly disclosed that it would rely on information provided by the managers of the funds in which the Austin Capital Funds invested.

> Difficulty of Monitoring Investments.  If [Austin Capital] invests the Master Account's and the Fund's assets in other [private investment partnerships ("the Investment Vehicles")], although [Austin Capital] will monitor the performance of the managers of such Investment Vehicles, *it must ultimately rely on (i) the principals of each investment entity or its manager to operate in accordance with the investment strategy or the guidelines laid out by such persons; and (ii) the accuracy of the information provided by them.*  If a manager of an Investment Vehicle does not invest in accordance with the stated investment strategy or

"factual allegations in the complaint do not give rise to a strong inference that the alleged failure to conduct due diligence was indicative of an intent to defraud."  *South Cherry II*, 573 F.3d at 113.

Moreover, despite plaintiffs' repeated insistence, the Complaint alleges no facts to support plaintiffs' conclusion that if Austin Capital had not "ignored" the red flags, they "would have" discovered that Madoff was a fraud, and thus defendants are liable for securities fraud.  (*E.g.*, ¶¶ 4, 61, 78, 93.)  First, Austin Capital's alleged failure to adhere to its own due diligence practices does not give rise to Section 10(b) liability.  *See Hart*, 145 F. Supp. 2d at 369 ("Courts have refused to assign 10b-5 liability merely for a violation of a defendant's standard practices and procedures.").  Second, Austin Capital's alleged failure to conduct enough due diligence does not establish scienter where the allegations do not show that defendants intended to deceive plaintiffs.  *See In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 417 (S.D.N.Y. 2007) ("South Cherry I"), *aff'd*, *South Cherry II*, 573 F.3d 98; *see also Hart*, 145 F. Supp. 2d at 368 (dismissing on recklessness grounds, a complaint that "fail[ed] to adduce any specific facts supporting an inference of *knowledgeable participation* in the alleged fraud").  Finally, the Second Circuit has affirmed dismissal of a complaint, like this one, "replete with allegations that [the defendant] 'would' have learned the truth" about the fund if the defendant had performed the due diligence it promised.  *South Cherry II*, 573 F.3d at 112 (concluding that such allegations failed to establish scienter).

### 3.   Any Inference Of Scienter Is Not Cogent And Is Less Compelling Than An Inference Of Non-Fraudulent Intent.

Overwhelming any inference of scienter is the undisputed fact that Madoff successfully concealed his fraud from nearly everyone, including sophisticated investors, hedge fund advisors,

---

(continued…)

guidelines of such Investment Vehicle, or if the information it furnishes to the Investment Manager is not accurate, the Master Account and, therefore, the Fund might sustain losses with respect to its investment.

(11/1/07 ERISA Fund POM at 25, Ritts Decl. Ex. D (emphasis added).)

consultants, lawyers, lenders, market analysts, accountants, and regulators—the SEC and FINRA—for twenty years.  *E.g.*, *Newman*, 2010 WL 4118083, at *8.  Such deception was achieved through the "use of elaborate machinery, including falsifying account statements and trade confirmations, to promote the illusion that he was making securities transactions with investors' money, when the reality was that when earlier investors sought to collect their 'profits,' Madoff simply paid them out of the capital received from newer investors."  *S.E.C. v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) (internal quotation and citation omitted).

Plaintiffs' theory—that defendants could not have acted innocently when they failed to discover Madoff's fraud—has been rejected by this Court.  *See Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*, No. 09 Civ. 3708 (TPG), 2010 WL 1257567, at *6 (S.D.N.Y. Mar. 31, 2010) ("Rather than plaintiffs' theory that KPMG and KPMG Cayman could not have acted innocently when they told plaintiffs that they conducted GAAS-compliant audits, the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals.").  Just as the auditors of the Tremont funds were apparently "in the dark," so too were investors in those funds, including Austin Capital.  *Id.*; *see also In re Tremont*, 703 F. Supp. 2d at 371 ("[T]he more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and eluding the SEC and other financial professionals.").

Indeed, "[o]ne substantial competing inference this court may draw from these alleged facts is that [more] due diligence would not have uncovered the fraud."  *South Cherry I*, 534 F. Supp. 2d at 418.  "Given that [Madoff] managed to deceive the entire investing community for nearly [two decades], [plaintiffs'] allegation that [Austin Capital] would necessarily have

uncovered the fraud had it conducted the due diligence it promised is far from compelling." *See id.* As plaintiffs themselves have alleged in this Court: "[p]rior to Madoff's arrest, neither Tremont Group and its predecessors nor Tremont Partners gave the slightest indication that anything was amiss with respect to their investments through the Rye Funds." (*Tremont* ¶ 241.) "[R]evelations of Madoff's scheme and BMIS's implosion completely sandbagged the Rye Funds' investors." (*Tremont* ¶ 242.)

When presented with similar allegations relating to the Madoff scheme, courts have concluded that an inference of scienter is simply not as cogent and compelling as an inference of non-fraudulent intent. *See Newman*, 2010 WL 4118083, at *8; *In re Beacon Assocs. Litig.*, No. 09 Civ. 777(LBS), 2010 WL 3895582, at *20 (S.D.N.Y. Oct. 5, 2010) (red flags alone did not establish scienter); *accord Meridian Horizon*, 2010 WL 1257567, at *6 (red flags did not establish scienter as to auditors); *In re Tremont*, 703 F. Supp. 2d at 371 (same); *Stephenson*, 700 F. Supp. 2d at 624; *Cohmad*, 2010 WL 363844, at *2 (rejecting scienter allegations where the more compelling inference was that "Madoff fooled the defendants as he did individual investors, financial institutions, and regulators").

Nor is the conclusion different if a "handful" of entities suspected the true nature of Madoff's scheme. "For twenty years, Madoff operated this fraud without being discovered and with only a handful of investors withdrawing their funds as a result of their suspicions. The actions of the minority cannot support an inference of intent to defraud as to the numerous other investors who were still in the dark." *Newman*, 2010 WL 4118083, at *8.

## C.   The Complaint Impermissibly Lumps All The Defendants Together.

Rather than specifying what each defendant did that constituted fraud, the Complaint consistently lumps them into a single wrongdoing mass (*see, e.g.*, ¶ 50), which is the polar opposite of pleading with particularity. Rather than explaining what a particular defendant did at a

particular time that amounted to fraud, the Complaint never ties alleged misstatements to specific defendants.  In fact, it does not allege anything that was said during the putative class period by any of the individual defendants,[8] or any statement by ACM GP, Victory, or KeyCorp.

In lieu of pleading particularized facts, plaintiffs assert that it is "appropriate" to treat all defendants as group for pleading purposes.  (¶ 50.)  Though plaintiffs may connect statements to a particular defendant using the group pleading doctrine, they may do so only where the Complaint alleges "facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement."  *Anwar v. Fairfield Greenwich Ltd.*, -- F. Supp. 2d -- , 2010 WL 3341636, at *19 (S.D.N.Y. 2010) (quoting *In re Alstom*, 406 F. Supp. 2d at 448).  Mere contentions of corporate parent-subsidiary relationships are not enough to invoke the group pleading doctrine and attribute statements of the subsidiary to the parent.  *See Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 213-14 (S.D.N.Y. 2009).

The Complaint lacks even a single well-pleaded fact to support the conclusory allegations that KeyCorp and Victory were "involve[d] in Austin Capital's day-to-day operations" (¶ 29), or that ACM GP, Victory, and KeyCorp were "involved in drafting, producing, reviewing, and/or disseminating" the allegedly false statements issued by Austin Capital (¶ 50).  Plaintiffs cannot invoke the group pleading doctrine as to ACM GP, Victory, or KeyCorp based on unsupported conclusions, and so plaintiffs cannot attribute any alleged misstatement to these defendants.

Moreover, the lumping together of defendants results in a failure of the Complaint to plead with particularity the reasons why alleged statements were fraudulent, which Rule 9(b) mandates.  *S.E.C. v. Patel,* No. 07-CV-39, 2008 WL 782483, at *5 (D.N.H. Mar. 24, 2008) (dismissing

---

[8] The Complaint alleges that an article dated November 26, 2007 quoted defendant Riley regarding the changes after Austin Capital was acquired by KeyCorp, but does not allege that the statement quoted was false or misleading in any way.  (*See* ¶ 25.)

complaint for failure to satisfy 9(b), finding where "multiple defendants are involved, each defendant's role in the fraud must be particularized").  Rather than pointing to a specific document or communication or item of information that was allegedly known to a specific defendant at a specific time when he made a contrary statement, the Complaint treats the defendants' knowledge in gross, which Rule 9(b) does not permit.  *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("group pleading," or referring to all defendants under a common label, cannot satisfy a plaintiff's obligation to "allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005) (group pleading "does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made").

      **D.**    **The Complaint Fails To Plead Particularized Facts Demonstrating The Falsity Of Any Alleged Misrepresentation.**

For the same reasons the hindsight-based "red flags" theory fails to meet the PSLRA's requirements for pleading scienter, that theory also fails to satisfy Rule 9(b).  *See In re Tremont*, 703 F. Supp. 2d at 372 ("Since plaintiffs' Section 10(b) claim does not survive, plaintiffs' common law fraud claim, based on the same allegations of fact, must be dismissed as well.").

Plaintiffs' allegations regarding purported misrepresentations relating to Austin Capital's due diligence and risk management practices also do not satisfy Rule 9(b) because they rely on nothing more than conclusory assertions of falsity, coupled with carefully-selected excerpts of statements divorced from their context.  (*See, e.g.*, ¶¶ 71, 176 (alleging that selective excerpts of presentations and offering memoranda were "false and misleading" and known to be false at the time the representations were made.)  This "pleading technique[,] [] to couple a factual statement with a conclusory allegation of fraudulent intent," has been rejected by the Second Circuit as insufficient to satisfy heightened pleading requirements.  *Shields*, 25 F.3d at 1129.  Instead, to

satisfy Rule 9(b) or the PSLRA, the Complaint must *allege facts* demonstrating that the alleged

misrepresentation was false when made. *Rombach*, 355 F.3d at 172 (dismissing complaint that did

not allege that statements were false when made).

**1.    Plaintiffs Do Not Allege The Contemporaneous Falsity Of Any
Supposed Misrepresentation Regarding Investment Criteria.**

While the Complaint quotes from materials regarding Austin Capital's initial and ongoing

due diligence, plaintiffs do not explain how any of those representations were false when made.

(*See* ¶¶ 67-68.)  Plaintiffs allege that Austin Capital stated that it would do things but that it had no

intention of doing them.  But the Complaint fails to include specific facts establishing that at the

time the statement was made, Austin Capital had no intention of doing what it said it would do.

Plaintiffs thus have not complied with their obligation to state particularized false statements.

Further, though plaintiffs allege the falsity of representations regarding the various criteria

used to evaluate and select hedge fund managers (¶¶ 69-70), their assertion purposely omits the

remainder of the passage that makes clear that the statements are merely guidelines and principles,

not promises or requirements.

Specifically, defendants did not represent that *each* investment would meet *every* factor

and criteria listed.  To the contrary, defendants plainly stated that "[i]t is possible that some of the

Master Account's hedge fund managers will not meet all of the above criteria . . . ."  (11/1/07

ERISA Fund POM at 15 (cited and quoted at ¶ 69), Ritts Decl. Ex. D.))  In quoting limited

excerpts of the POM, the Complaint selectively overlooks the next set of statements—printed in

all capital letters and in bold font—including the following:

> DEPENDING ON CONDITIONS AND TRENDS IN THE
> SECURITIES MARKETS AND THE ECONOMY IN GENERAL,
> [AUSTIN CAPITAL] <u>MAY PURSUE ANY OBJECTIVES,
> EMPLOY ANY INVESTMENT TECHNIQUES</u> OR <u>PURCHASE
> ANY TYPE OF SECURITY</u> THAT IT CONSIDERS

APPROPRIATE AND IN THE BEST INTERESTS OF THE FUND
WHETHER OR NOT DESCRIBED IN THIS SECTION.

(*Id*. (emphasis added).)  Thus, contrary to plaintiffs' suggestion, defendants did not represent that

Austin Capital would pursue only certain objectives, or employ only certain investment techniques,

or purchase only certain types of securities.

> **2.      Plaintiffs Do Not Allege The Contemporaneous Falsity Of Any
> Purported Misrepresentation Regarding Onsite Visits To Managers.**

Plaintiffs' contention that defendants misrepresented the frequency with which Austin

Capital visited managers of hedge funds held in the Austin Capital Funds entirely misses the mark.

(*See* ¶¶ 71-73.)  Austin Capital did not represent to any investor that it would, or even could, visit

*sub*-managers, as confirmed by plaintiffs' own allegations.  (*See* ¶ 72 (quoting Request for

Information describing due diligence performed on *managers*, including "travel to the prospective

*manager's* office"); *id*. (quoting same describing communication process "[o]nce a new *manager*

is hired").)  Plaintiffs concede that Austin Capital met with the *manager* of the Rye Fund, Tremont:

"[Austin Capital] ha[d] visited or called Tremont various times over the life of the investment" (¶

75), and this is not inconsistent with the representations plaintiffs quote (¶ 72).

> **3.      Plaintiffs Do Not Allege The Contemporaneous Falsity Of Any Alleged
> Misrepresentation Regarding Due Diligence On Underlying
> Investments.**

Like their related "red flag" allegations, plaintiffs' assertion that defendants failed to

conduct a due diligence review of Madoff's investment activities is similarly off-target.  (¶ 79.)

Plaintiffs contend that Austin Capital should have looked into whether Madoff was actually

making trades and the failure to do so was in "stark contrast to the promises made."  (*Id*.)  No such

"promise" to investigate the activities of a sub-manager was made and, in fact, Austin Capital

explicitly advised that it would have limited access to certain information about the underlying

portfolio positions of an investment like the Rye Fund:

> Although [Austin Capital] will endeavor to monitor managers continuously, *[Austin Capital] is unlikely to have access to information about the underlying portfolio positions of the [private investment partnerships ("the Investment Vehicles")] in which the Master Account invests on a continuous basis.* Investors in the Investment Vehicles, moreover, typically have no right to demand such information of the managers. Accordingly, [Austin Capital] will not be in a position to analyze or respond to developments within any particular Investment Vehicle unless and until information relating thereto is disseminated by the manager to its investors, including the Master Account. Such information may not necessarily be timely or complete.

(11/1/07 ERISA Fund POM at 25, Ritts Decl. Ex. D (emphasis added); *see also* 5/1/06 All Seasons Offshore POM at 11 (same) (cited at ¶ 69), Ritts Decl. Ex. H.)

Further, plaintiffs fail to plead particularized facts showing that any such promise was false *when made*. "To meet the pleading requirement of Rule 9(b), plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why." *Rombach*, 355 F.3d at 175. Because plaintiffs fail to explain why and fail to allege particularized facts demonstrating that any alleged misstatement was false when made, the Complaint must be dismissed.

## III. The Section 20(a) Claim Must Be Dismissed Because The Complaint Does Not Plead A Primary Violation.

Because plaintiffs' control person claim is "necessarily predicated on a primary violation of securities law," and because the Complaint has not stated a claim under Section 10(b), this "secondary claim[] must also be dismissed." *Id.* at 177-78; *see also Brown v. Hutton Group*, 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) ("[I]t is impossible to state a claim for secondary liability under Section 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party.").

**IV.    The Section 12(a)(2) Claim Must Be Dismissed Because Private Placement Memoranda Do Not Give Rise To Section 12 Liability.**

The Section 12 claim fails because a buyer of securities in a private transaction cannot sue under Section 12(a)(2).  *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005).  In *Gustafson v. Alloyd Co., Inc.*, the Supreme Court held that Section 12(a)(2) liability cannot attach unless there is an "obligation to distribute a prospectus in the first place."  513 U.S. 561, 571 (1995).  No such obligation arises in a private sale of securities because a prospectus, as "narrow[ly]" defined by the Supreme Court, is "a document that describes a *public offering* of securities."  *Yung*, 432 F.3d at 148 (quoting *Gustafson*, 513 U.S. at 584).  In light of this, the Second Circuit was "compel[led]" to conclude that "a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary."  *Id.* at 149.

Plaintiffs concede that they purchased interests in the Austin Capital Funds pursuant to private placement memoranda (¶ 176), which specified that the shares of the fund were "exempt from registration under the 1933 Act, and are not and will not be marketed to the public in the United States" and that investors in the fund are limited to "accredited investors" and "qualified purchasers," as defined in the 1933 and 1940 Acts (11/1/07 ERISA Fund POM at iv (cited at ¶ 69), Ritts Decl. Ex. D).  (*See also id.* at 50 ("Shares are offered to U.S. investors without registration in reliance upon the exemption contained in Regulation D of the 1933 Act or regulations of the [SEC] applicable to transactions not involving a public offering.").)  Because these "offers were made to institutional investors, not the public at large, and the transactions were private ones," plaintiffs' Section 12 claim must be dismissed.  *Gotham Holdings, LP v. Health Grades, Inc.*, 534 F. Supp. 2d 442, 445 (S.D.N.Y. 2008).

**V.    The ERISA Claims Must Be Dismissed Because The Complaint Fails To Plead Either The Fiduciary Status Of Most Defendants Or A Breach Of Fiduciary Duty.**

**A.    Plaintiffs Have Failed To Plead A Fiduciary Status For All Defendants Except Austin Capital.**

A defendant can be held liable for breach of an ERISA fiduciary duty only if a complaint adequately alleges—with facts—that he or she was an ERISA fiduciary with respect to the conduct in question.  For virtually all the defendants here (all except Austin Capital), the Complaint lacks factual allegations showing each defendant's fiduciary status with respect to the Rye Fund investment.  Instead, the Complaint simply repeats language from the statute over and over:  "[b]y virtue of the authority or control [defendant] exercised over the management and disposition of ERISA covered employee benefit plan assets . . . , defendant [] has at all relevant times been an ERISA fiduciary."  (*See, e.g.*, ¶¶ 20, 22, 23, 34-41.)  Because the Complaint does not articulate facts to support that legal conclusion as to each defendant, it fails to allege their fiduciary capacity and the fiduciary claims against those defendants must be dismissed.  *See, e.g.*, *In re Citigroup ERISA Litig*., No. 07 Civ. 9790, 2009 WL 2762708, at *5, 15 (S.D.N.Y. Aug. 31, 2009) (dismissing ERISA claims in part because allegations were "entirely conclusory" and insufficient under *Twombly* and *Iqbal*); *In re Huntington BancShares, Inc. ERISA Litig*., 620 F. Supp. 2d 842, 852 (S.D. Ohio 2009) (plaintiffs' complaint "merely sets out the 'formulaic recitation of the elements' of their [ERISA] breach of fiduciary duty cause of action . . . , leaving it conceivable; however, completely implausible") (quoting *Twombly*, 550 U.S. at 555).

**1.    The Defendants' Titles And Corporate Relationships Are Insufficient To Establish Fiduciary Status.**

The naked assertion that all the members of Austin Capital's board, all the members of the board of its general partner (ACM GP), everyone listed on Austin Capital's Forms ADV, and all of Austin Capital's corporate affiliates (ACM GP, Victory, and KeyCorp) are ERISA fiduciaries is

not enough to establish fiduciary capacity.  The Forms ADV (the entire basis for the assertion of

fiduciary capacity as to the individuals) list the names of Austin Capital's officers and directors.

But simply being listed on a Form ADV as an executive of an ERISA fiduciary does not establish

an individual's fiduciary capacity.  *See Beacon Assocs.*, 2010 WL 3895582, at *32 (corporate

officers, directors, and partners "are liable as fiduciaries under section 1109 only if they personally

breach a fiduciary duty") (citing *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1242 (2d Cir.

1989)); *see also In re Lehman Bros.*, 683 F. Supp. 2d 294, 299-300 (S.D.N.Y. 2010) (finding the

allegation that director defendants had "control and authority" over a plan was insufficient absent

facts alleging how they exercised that power).

"An individual cannot be held liable for corporate ERISA violations solely by virtue of his

role as officer, shareholder, or manager."  *NYSA-ILA Med. & Clinical Servs. Fund v. Catucci*, 60 F.

Supp. 2d 194, 206 (S.D.N.Y. 1999) (internal quotation marks and citation omitted).  Instead of

titles and conclusions, plaintiffs must allege facts and "special circumstances" sufficient to impose

personal liability on the individual defendants.  "These 'special circumstances' include: (1)

knowingly participating in a fiduciary's breach of ERISA trust obligations; (2) conspiring to divert

ERISA funds for personal benefit; (3) intermingling personal and corporate assets; (4) engaging in

fraudulent conduct; or (5) where the individual is in fact the corporation or the corporation's alter

ego."  *Beacon Assocs.*, 2010 WL 3895582, at *32 (citation omitted).  Plaintiffs have not alleged

any such circumstances as to the individuals or the corporate affiliates of Austin Capital.

ERISA claims against individuals recently have been dismissed on similar grounds in both

Madoff-related and other cases, and the same should be done here:  "Plaintiffs plead no specific

facts indicating that [the individual defendants] were involved in or knew of any of the alleged

wrongdoing on the part of [Madoff, Tremont, or the Rye Fund]; their allegations are mainly based

on job descriptions . . . without any specific allegations that the individuals were connected with misconduct."  *Id.*  Likewise, in *Lehman Brothers*, the Court dismissed ERISA claims against members of Lehman's board, finding the allegation that "Defendant . . . was a fiduciary of the Plan, within the meaning of ERISA . . . in that he exercised discretionary authority with respect to the management and administration of the Plan and management or disposition of the Plan's assets," 683 F. Supp. 2d at 300 n.39, only parroted the language of the statute and offered a legal conclusion.  *Id*. at 300 ("In the absence of any facts to support this assertion, [] I need not accept it as true.").  Here, plaintiffs' similar repetition of the phrase "[b]y virtue of the authority or control [defendant] exercised over the management and disposition of ERISA covered employee benefit plan assets . . . , defendant [] has at all relevant times been an ERISA fiduciary" (¶¶ 23, 32, 34, 35, 38) also fails to set forth facts sufficient to show fiduciary status.  That is fatal to the ERISA claims against the individual defendants.

The effort to plead fiduciary status as to Austin Capital's corporate affiliates (ACM GP, Victory and KeyCorp) fares no better.  Plaintiffs assert, in conclusory terms, that each affiliate had "authority or control" over Austin Capital and that the corporate defendants "ignore[d] corporate formalities and structure."  (¶¶ 20, 22, 23, 31.)  They also allege that KeyCorp and Victory referred to Austin Capital as part of the overall corporate family in certain documents or communications (rather than, one supposes, somehow concealing the corporate relationship). (¶¶ 25-29.)  But there are no factual allegations that any of the corporate affiliates ever did anything with respect to the investments of the Austin Capital Funds in general, or the investment in the Rye Fund in particular.  Plaintiffs are trying to invoke a form of *respondeat superior* liability against Austin Capital's affiliates, but absent factual allegations sufficient to pierce the corporate veil, a parent or sibling corporation is not liable under ERISA for the acts of its affiliates.

*Beacon Assocs.*, 2010 WL 3895582, at *32 (citing *Trs. of the Local 464A UFCW Pension Fund v. Wachovia Bank, N.A.*, No. 09 Civ. 668 (WJM), 2009 WL 2152074, at *3 (D.N.J. July 14, 2009)); *see also In re Bank of Am. Corp. Secs., Derivative, & ERISA Litig.*, No 09 MD 2058 (PKC), 2010 WL 3448197, at *13 (S.D.N.Y. Aug. 27, 2010) ("several district courts in this circuit have declined to apply *respondeat superior* in the ERISA context as an independent theory of liability"); *In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, No. 02 MDL 1500, 2005 WL 563166, at *4 n.5 (S.D.N.Y. Mar. 10, 2005) ("[T]here is no reason to recognize an implied ERISA cause of action under the doctrine of *respondeat superior*, in light of the Supreme Court's 'unwillingness to infer causes of action in the ERISA context, since the statute's carefully crafted and detailed enforcement scheme provides "strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly."'") (citations omitted).  Instead, plaintiffs must adequately allege fiduciary capacity as to each corporate defendant.  They have not done so and the ERISA claims against ACM GP, Victory, and KeyCorp must be dismissed.

> ## 2.   Allegations That Lump All The Defendants Together Are Insufficient To Establish Fiduciary Status.

The Complaint's attempt to lump all defendants together and tag them with the same imputed duties, unspecified misrepresentations, and undifferentiated breaches of duty is similarly flawed.  (*See* ¶¶ 44-47).  Fiduciary relationships must be supported by factual allegations, and may not be presumed, as plaintiffs do here.  *See Pietrangelo v. NUI Corp.*, No. Civ. 04-3223 (GEB), 2005 WL 1703200, at *10 (D.N.J. July 20, 2005) (holding that plaintiffs did not satisfy Rule 8(a) pleading requirements in an ERISA action where the complaint's allegations referred to all defendants collectively as "Defendants"); *see also In re Providian Fin. Corp. ERISA Litig.*, No. C 01-05027 CRB, 2002 WL 31785044, at *1 (N.D. Cal. Nov. 14, 2002) ("[P]laintiffs have lumped the various classes of Defendants into an undifferentiated mass and alleged that all of them

violated all of the asserted fiduciary duties."); *In re McKesson HBOC Inc. ERISA Litig.*, No. C00-20030RMW, 2002 WL 31431588, at *3 (N.D. Cal. Sept. 30, 2002) (dismissing ERISA claims where the "complaint . . . is replete with overly general allegations pursuant to which nearly all Defendants are generally alleged to be liable for all breaches of fiduciary duty, all the while failing to identify specific Defendants who are liable for specific breaches of specific fiduciary duties").

The Complaint is premised on the factually unsupported conclusion that every defendant is a fiduciary and every defendant acted in an ERISA fiduciary capacity with respect to everything having to do with the Rye Fund investment.  But plaintiffs must allege that each defendant exercised discretionary authority "with respect to the particular activity at issue" to state a fiduciary duty claim.  *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005).  In other words, even if the Court accepted plaintiffs' conclusions that the non-Austin Capital defendants were fiduciaries for some purposes, it would not mean that they were fiduciaries for all purposes touching upon Austin Capital.  Worse still, plaintiffs have not identified any specific action by any specific defendant that amounted to a breach of a duty.  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary . . . when taking the action subject to the complaint."); *see, e.g.*, *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005) ("ERISA does not attach liability for investment decisions to fiduciaries whose roles were limited to appointing, retaining and removing other fiduciaries.").

Plaintiffs' shotgun pleading attempts to ensnare everyone connected to Austin Capital with a fiduciary duty under ERISA, but without facts to back up each defendant's fiduciary status.  The ERISA claims against all defendants except Austin Capital should be dismissed on this ground.

**B.      Plaintiffs Have Failed To Plead A Plausible Claim For Breach Of A Fiduciary Duty Under ERISA.**

**1.      Plaintiffs Have Not Plausibly Alleged Imprudence.**

To survive dismissal, plaintiffs' breach of fiduciary duty claim under ERISA must be more than "merely consistent with the defendant's liability." *Iqbal*, 129 S. Ct. at 1949.  It must nudge the claim "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  Here, plaintiffs do not even come close.

Plaintiffs' conclusory allegations of imprudence are implausible because they entirely ignore the roles of the Rye Fund's managers, auditors, and administrators.  Plaintiffs admit that the Rye Fund was managed by Tremont (¶ 63) whose corporate parents are Oppenheimer and MassMutual (*Tremont* ¶¶ 26-28, 31).  And there can be no question that the Rye Fund was audited by Ernst & Young and later KPMG (*Tremont* ¶¶ 323, 325, 328, 331); *In re Tremont*, 703 F. Supp. 2d at 366-67, or that BONY provided the Rye Fund with administration, valuation, and custodial services (*Tremont* ¶ 40).

Rather than acknowledging the roles of *these* managers, auditors, and administrators plaintiffs say that *Madoff's* auditor was inadequate, that *Madoff's* key personnel were family members, and that *Madoff's* back office operations were weak and his account statements were flawed.  (¶ 70.)  But the Austin Capital Funds did not simply give all of their assets directly to Madoff.  The Complaint completely fails to account for the fact that the Austin Capital Funds' investment in the Rye Fund (just one of 30-35 allocations)[9] was managed by Tremont, which undertook to select and monitor the sub-advisor to the Rye Fund, Madoff.  The Rye Fund's administrator was not Madoff, it was Bank of New York Alternative Investment Services, Inc.

---

[9] Plaintiffs do not claim that any of the other investments made by the Austin Capital Funds were imprudent or that the portfolio as a whole was mismanaged.

("BONY") (*Tremont* ¶ 40), and there are no allegations to suggest there was anything imprudent about investing in a fund administered by BONY.  The Rye Fund's auditor was not Friehling & Horowitz, it was (depending on the year) either KPMG or Ernst & Young.  There are no allegations that suggest there was anything imprudent about investing in a fund audited by these blue-chip firms, or that there was anything imprudent about relying on financial statements audited by those firms that showed the Rye Fund had hundreds of millions of dollars in assets year after year.  And the Rye Fund was not managed by a small shop of family members with limited resources, it was managed by Tremont which, according to plaintiffs, was a reputable hedge-fund management firm that was controlled by MassMutual Financial Group, a large, sophisticated financial services provider.  (*Tremont* ¶ 193).

Plaintiffs have not alleged that anyone connected with Austin Capital had actual knowledge of Madoff's fraud, or even suspected fraud.  Nor have they alleged that anyone at Austin Capital knew of the supposed "red flags" or perceived them as such.  And none of those flags pertained to Tremont, Tremont's personnel, Tremont's auditors, or Tremont's administrators.

Further, plaintiffs concede that defendants did conduct due diligence on Tremont, the Rye Fund's manager, at "various times" over the life of the investment.  (¶ 75.)  Plaintiffs also concede that Austin Capital went beyond Tremont and visited Madoff, the sub-manager, at least once.  (*Id*.) But without explaining how Austin Capital knew or should have known that Tremont's due diligence or management was inadequate, plaintiffs conclude that it was "reckless" to rely on Tremont.  (¶ 82.)  Similarly, plaintiffs offer no explanation as to why it was reckless or imprudent to rely on the Rye Fund's financial statements audited by respected auditing firms.  (¶ 81.)  And they have not identified any defect or inconsistency in a single document Austin Capital actually received from Tremont, KPMG, BONY or Ernst & Young that would or should have revealed the

fraud.  Plaintiffs' claim is nothing more than *res ipsa loquitur* dressed up with newspaper clippings:  defendants must have been imprudent because Madoff stole their money and, after the fact, people discovered how.

By plaintiffs' own admission, other "prudent," sophisticated investors entrusted funds to Madoff.  Under the heading "Prudent Advisors Stopped Investing . . ." plaintiffs allege that J.P. Morgan Chase & Co. ("Chase") invested $250 million dollars with Madoff as late as 2006.  (¶ 97.) Only in the fall of 2008, a few months before Madoff's fraud was revealed, did Chase withdraw the funds.  The same is true of plaintiffs' other example of "prudence"—the Fort Worth Employees' Retirement Fund—which, plaintiffs admit, invested millions of dollars in the same Rye Fund in 2003 and did not redeem the investment until late 2008.  (¶ 98.)  These examples do not prove plaintiffs' claims.  They undermine plaintiffs' claims because they show that sophisticated, concededly "prudent" entities also invested in Madoff, made last-minute redemptions, and now face the likelihood of having to return those redemptions.  (*Id.*; *see Picard v. J.P. Morgan Chase & Co.*, No. Adv. Pro. No. 08-01789 (complaint filed under seal Dec. 2, 2010).)

Further, "Tremont Partners[] claimed to have conducted exhaustive due diligence regarding all aspects of the Rye Funds' operations, investments and management."  (*Tremont* ¶ 314.)  And Austin Capital entrusted funds with Tremont because, in addition to the well-known auditors, managers, and administrators that serviced the Rye Funds, "neither Tremont Group and its predecessors nor Tremont Partners gave the slightest indication that anything was amiss with respect to their investments through the Rye Funds."  (*Tremont* ¶ 241.)  So the "revelations of Madoff's scheme and BMIS's implosion completely sandbagged the Rye Funds' investors," including Austin Capital.  (*Tremont* ¶ 242.)  Austin Capital was not reckless or imprudent, it was blind-sided like everyone else and plaintiffs allege no facts that plausibly suggest otherwise.

> **2.      Hindsight And So-Called "Red Flags" Cannot Serve As The Basis For A Breach Of Fiduciary Duty Claim.**

As explained above, plaintiffs have offered no facts to show that the Rye Fund exhibited any "red flags" at all.  And even if they had, the ERISA fiduciary duty claim would still fail.  That claim rests entirely on the premise that "the loss of Class assets was foreseeable in light of the numerous red flags concerning Madoff's operations and the significant risk that Madoff was misappropriating investor funds."  (¶ 66.)  But "Madoff deceived countless investors and professionals, as well as his primary regulators," the SEC and FINRA.  *Newman*, 2010 WL 4118083, at *1.  The suggestion of imprudence is also at odds with plaintiffs' own allegation that $65,000,000,000 was lost by individuals, financial institutions, hedge funds, and other entities— and missed by sophisticated accountants, bankers, and regulators with subpoena power.  (*See* ¶ 2.)  Neither the newspaper clippings nor the hindsight analysis offered by plaintiffs make out a plausible claim for imprudence.

The unsupported conclusion that defendants were imprudent because they failed to uncover the Ponzi scheme is not enough to sustain an ERISA claim.  Plaintiffs must "nudge their claims across the line from conceivable to plausible."  *In re Lehman Bros.*, 683 F. Supp. 2d at 303 (citing *Twombly*, 550 U.S. at 570)).  Plaintiffs' repeated conclusion that defendants "knew" or "should have known" of the Madoff fraud—without any specific factual allegations of actual knowledge at the time of the investment, or plausible suggestion of constructive knowledge other than red flags missed by thousands of others—is insufficient to state a claim.  While the "red flags" and newspaper clippings might be enough to show that it was theoretically conceivable that Austin Capital personnel could have unearthed Madoff's fraud, "*Twombly* prohibits [a Court] from crediting this type of speculation."  *Id.*; *Saint Vincent Catholic Med. Ctrs. v. Morgan Stanley Inv. Mgmt. Inc.*, No. 09 Civ. 9730 (PKC), 2010 WL 4007224, at *4 (S.D.N.Y. Oct. 4, 2010) ("A

'theoretically conceivable' awareness of risk was insufficient."); *Trustees of S. Cal. IBEW-NECA Defined Contrib. Plan v. Bank of New York Mellon Corp.*, No. 09 Civ. 6273 (RMB-AJP), 2010 WL 1558587, at *6 (S.D.N.Y. Apr. 14, 2010) (dismissing ERISA prudence claim, holding "Plaintiff's allegations—based upon quotations from news articles—fail to state a claim"; and the "Amended Complaint's factual allegations may suggest that it was 'theoretically conceivable' that Defendants should have known about Lehman's precarious financial condition, but the *Twombly* decision argues against crediting this type of speculation."), *vacated to allow repleading by* 2010 WL 3958790; *see also In re Citigroup Inc. S'holder Derivative Litig*. ("Citigroup II"), No. 07 Civ. 9841 (SHS), 2009 WL 2610746, at *6 (S.D.N.Y. Aug. 25, 2009) ("newspaper articles chronicling the collapse of the subprime mortgage market" did not show that defendant directors "'were consciously disregarding a duty somehow to prevent Citigroup from suffering losses'" (quoting *In re Citigroup Inc. S'holder Derivative Litig*. ("Citigroup I"), 964 A.2d 106, 128 (Del. Ch. 2009)).

Plaintiffs' citation to the now-familiar red flags also ignores that the "flags" were identified *post hoc* (¶¶ 95, 97, 98, 99, 100, 101, 102, 105) or in non-public documents (¶¶ 89(a)-(k)). Hindsight allegations are insufficient to state a claim for breach of fiduciary duty under ERISA. "Because the fiduciary's obligation is to exercise care prudently and with diligence under the circumstances then prevailing, his actions are not to be judged from the vantage point of hindsight." *Chao v. Merino*, 452 F.3d 174, 182 (2d. Cir. 2006); *In re Constellation Energy Group, Inc*., -- F. Supp. 2d --, 2010 WL 3221821,*5 (D. Md. Aug. 13, 2010) (dismissing ERISA prudence claim, noting that "[o]ne cannot simply find investment in high-risk companies prudent when they succeed and imprudent when they fail"); *Ulico Cas. Co. v. Clover Capital Mgmt., Inc*., 335 F. Supp. 2d 335, 340 (N.D.N.Y. 2004) ("The focus of the [ERISA prudent man] inquiry is what steps the fiduciary took before making the decision to act, and not whether the action succeeded or

failed."). Plaintiffs' allegations fail to address either Austin Capital's knowledge or circumstances at the time the Rye Fund investment was made or how Austin Capital's actual conduct failed to meet a standard of prudence given those circumstances.

This Court already has found that Madoff's fraud went undetected because of "his proficiency in covering up his scheme and eluding the SEC and other financial professionals." *See In re Tremont*, 703 F. Supp. 2d at 371. Here, plaintiffs offer no "factual enhancement" to show that the reason Austin Capital did not detect the fraud was recklessness or imprudence and not Madoff's proficiency in covering up the fraud. (¶ 56 (citing Madoff allocution) ("The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.").)

### 3. *Beacon Associates* Shows Why Plaintiffs' Claims Fail Here.

The decision in *Beacon Associates* provides an instructive contrast to the claims plaintiffs allege here. The Beacon Associates matter primarily involved three groups of defendants: Ivy Asset Management ("Ivy"), a registered investment advisor, J.P. Jeanneret Associates, Inc. ("Jeanneret") and Beacon Associates, LLC, ("Beacon") which were formed to create investment vehicles to be managed by Madoff. *Beacon Associates*, 2010 WL 3895582, at *2. Comparing the facts alleged against the defendants in *Beacon Associates* to the conclusory allegations in this case highlights the weakness of plaintiffs' claims. Not one fact identified by Judge Sand as a basis for allowing certain ERISA claims to proceed in *Beacon Associates* is present here.

The *Beacon Associates* complaint alleged that Ivy had direct access to Madoff since 1987 and that Beacon and Jeanneret paid Ivy fees for investors that they placed with Madoff. *Id.* at *2-3. It also contends that principals of Ivy suspected that Madoff was running a Ponzi scheme as early as 1991. *Id.* at *4. Further, Judge Sand noted that plaintiffs in *Beacon Associates* specifically

alleged that by 1997 Ivy presented questions to Madoff about records inconsistent "with the number of option trades and their prices as reported."  *See id.*  By 1998, one of Ivy's principals recommended that Ivy withdraw all of its proprietary funds from Madoff.  *Id.* at *6.  In 2001, Ivy sent letters to Jeanneret and a Beacon principal informing them that Ivy would no longer be performing due diligence on Madoff.  *Id.* at *8.  In 2006 and 2007, Ivy executed advisory agreements with Beacon and Jeanneret, "explicitly exclud[ing] Madoff from the managers Ivy agreed to research, monitor, meet with, and evaluate."  *Id.*  Jeanneret and Beacon went on investing with Madoff anyway.  *Id.* at *19-20.

The allegations here stand in stark contrast to those in *Beacon Associates*.  Plaintiffs here have not alleged that Austin Capital believed that Madoff was running a Ponzi scheme, or that Austin Capital received inconsistent records from the Rye Fund, or that Austin Capital principals recommended Austin Capital withdraw all its funds from the Rye Fund.  Nor, most importantly is there any allegation that Tremont told Austin Capital that it had quit performing due diligence on Madoff, but that Austin Capital continued to invest in the Rye Fund anyway.  To the contrary, "Rye Fund investors were never alerted to the indicia of criminality and/or gross irregularities in Madoff's operations, never had a reasonable opportunity to withdraw their funds from Madoff's control before it was too late to do so."  (*Tremont* ¶ 444.)

Judge Sand's primary reason for permitting the ERISA claims to proceed in *Beacon Associates* is absent here.  In *Beacon Associates*, the plaintiffs alleged that the defendants who had hired Ivy expressly to perform due diligence, custodial, and other administrative tasks, were actually "aware that Ivy had ceased performing due diligence on Madoff" and had stopped recommending Madoff, and yet continued to invest with Madoff.  2010 WL 3895582, at *24.  There is nothing remotely similar alleged here.  Absent specific facts about why defendants

actually knew or should have known of the inaccuracies in the Rye Fund's reporting or financial statements (like those alleged in *Beacon Associates*), plaintiffs' claims amount to nothing more than the conclusion that defendants must have acted imprudently because they failed to detect the fraud, and that is not enough. *Iqbal*, 129 S. Ct. at 1949.

Madoff's massive fraud went undetected by investors and regulators for decades, and plaintiffs have not alleged any circumstances unique to Austin Capital. Without anything to separate Austin Capital from countless others running similar enterprises who fell victim to Madoff's fraud under circumstances of "like character," the only plausible inference under *Iqbal* is that defendants used the same skill, prudence, and diligence that others would (and did) use "in the conduct of an enterprise of a like character." 29 U.S.C. § 1104(a)(1)(B).

### C.   The ERISA Claims For Prohibited Transactions And Co-Fiduciary Liability Also Fail.

Plaintiffs' claim for paying fees in violation of ERISA § 1104(a)(1)(D) fails because they have not identified a prohibited transaction. The plaintiffs in *Beacon Associates* raised the exact same claim, which was rejected by this Court:

> [T]he [agreements] presumably anticipated that Defendants would use the figures reported to them to calculate fees. Plaintiffs do not really contend that Defendants' actions violated these procedures, but that Defendants knew or should have known the figures were false and used them anyway. This is a repackaging of their prior allegations of failure to discover the Madoff Ponzi scheme, and is unrelated to the terms stated on the face of the plan documents. . . . The claims under section 1104(a)(1)(D) are dismissed.

*Beacon Assocs.*, 2010 WL 3895582, at *25.

Plaintiffs' claim for co-fiduciary liability fails because, as explained above, plaintiffs have failed to adequately allege a fiduciary capacity as to any defendant except Austin Capital and have failed to allege a breach of fiduciary duty as to any defendant. *Id.* at *27. Finally, plaintiffs' claim

for disgorgement (Count VII) identifies only a remedy and not a separate cause of action under

ERISA and must be dismissed for the reasons identified above.  *See* 29 U.S.C.A. § 1109(a).

## VI.     The Common-Law Claims Must Be Dismissed.

### A.     All Common-Law Claims Except Fraud Are Preempted By The Martin Act.

"The Martin Act prohibits various fraudulent and deceitful practices in the distribution,

exchange, sale, and purchase of securities but does not require proof of intent to defraud or

scienter." *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 36 (S.D.N.Y. 2008) (citations omitted)*; see*

N.Y. Gen. Bus. Law § 352 et seq. (McKinney 1996).  The New York Attorney General has "sole

discretion to investigate securities violations within or from the state of New York." *South Cherry*

*I*, 534 F. Supp. 2d at 421 (citing N.Y. Gen. Bus. Law §352(1) (McKinney 2007)).  There is no

private right of action under the Martin Act, *Kassover*, 619 F. Supp. 2d at 36, and "[t]he vast

majority of state and federal courts have found that 'causes of action related to a plaintiff's

securities fraud claim that do not include scienter as an essential element are typically preempted

by the Martin Act,'" *South Cherry I*, 534 F. Supp. 2d at  421.

"[A] transaction qualifies as 'within or from' New York for purposes of the Martin Act if a

plaintiff alleges that a substantial portion of the events giving rise to a claim occurred in New

York." *In re Tremont*, 703 F. Supp. 2d at 372 (citing *Sedona Corp. v. Ladenburg Thalmann & Co.,*

*Inc.*, No. 03 Civ. 3120 (LTS), 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005) (finding a

substantial part of the events giving rise to the claims occurred in New York where the underlying

securities were allegedly manipulated in New York).  Here, Martin Act preemption applies

because all of plaintiffs' claims are founded on alleged misstatements and omissions concerning

due diligence and monitoring of the Rye Fund, a fund managed in New York.  In *Tremont*, this

Court already has determined that substantial acts in furtherance of the alleged wrongdoing

connected with Madoff and the Rye Fund "occurred within the district, thus satisfying the Martin

Act's geographic prong."  *Id.* at 373.  Victory, moreover, is a New York corporation (¶ 23), and plaintiffs allege that Victory "managed the assets of the Austin Capital Funds" (¶ 21).  This Court also already has observed that where a security exposed to Madoff's fraud is managed in New York, the security "ha[s] a significant territorial nexus with New York for purposes of Martin-Act preemption."  *Meridian*, 2010 WL 1257567, at *8; *Barron v. Igolnikov*, No. 09 Civ. 4471 (TPG), 2010 WL 882890, at *6 (S.D.N.Y. Mar. 10, 2010).

Previously, this Court determined that the non-fraud claims raised in *In re Tremont*—based on the same alleged due diligence failures regarding Rye funds (including the fund at issue here)—were preempted.  *In re Tremont*, 703 F. Supp. 2d at 372; *see also Meridian*, 2010 WL 1257567, at *8.  Other courts follow the same Martin Act preemption analysis,[10] and nothing in the Complaint presents a reason to depart from the rationale this Court relied on in March of this year.  Indeed, *In re Tremont* applies with equal, if not greater, force today.[11]  Counts VIII, X, XI, XII, and XIII should be dismissed as preempted by the Martin Act.

## B.    SLUSA Preempts All Of The Common-Law Claims.

The common-law claims are also preempted by the Securities Litigation Uniform Standards Act ("SLUSA").  SLUSA provides: "No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal

---

[10] *See, e.g.*, *Abbey v. 3F Therapeutics, Inc.*, No. 06 Civ. 409 (KMW), 2009 WL 4333819, at *14 (S.D.N.Y. Dec. 2, 2009) (negligent misrepresentation claim preempted); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 330-31 (S.D.N.Y. 2006) (same); *see also Owens v. Gaffken & Barriger Fund, LLC*, No. 08 CIV. 8414 (PKC), 2009 WL 3073338, at *13-14 (S.D.N.Y. Sept. 21, 2009) (unjust enrichment claim preempted); *Kassover*, 619 F. Supp. 2d at 37-39 (breach of fiduciary duty, negligent misrepresentation, and negligence claims preempted); *Pro Bono Invs., Inc. v. Gerry*, No. 03-cv-4347 (JGK), 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005) (breach of fiduciary duty, gross negligence, constructive trust and unjust enrichment counterclaims preempted).

[11] Since this Court's March 30, 2010 opinion, as plaintiffs point out, the New York Attorney General has taken further Madoff-related action under the Martin Act.  (*See* ¶ 105 (citing *New York v. Ivy Asset Mgmt. LLC*, No. 45048912010 (N.Y. Sup. Ct. May 11, 2010)).)  And other courts have joined this Court in finding Martin Act preemption for similar claims in similar Madoff-related contexts.  *See Beacon Assocs.*, 2010 WL 3895582, at *38; *Newman*, 2010 WL 4118083, at *15 & n.16 (stating that "because these claims are based on substantially the same acts alleged to constitute securities fraud under section 10(b), they are likely preempted by the Martin Act").

court by any private party alleging a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A) (2000); § 77p(b)(1) (1998).  SLUSA preempts a claim if the claim is: (i) a covered class action; (ii) based on state law; (iii) alleging a material misrepresentation or omission; (iv) in connection with the purchase or sale of a covered security.  *See In re WorldCom, Inc.,* 263 F. Supp. 2d 745, 769 (S.D.N.Y. 2003).  In other Madoff-related cases, courts have applied SLUSA to dismiss the very claims asserted by plaintiffs here, and the Court should follow suit now.[12]

### 1.    This Is A Covered Class Action.

SLUSA broadly defines a "covered class action" to include lawsuits in which "damages are sought on behalf of more than 50 persons" or "one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated." 15 U.S.C. § 78bb(f)(5)(B)(ii)(II) (2000); § 77p(f)(2) (1998).  Plaintiffs allege that the class here is in excess of 100 members.  (¶ 118.)

Plaintiffs cannot escape SLUSA preemption by choosing the New Mexico ERB and the Texas Trust as the putative class representatives for the state-law claims.  Though the selection of those funds appears to be an attempt to circumvent "covered class" status by utilizing the state pension plan exception in SLUSA, that exception does not apply here.  *See* 15 U.S.C. § 78(bb)(f)(3)(B).  To be exempt from SLUSA preemption, an action must be brought by a state plan "as a member of a class comprised solely of other States, political subdivisions, or State pension plans that are named plaintiffs, and that have authorized participation, in such action."  *Id*.; *see also In re Hollinger Int'l, Inc. Secs. Litig.*, No. 04C 0834, 2006 WL 1806382, at *18 n.5 (N.D.

---

[12] *See, e.g.*, *Newman*, 2010 WL 4118083, at *10; *Beacon Assocs.*, 2010 WL 3895582, at *34; *Barron*, 2010 WL 882890, at *4 (Griesa, J.); *Levinson v. PSCC Servs., Inc.*, No. 09 CV 00269 (PCD), 2009 WL 5184363, at *12 (D. Conn. Dec. 23, 2009); *Backus v. Connecticut Comm. Bank, N.A.*, No. 09-CV-1256, 2009 WL 5184360, at *1, 5-6 (D. Conn. Dec. 23, 2009).

Ill. June 28, 2006) (dismissing securities claims, finding that any attempt to amend

"presumably . . . would exclude any plaintiffs who are not state pension plans").  Here, because

the New Mexico ERB and Texas Trust purport to bring claims on behalf of *all* non-ERISA

investors in the Austin Capital Funds, the claims are not limited to those belonging to other States,

political subdivisions, or state pension plans.  (*See* ¶¶ 167-214.)  Indeed, beyond those two,

plaintiffs have not identified any other state pension plan that has "authorized participation" in this

action, much less a class comprised "solely" of such plans that are "named plaintiffs."

>        2.        **Misrepresentations And Omissions Underpin Plaintiffs' Claims.**

Plaintiffs' claims for fraud and negligent misrepresentation meet SLUSA's requirements

for preemption because they are based on alleged misrepresentations or omissions. (*See, e.g.*, ¶¶

174 (fraud claim based on allegation that defendants "falsely represented that they would conduct

due diligence into Rye Select Prime Fund"), 201(a) (negligent misrepresentation claim based on

alleged inaccurate information in the offering documents).)  This Court has held that fraud and

negligent misrepresentation claims fall squarely within SLUSA's preemptive scope.  *See, e.g.*, *In*

*re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 443 (S.D.N.Y. 2001).

Material misrepresentations or omissions are not an essential element of plaintiffs' claims

for gross negligence, breach of fiduciary duty, breach of contract, and unjust enrichment.

However, each of those claims is based on alleged misrepresentations or omissions: not just

Madoff's misrepresentations, but also defendants' alleged misstatements and omissions in sales

presentations and offering documents for the Austin Capital Funds.  Indeed, the bulk of the

allegations targeting defendants' conduct fall under the heading "False and Misleading Statements

Concerning Austin Capital's Purported Due Diligence, Risk Management Practices and Financial

Performance."  (*See* ¶¶ 67-82.)  All these claims are barred by SLUSA because they are based on

the same allegations as the preempted fraud and negligent misrepresentation claims.  *Felton v.*

*Morgan Stanley Dean Witter & Co.*, 429 F. Supp. 2d 684, 693 (S.D.N.Y. 2006) (dismissing

contract claims under SLUSA where the gravamen of the complaint was a fraudulent omission).

Addressing similar circumstances—including in Madoff-related cases—courts have held

that SLUSA preempts these state common-law claims.  *See, e.g., Beacon Assocs.*, 2010 WL

3895582, at *33-34 (dismissing breach of contract, breach of fiduciary duty, and other claims as

preempted); *Barron*, 2010 WL 882890, at *3, 5 (dismissing breach of fiduciary duty claim as

preempted); *Levinson*, 2009 WL 5184363, at *14 (dismissing all Madoff-related state-law claims,

including those for breach of contract, unjust enrichment, and breach of fiduciary duty because

they relied on fraud "as an integral part of the conduct giving rise to the claims"); *see also Miller v.*

*Nationwide Life Ins. Co.,* 391 F.3d 698, 702 (5th Cir. 2004) (holding that breach of contract claim,

which incorporated allegations of materially false statements in seller's prospectus, was preempted

by SLUSA); *Atkinson v. Morgan Asset Mgmt., Inc*., 664 F. Supp. 2d 898, 906-07 (W.D. Tenn.

2009) (dismissing contract and fiduciary-duty claims as preempted by SLUSA).

### 3.     Plaintiffs Allege The Purchase And Sale Of "Covered" Securities "In Connection With" Alleged Misrepresentations Or Omissions.

For purposes of SLUSA, "covered" securities include those listed or authorized for listing

on the New York Stock Exchange or another national exchange.  *See* 15 U.S.C. § 77r(b)(1)(A),

(B), cited in 15 U.S.C. § 78bb(f)(5)(E), § 77p(f)(3).  The relevant covered securities here are the

"basket of common stocks within the S&P 100 Index" that Madoff supposedly purchased for the

Rye Fund pursuant to the split-strike conversion strategy.  (¶¶ 56, 89(c).)  Whether plaintiffs or

defendants purchased "covered" securities *directly* is irrelevant.  Rather, "it is enough that the

fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone

else."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006); *Sofonia v.*

*Principal Life Ins. Co.*, 465 F.3d 873, 879 n.4 (8th Cir. 2006).  Here, the alleged fraud coincided

with Madoff's purported securities transactions.  That the trades never took place does not

preclude finding a connection with covered securities.  *See id.*[13]

  As this Court recently held in *Barron, Beacon Associates* and *Newman*, misrepresentations

related to limited partnership interests were "in connection with" covered securities where the

funds were created for the purpose of investing in covered securities and the misrepresentations

"had the effect of facilitating Madoff's fraud."  *Beacon Assocs.*, 2010 WL 3895582, at *34; *see*

*also Newman*, 2010 WL 4118083, at *10; *Barron*, 2010 WL 882890, at *5; *Levinson*, 2009 WL

5184363, at *11 (considering the "nature of the parties' relationship, and whether it necessarily

involved the purchase and sale of securities").  Thus, there is "no question that Madoff's Ponzi

scheme was 'in connection with' the purchase and sale of securities."  *Levinson*, 2009 WL

5184363, at *9.  Further, Madoff represented to investors like the Rye Fund that he would

purchase and sell securities in the Standard & Poor's 100 Index, and he used prices from the

public markets on the documentation he sent to customers.  *Barron*, 2010 WL 882890, at *5.

  Here, both Madoff's misrepresentations and the alleged misrepresentations and omissions

of the defendants coincide with purported purchase and sale of "covered" securities.  The

Complaint recounts Madoff's Ponzi scheme involving covered securities, and alleges that

defendants made (i) "misrepresentations . . . in connection with their loss of millions of dollars of

investors' money through investments made in funds controlled by" Madoff (¶ 1), (ii) false and

misleading representations about Madoff's investment of his own capital in the Rye Fund (¶ 70),

(iii) false representations about Madoff's compensation (*id.*), and (iv) false representations and

---

[13] "[U]nfulfilled promises to purchase securities qualify as actual purchases so long as the defrauded party actually pays for what he or she is led to believe are securities or the right to purchase securities."  *Schnorr v. Schubert*, No. 05-303, 2005 WL 2019878, at *5-7 (W.D. Okla. Aug. 18, 2005); *see also Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1347-51 (11th Cir. 2008) (SLUSA applied to class action seeking to hold defendant liable for fraud in which third party stole investors' money rather than securities); *Falkowski v. Imation Corp*., 309 F.3d 1123, 1129-30 (9th Cir. 2002) ("[I]f a person contracts to sell a security, that contract is a 'sale' even if the sale is never consummated."), *amended by* 320 F.3d 905 (9th Cir. 2003); *S.E.C. v. Zandford*, 535 U.S. 813, 819-20 (2002) ("a broker who accepts payment for securities that he never intends to deliver . . . violates §10(b) and Rule 10b-5").

omissions concerning due diligence and oversight of Madoff (¶¶ 71-74).  For these reasons,

SLUSA preemption applies and all the state-law claims must be dismissed.[14]

> **C.      The Claims For Breach Of Fiduciary Duty, Unjust Enrichment, Breach Of
>          Contract, And Gross Negligence Must Be Dismissed Because They Are
>          Derivative, Not Direct.**

The Complaint asserts direct claims for breach of fiduciary duty, unjust enrichment, breach

of contract, and gross negligence.  The putative class representatives bringing those claims in

Counts VIII-XV are the New Mexico ERB and the Texas Trust.  The Safe Harbor QP Fund, in

which the New Mexico ERB invested (¶ 17), is a Texas limited partnership.  (8/15/04 Safe Harbor

QP Ltd. P'ship Agmt. at 6, Ritts Decl. Ex. I.)  The Safe Harbor Offshore Fund, in which the Texas

Trust invested (¶ 17a), is a Cayman Islands company.  (3/22/06 Safe Harbor Offshore Arts., Ritts

Decl. Ex. J.)  Under Texas and Cayman Islands law, however, these claims are derivative and not

direct.

"In Texas, a stockholder does not have a cause of action for injury to the corporation.  A

stockholder cannot bring an action for impairment of a business against the one who has injured

the corporation, even if the acts have demonstrably depreciated the value of his shares."

*Motorola, Inc. v. Chapman*, 761 F. Supp. 458, 460 (S.D. Tex. 1991).  The same holds true under

Texas law for claims related to limited partnerships; a single limited partner cannot bring a direct

claim on his own behalf for harms that, if they occurred, affected the limited partnership as a

whole.  *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 250 (Tex. App. 2005) (dismissing a

limited partner's direct claims because "[a]n individual stakeholder in a legal entity does not have

a right to recover personally for harms done to the legal entity").

---

[14] Even if the fraud claim were not completely preempted by SLUSA, it would fail for the same reasons that plaintiffs' Section 10(b) claim fails.  As this Court has held, "the elements of Section 10(b) claims are essentially the same as those for common law fraud in New York."  *Meridian*, 2010 WL 1257567, at *6-7.  Because plaintiffs' Section 10(b) claims cannot survive, "plaintiffs' common law fraud claims, based on the same allegations of fact, must be dismissed as well."  *Id.*; *In re Tremont*, 703 F. Supp. 2d at 371-72.

The result is no different under Cayman Islands law.[15]  Under the "No Reflective Loss Principle," a shareholder cannot directly recover the diminution in the market value of his shares because such a "loss" is a reflection of the loss suffered by the company.  *Gardner v. Parker*, [2003] EWHC 1463 (Ch), 2003 WL 21353425 (High Court of Justice, Chancery Division), at ¶¶ 28, 29-31; *see also Winn*, 499 F. Supp. 2d at 395 (applying English law, dismissing shareholder's claims for lack of standing).  The No Reflective Loss Principle bars the claims here because the alleged loss, if any, unmistakably stems from the diminution in the value of the Austin Capital Funds due to Madoff's fraud.  *Gardner*, 2003 WL 21353425 at ¶ 41.

Because any alleged harm was suffered by the Austin Capital Funds themselves, all the claims in Counts VIII-XV are derivative.  Investors like the Texas Trust and New Mexico ERB, were harmed only indirectly through an impairment in the value of their limited partnership interests and thus lack standing to sue directly.  *Nauslar*, 170 S.W.3d at 250 ("Plaintiffs do not have a separate, individual right of action for injuries to the partnership that diminished the value of their ownership interest in that entity."); *accord Baker v. Andover Assocs. Mgmt. Corp.*, Index No. 6179/09, slip op. at 17 (N.Y. Sup. Ct. Nov. 30, 2009) (dismissing claims brought by an investor in a Madoff-exposed fund on the ground that claims were derivative).[16]  For these reasons, the Texas Trust's and New Mexico ERB's claims for breach of fiduciary duty, unjust enrichment, breach of contract, and gross negligence must be dismissed.

### D.     The Unjust Enrichment Claim Fails Because There Is A Contract.

Plaintiffs' claim for unjust enrichment must be dismissed because there is an actual written agreement covering the relationship between the New Mexico ERB and Austin Capital.  *See, e.g.,*

---

[15] When, as here, Cayman law is silent on the issue, principles of English law control.  *See Winn v. Schafer*, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007).

[16] In addition to preemption and lack of standing, plaintiffs' derivative claim for breach of contract fails because plaintiffs have not identified any contractual provision that has been breached.

*Goldman v. Metro. Life Ins. Co*., 5 N.Y.3d 561, 572 (2005); *see also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co*., 70 N.Y.2d 382, 388 (1987); *Metro. Elec. Mfg. Co. v. Herbert Constr. Co., Inc.*, 583 N.Y.S.2d 497, 498 (N.Y. App. Div. 1992).  Here, the Safe Harbor QP agreement not only covers the same subject matter as the unjust enrichment claim, but is a necessary predicate to the cause of action.  Through its unjust enrichment claim, the New Mexico ERB is seeking to recover fees that were paid pursuant to the Safe Harbor QP agreement.  (*See* ¶ 188.)  That claim is identical to the contract claim.  (*Compare* ¶ 190 (alleging defendants breached the Safe Harbor QP agreement by not using care in selecting its managers), *with* ¶ 184 (claiming that the management fees are unjustified because defendants did not use care in selecting fund managers).)  Because any recovery for the unjust enrichment claim would necessarily be based on an existing contract, the claim must be dismissed.  *See Baker*, Index No. 6179/09, slip op. at 28 ("Because there is no dispute that the Defendants' receipt and retention of fees was made pursuant to the various agreements, there is no dispute that there exists a written contract covering the subject matter of this cause of action and Plaintiff's claim for unjust enrichment . . . shall be dismissed.").

## VII.    The Texas And New Mexico Blue-Sky Claims Must Be Dismissed.

The Texas blue-sky claim (Count XV) fails because it sounds in fraud and, as explained above, none of the claims in the Complaint are pleaded with particularity.  (*See infra* at 13-26.)  It also fails because SLUSA preempts covered class actions under state law—statutory or common law—based on misrepresentations or omissions like those alleged here.  The claim under Texas Revised Civil Statute Article 581-33, just like the preempted common-law claims, arise from purported "untrue statements of material facts or omissions to state a material fact."  (¶ 212.)

The claim under New Mexico securities law (Count XIV), fails for the same reasons the Texas claim fails.  Moreover, the New Mexico blue-sky claim also fails because the statute under

which the Complaint proceeds, N.M. Stat. Ann. § 58-13C-509, did not become effective until January 1, 2010 and does not apply to sales of securities before 2010.

## VIII.   The Claims Against Defendant Dugas Must Be Dismissed.

The Complaint names Ronald Dugas, a member of Austin Capital's board, as a defendant. (¶ 22.)  Though the Complaint asserts that Mr. Dugas "controlled the investment assets" of the Austin Capital Funds in 2009, it does not allege that he did so at any time during the putative class period, and it cites a Form ADV filed eight months *after* the putative class period as the sole basis for including him in the case.  (*See* ¶ 41 (citing 7/17/09 Form ADV Part II, Ritts Decl. Ex. K).) Absent an allegation (which plaintiffs cannot make) that Mr. Dugas filled some capacity at Austin Capital during the putative class period, the claims as to him must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss the Complaint in its entirety.

Dated:  December 23, 2010                                     Respectfully submitted,


                                                             s/ Harold K. Gordon
                                                             _____
                                                             Harold K. Gordon
Of Counsel:                                                  JONES DAY
                                                             222 East 41st Street
Richard J. Bedell, Jr.                                       New York, NY  10017-6702
Geoffrey J. Ritts                                            Tel:  212-326-3939
Louis A. Chaiten                                             Fax:  212-755-7306
Peter G. Hilbert
JONES DAY                                                    Attorney for Defendants
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
Tel:  216-586-3939
Fax:  216-579-0212

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

IN RE AUSTIN CAPITAL MANAGEMENT, )   Case No. 1:09-MD-02075-TPG
LTD. SECURITIES & EMPLOYEE            )
RETIREMENT INCOME SECURITY ACT  )   **Hon. Thomas P. Griesa**
(ERISA) LITIGATION                           )
                                                        )
                                                        )
                                                        )
                                                        )
_____

## CERTIFICATE OF SERVICE

I certify that on December 23, 2010, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

s/ Harold K. Gordon
_____
Harold K. Gordon

One of the attorneys for Defendants